Claire Loebs Davis, WSBA #39812
Dakota Rash, WSBA #57299 (admission to ED WA pending)
ANIMAL & EARTH ADVOCATES, PLLC
2226 Eastlake Ave E #101
Seattle, WA 98102
Tel: (206) 601-8476
claire@animalearthlaw.com
dakota@animalearthlaw.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KETTLE RANGE CONSERVATION GROUP,<br><br>Plaintiff,<br><br>    v.<br><br>U.S. FOREST SERVICE, GLENN CASAMASSA, Pacific Northwest Regional Forester, U.S. Forest Service, RODNEY SMOLDON, Forest Supervisor, Colville National Forest, TRAVIS FLETCHER, District Ranger, Republic Ranger District, U.S. Forest Service.<br><br>Defendants. | Case No. 2:21-cv-161<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act |

COMPLAINT – 1

## I.   INTRODUCTION

1.     Plaintiff Kettle Range Conservation Group ("KRCG" or "Plaintiff") challenges the final decision by the United States Forest Service ("Forest Service") to proceed with the Sanpoil Project ("the Project"), because of its failure to perform a meaningful analysis of the environmental impacts of allowing timber harvests, controlled burns, and road work within 47,956 acres (the "Project Area") of the Colville National Forest ("Colville Forest" or "Forest"). KRCG also challenges the Forest Service's final decision approving the 2019 Colville National Forest Land Management Plan ("2019 Forest Plan" or "Plan"), because it fails to protect old-growth trees from logging through projects such as the Sanpoil Project.

2.     The Project Area lies in the heart of the majestic Kettle River Range, a remote landscape that features mountain peaks rising to more than 7,000 feet, towering forests of old-growth ponderosa pine, open sagebrush meadows, and countless lakes, rivers, creeks, streams, and wetlands. The Project Area features spectacular hiking trails and sections of remote wilderness, including three Inventoried Roadless Areas ("Roadless Areas") and a large portion of the Bald Snow Recommended Wilderness Area.

3.     The Project Area is also home to a wide variety of plants and animals, including many species categorized as sensitive, threatened, or endangered by either the federal government or the state of Washington. Packs of state endangered gray

1  wolves roam through the Project Area, where cameras have also captured images of

2  rare Canada lynx, while the Project Area also provides valuable habitat for grizzly

3  bear and wolverine. Whitebark pine trees cling to the mountains at the harshest

4  elevations, old-growth forests provide nesting habitat for the northern goshawk and

5  sensitive species of woodpecker, and lowland riparian areas support sensitive

6  species of bat, frog, and trout.



*A whitetail buck pauses in a Sanpoil Project Area meadow. Photo courtesy of KRCG.*

7      4.    The Sanpoil Project would allow timber harvests in 8,410 acres of the

8  Project Area and prescribed burns in another 19,129 acres, which would open 10,585

9  acres for increased cattle grazing, and require the construction of 4 miles of

10  temporary roads and improvements to 8 miles of crude "non-system" roads. This

11  activity would significantly impact Forest ecosystems—transforming complex

COMPLAINT – 3

forests into clear-cut wastelands, damaging stands of old-growth trees, spreading invasive species, degrading riparian areas, compromising unique habitats, severing vital wildlife corridors, despoiling pristine wilderness and prime recreational areas, and displacing sensitive, threatened, and endangered species.

5.    The National Environmental Policy Act ("NEPA") requires the Forest Service to take a "hard look" at such potential environmental impacts before approving a project. The Forest Service did not do so here. It failed to describe or analyze how the Project would affect specific areas, habitats or features within the Project Area, skimmed over its potential direct impacts to sensitive, threatened, and endangered species, and disregarded the potentially grave cumulative impact the Project might have on the Forest ecosystem when combined with several other recent and planned timber projects in the immediate area.

6.    In designing the Project, the Forest Service also disregarded its own objectives for preserving scenic quality and the integrity of existing Forest structures—objectives set just a year earlier in the 2019 Forest Plan. The Project also puts old-growth forests at risk, because the 2019 Forest Plan removed protections for old-growth trees without proper analysis under NEPA and the National Forest Management Act ("NFMA").

7.    The Forest Service refused to consider viable alternatives for the Project that would have minimized environmental impact and preserved valuable

wilderness areas, because it was impermissibly focused on maximizing timber revenue. It also avoided doing a full analysis of the environmental impacts of the Project through an Environmental Impact Statement ("EIS"), despite the Project's broad scope, controversial nature, impact to sensitive wildlife species, and alteration of unique geological and recreational areas.

8.    Plaintiff thus challenges the Forest Service's decision to proceed with the Sanpoil Project, and its final Record of Decision ("2019 Plan ROD") for the 2019 Forest Plan, due to violations of NFMA, NEPA, and the Administrative Procedure Act ("APA").

## II.    JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA), 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), 2412 (costs and fees) and 1346 (United States as defendant). This cause of action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701-706, NEPA, 42 U.S.C. §§ 4321-4370m-12, NFMA, 16 U.S.C. §§ 1600-1614, and those statutes' implementing regulations.

10.    The actions challenged are final agency actions, properly subject to judicial review under the APA. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

11.     Plaintiff has exhausted all available administrative remedies.

12.     Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

13.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## III.   PARTIES

14.     Plaintiff KETTLE RANGE CONSERVATION GROUP is a rural, grassroots, non-profit environmental charity formed in 1976 in Republic, Washington, with a membership of about 500 people. KRCG's mission is to defend wilderness, protect biodiversity, and restore ecosystems of the upper Columbia River Basin. KRCG's work includes oversight of federal management of the Okanogan and Colville National Forests; promotion of dry and damaged forest restoration; environmental education for citizens, business, and community groups; preservation of wilderness; and protection of fish and wildlife.

15.     KRCG is a founding board member of the Northeast Washington Forest Coalition ("NEWFC"), a collaborative organization created in 2002 by groups representing the interests of the timber industry, such as Vaagen Brothers Lumber, and recreational and conservation interests, such as Conservation Northwest and the Lands Council. NEWFC's purpose is to work with the Forest Service on projects in

COMPLAINT – 6

the Colville Forest that promote ecological forest restoration, aquatic restoration, wildland protection, recreation, and economic stability in the surrounding area. NEWFC has cooperated with the Forest Service on a number of projects, and in 2009, it helped the Forest Service develop a project called Northeast Washington Forest Vision 2020 ("Vision 2020"), which received funding through the Collaborative Forest Landscape Recreation Act ("CFLRA"). Because NEWFC operates by consensus, all board members, including KRCG, must approve any comments and objections submitted to the Forest Service. The Sanpoil Project marked the first time NEWFC had ever filed an objection to a Forest Service project.

16.     KRCG brings this action on its own behalf and on behalf of its members and supporters, many of whom live near the Project Area, and who visit it for recreational and professional pursuits. Plaintiff's members, supporters, and staff enjoy using the Project Area for recreation, including hiking, skiing, camping, backpacking, boating, fishing, and wildlife viewing. Plaintiff's members, supporters, and staff have engaged in these activities in the past and intend to do so again in the near future. They gain aesthetic enjoyment from the beauty of the Project Area, including the old-growth forests, subalpine meadows, and diverse riparian areas that would be impacted by commercial logging, road construction, burning, and increased grazing. Plaintiff's members also enjoy observing, attempting to observe, hearing, seeing evidence of, and studying many species of fish and wildlife

that live in the Project Area, including the many sensitive, threatened, and endangered species that the Project may displace. The opportunity to enjoy the beauty of the Project Area and its wildlife is of significant interest and value to Plaintiff's members, supporters, and staff, and they are dedicated to ensuring the long-term health of the Forest as a whole. The legal violations alleged in this Complaint therefore cause direct injury to the aesthetic, conservation, recreational, scientific, educational, inspirational, and wildlife preservation interests of KRCG and its members, supporters, and staff.

17.    KRCG's members, supporters, and staff have an interest in ensuring that the Forest Service fulfills its obligation to manage the Forest as a whole, and the Project Area specifically, in a manner that does not impair the diversity, viability, or resiliency of the landscape and native wildlife.

18.    On its own and through its membership in NEWFC, KRCG participated in the comment and objection phases of the development of the Sanpoil Project and the 2019 Forest Plan, acting behalf of its members, supporters, and staff, who have an interest in ensuring that the Forest Service complies with all applicable federal statutes and regulations while authorizing forest management projects. Plaintiff's members, supporters, and staff have an interest in ensuring that the Forest Service fulfills its obligation to manage the Forest in a manner that does not impair the diversity, viability, or resiliency of either the ecological values of the forest, or the

COMPLAINT – 8

native wildlife that live there. The interests of KRCG and its members, supporters, and staff have been, and are being, adversely and irreparably injured by Defendants' failure to comply with federal law, and this injury would continue until and unless the relief requested in this Complaint is granted. These are actual, concrete injuries, traceable to Defendants' conduct, that would be redressed by the requested relief.

19.    Defendant U.S. FOREST SERVICE is an agency of the United States within the Department of Agriculture and is charged with managing the public lands and wildlife of the Colville National Forest, in accordance and compliance with NEPA, NFMA, the APA, and their implementing regulations.

20.    Defendant GLENN CASAMASSA is the Pacific Northwest Regional Forester for the Forest Service. He is sued in his official capacity as the decisionmaker who signed the final Record of Decision for the 2019 Forest Plan challenged herein.

21.    Defendant RODNEY SMOLDON is the Forest Supervisor for the Colville National Forest, responsible for its management in compliance with NEPA, NFMA, and the APA. Defendant Smoldon is sued in his official capacity.

22.    Defendant TRAVIS FLETCHER is the District Ranger for the Republic Ranger District, named as the responsible official for the Sanpoil Project. Defendant Fletcher is sued in his official capacity.

# IV.    LEGAL FRAMEWORK

## A. National Forest Management Act

23.    NFMA is the primary statute governing the administration of national forests. 16 U.S.C. §§ 1600-1614. NFMA and its implementing regulations provide for forest planning and management by the Forest Service on both the forest level and the individual project level.

24.    At the forest level, NFMA requires the Forest Service to develop, maintain, and revise a Land and Resource Management Plan ("Forest Plan") for each national forest. 16 U.S.C. § 1604(a). Forest Plans consist "of broad, long-term plans and objectives for the entire forest." *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1109 (9th Cir. 2018). They are "designed to manage forest resources by balancing the consideration of environmental and economic factors." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

25.    A Forest Plan must establish natural resource management practices forest-wide, and provide for sustained yields and multiple uses, including the coordination of outdoor recreation, livestock grazing, timber harvest, and soil conservation, as well as the protection of watersheds, riparian areas, wilderness, and fish and wildlife species habitat and diversity. 16 U.S.C. § 1604(e), (g). The Forest Service must provide for and foster public participation in the development, review, and revision of Forest Plans. *Id.* § 1604(d).

26.     NFMA also requires the Forest Service to adopt additional regulations for its Forest Plans. *Id.* § 1604(g)(3). These guidelines must ensure that Forest Plans "provide for diversity of plant and animal communities" and "for steps to be taken to preserve the diversity of tree species." 16 U.S.C. § 1604(g)(3)(B).

27.     The Forest Service adopted forest planning regulations in 1982. 47 Fed. Reg. 43,026-43,052 (Sept. 30, 1982) ("1982 Rules").[1] The Forest Service revised these regulations in 2012, but included transitional provisions allowing it to elect to apply the 1982 Rules to the development or revision of Forest Plans initiated prior to 2012. 36 C.F.R. § 219.17(b)(3). The Forest Service elected to apply the 1982 Rules to the development of the 2019 Forest Plan, which it began in 2003.

28.     The 1982 Rules define "diversity" as the "distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 1982 Rules § 219.3. The Rules further specify that "diversity shall be considered throughout the planning process" and "inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition." 1982 Rules § 219.26.

29.     The 1982 Rules also require that "wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate

---

[1] Also available at https://www.fs.fed.us/emc/nfma/includes/nfmareg.html. In this Complaint, citations to the 1982 Rules will be in the form "1982 Rules § 219.xx."

species in the planning area." 1982 Rules § 219.19. To meet this requirement, the Forest Service must ensure that sufficient habitat is "well distributed" throughout a forest planning area. *Id*.

30. The 1982 Rules require a Forest Plan to designate certain "management indicator species," whose "population changes are believed to indicate the effects of management activities," including those activities that affect "vegetation type [and] timber age classes[.]" 1982 Rules § 219.19(a)(1). Planning alternatives are to be evaluated in terms of "both amount and quality of habitat and of animal population trends of the management indicator species." 1982 Rules § 219.19(a)(2).

31. Under NFMA, all site-specific actions must be consistent with the governing Forest Plan. 16 U.S.C. § 1604(i); *see* 1982 Rules § 219.15 ("vegetation management practices…shall be defined in the forest plan with applicable standards and guidelines and the reasons for the choices"). A project or activity is consistent if it conforms to the components of a Forest Plan, including its standards, guidelines, and desired conditions. *All. for the Wild Rockies*, 907 F.3d at 1110.

32. When undertaking projects that involve "vegetative manipulation of tree cover," the Forest Service must choose alternatives that are "best suited to the multiple-use goals established for the area with potential environmental, biological, cultural resource, aesthetic, engineering, and economic impacts," as stated in the

applicable Forest Plan, and not select alternatives "primarily because they will give the greatest dollar return or the greatest output of timber[.]" 1982 Rules § 219.27.

## B. National Environmental Policy Act

33.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two fundamental purposes: (1) to guarantee that agencies take a "hard look" at the consequences before taking an action, by ensuring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts"; and (2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-350 (1989).

34.     To that end, NEPA requires federal agencies to prepare a detailed EIS for all major federal actions that may significantly affect the quality of the human environment. *See* 42 U.S.C. § 4332(C). An agency may first prepare an Environmental Assessment ("EA") to determine whether it needs to prepare an EIS. 40 C.F.R. §§ 1501.4(b); 1508.9.[2] An EA is a concise public document that briefly

---

[2] The Council on Environmental Quality ("CEQ") promulgates regulations implementing NEPA that are binding on all federal agencies. 40 C.F.R. §§ 1500-1518.4. In 2020, CEQ adopted new NEPA regulations with an effective date of September 14, 2020. *See* 85 Fed. Reg. 43304-43376. The prior regulations were still

1  describes the proposal, examines alternatives, considers environmental impacts, and

2  provides a list of individuals and agencies consulted. 40 C.F.R. § 1508.9. If the

3  agency concludes there is no significant impact associated with the proposed project

4  or activity, it may issue a Finding of No Significant Impact ("FONSI") in lieu of

5  preparing an EIS. 40 C.F.R. § 1501.4(e).

6      35.    NEPA analyses must consider a range of reasonable alternative actions

7  and thoroughly assess direct, indirect, and cumulative environmental effects of the

8  proposed alternatives. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502 and 1508.

9  Cumulative effects are "the impact on the environment which results from the

10  incremental impact of the action when added to other past, present, and reasonably

11  foreseeable future actions regardless of what agency (Federal or non-Federal) or

12  person undertakes such other actions." 40 C.F.R. § 1508.7. To take the required

13  "hard look," agencies must consider all past, present, and "reasonably foreseeable"

14  future impacts, even when preparing an EA. *Idaho Sporting Congress, Inc. v.*

15  *Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

---

in place when the 2019 Forest Plan was adopted, and the Forest Service chose to
apply those regulations to the Sanpoil Project, which was nearly final when the 2020
regulations became effective. *See, e.g.,* Draft Decision Notice and Finding of No
Significant Impact ("Draft Sanpoil FONSI") at 7 (evaluating finding of no
significant impact based on the standards of pre-2020 regulations). All citations to
NEPA regulations thus refer to the pre-2020 regulations.

COMPLAINT – 14

36.     When an agency proposes a project that would be implemented without further, site-specific NEPA review, it must disclose the details of its proposed action at a site-specific level and perform a detailed environmental analysis of the reasonably foreseeable impact of those site-specific actions. *See Se. Alaska Conservation Council v. United States Forest Serv.*, 443 F. Supp. 3d 995, 1006, 1011-12 (D. Alaska 2020).

37.     Agencies are required to evaluate both the context and intensity of an action to determine the significance of its impact on the environment. 40 C.F.R. § 1508.27. Context refers to the significance of the action with regard to society as a whole, the affected region, the affected interests, and the locality. *Id*. § 1508.27(a). Both short- and long-term effects are relevant to the action's context. *Id*.

38.     In evaluating intensity, an agency must consider ten "significance" factors, including: (1) impacts that may be both beneficial and adverse; (2) any effects on public health or safety; (3) unique characteristics of the geographic area, such as proximity to ecologically critical areas; (4) the level of controversy about potential environmental effects; (5) the degree of uncertainty, or existence of unique or unknown risks; (6) if it sets possible precedent for future actions; (7) the cumulative impacts of the action and other related actions; (8) any effect on scientific, cultural, or historical resources; (9) any effect on an endangered or

threatened species or its habitat; and (10) if the action might violate federal, state, or local requirements imposed to protect the environment. 40 C.F.R. § 1508.27(b).

39.     The presence of any of these factors is sufficient to indicate the project may have a significant impact to the environment, necessitating the preparation of an EIS. *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008). Indeed, an agency must prepare an EIS if any substantial questions exist regarding whether an action may have a significant effect on the environment, including if it may have a cumulatively significant effect when considered along with other past, present, and reasonably foreseeable actions. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

40.     Once it determines that an action may have a significant effect on the environment, an agency must develop and publish a draft EIS, and then solicit comments from the public. 40 C.F.R. §§ 1502.9 and 1503. An agency must respond to those public comments in its final EIS, including addressing any scientific evidence cited in those comments that contradicts its conclusions. 40 C.F.R. §§ 1502.9(b), 1503.4; *see Ctr. for Biological Diversity v. United States Forest Serv.*, 349 F.3d 1157, 1167-68 (9th Cir. 2003). Agencies "must respond explicitly and directly to conflicting views in order to satisfy NEPA's procedural requirements." *Earth Island Institute v. Forest* Service, 442 F.3d 1147, 1172 (9th Cir. 2006).

41.    The Forest Service uses the NEPA process at both broad, programmatic levels, including the development of Forest Plans, and at the individual project or "site-specific" level, including the development of logging projects.

**C. Administrative Procedure Act**

42.    Agency actions taken pursuant to NFMA and NEPA are reviewable under the APA, which provides a right of judicial review to persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute[.]" 5 U.S.C. § 702.

43.    Under the standards of the APA, an agency action is unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A rule or decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## V.   FACTS

### A. Project Area Includes Diverse Landscapes and Wilderness Areas

44.   The Project encompasses 47,956 acres within the Republic Ranger District of the Colville Forest. The Project Area lies in the heart of the Kettle River Range—2,700 square miles of rugged mountains and diverse landscapes, ranging from old-growth forests to subalpine meadows to riparian habitats, with wetlands, springs, rivers, and lakes. The Project Area contains a mix of forest types: stands of Douglas-fir and old-growth ponderosa pine are interspersed with mesic spruce, while subalpine fir predominates around riparian ecosystems.

45.   The Project Area offers myriad recreational opportunities, including hiking, camping, mountain biking, horseback riding, Nordic skiing, snowshoeing, hunting, fishing, and seasonal berry picking. Hikers enjoy the spectacular vistas the area has to offer on sections of the Pacific Northwest National Scenic Trail, Kettle Crest National Recreation Trail, Edds Mountain Trail, Thirteenmile Trail and the Snow Peak Trail.

46.   The Project Area encompasses two Roadless Areas, Cougar Mountain and Thirteenmile, and contains a portion of a third, the Bald Snow Roadless Area. Roadless Areas are specific parcels of land with wilderness characteristics that the Forest Service has designated for special protection, and in which road construction and commercial timber harvesting is prohibited.

*Map from Sanpoil EA, displaying the large portion of the Project Area covered by Cougar Mountain, Thirteenmile, and Bald Snow Roadless Areas, and the Bald Snow Recommended Wilderness Area.*

47.    The Project Area also overlaps a portion of the Bald Snow Recommended Wilderness Area. If the Forest Service's recommendation is approved by Congress, this area would be preserved through the National Wilderness Preservation System, and thus recognized as "an area where the earth and its community of life are untrammeled by man[.]" 16 U.S.C. § 1131(c).



*View of Thirteenmile Roadless Area within the Project Area. Photo courtesy of KRCG.*

**B. Project Area is Home to Sensitive, Threatened, and Endangered Species**

48.    The Project Area is home to a rich diversity of species, ranging from deer, elk, and moose, to cougar, bobcat, and black bear. Its forests host numerous bird species, including owls, hawks, and woodpeckers, while its riparian habitats are home to several varieties of frogs, salamanders, and trout.

49.    Numerous species in the Project Area have been designated as sensitive, threatened, or endangered—either nationwide or within the state of Washington. Whitebark pine, a candidate for the federal endangered species list, inhabits the harshest subalpine locations, and serves vital ecological functions such as preventing soil erosion, retaining snowpack, and sustaining birds and bears.

Meanwhile, old-growth forests within the Project Area provide unique habitat for many species, including populations of northern goshawks, which are a sensitive species for Forest Service Region 6, the region that includes the Colville Forest, as well as candidates for the state endangered species list. Logging is the largest threat to the survival of northern goshawks in Washington.

50.    These primeval forests are also inhabited by the pileated woodpecker, another candidate for the state endangered species list, and provide habitat for white-headed woodpecker, a Region 6 sensitive species and state candidate species, and the great gray owl, a Region 6 sensitive species.

51.    The Western bumblebee, a Region 6 sensitive species that is in rapid decline throughout the West, inhabits the meadows in the Project Area. Meanwhile, riparian areas are home to the little brown bat, another Region 6 sensitive species, and the Townsend's big-eared bat, a Region 6 sensitive species and state candidate species, which is threatened by human disturbance and destruction of its roost sites. The area's cold streams contain populations of interior Redband trout, a Region 6 sensitive species, while the Columbia spotted frog, a state candidate species, is suspected to live in its shallow ponds and backwaters.

52.    The Project Area is also a vital habitat corridor and prime habitat for the gray wolf, grizzly bear, wolverine, and Canada lynx.

53.    The Forest Service indicates that two packs of gray wolves, the Strawberry and Nc'icn Packs, have territories that include portions of the Project Area, while the Washington Department of Fish and Wildlife ("WDFW") reports that a newer pack, the Kettle Range Pack, has settled into territory just to the north of the area. Gray wolves are a Forest Service Region 6 sensitive species, and a state-listed endangered species.[3]

**Seclusion/core habitat for grizzly bears in the Sanpoil project area**



*Figure 2 from the Sanpoil Project BE shows core habitat for grizzly bears in the Project Area.*

54.    One of the two recovery areas for grizzly bear in Washington, the Selkirk Mountains Grizzly Bear Recovery Area, crosses into the northern portion of the Forest near the Canada border, and is thought to have a population of at least 50

---

[3] Washington law defines "endangered" as any wildlife species native to the state of Washington that is seriously threatened with extinction throughout all or a significant portion of its range within the state. WAC 232-12-297.

to 60 grizzly bears. Although grizzly bears have not been documented in the Project Area, WDFW has previously captured images of grizzly bears on its remote cameras elsewhere in the Kettle Range. The Forest Service has designated those parts of the Project Area that are at least 500 meters away from roads and motorized trails as core habitat for grizzly bear, a species that requires large expanses of undisturbed wilderness. Grizzly bears are listed as endangered in Washington and threatened across the nation, and their survival is jeopardized by increased habitat fragmentation caused by human activity.

55.     Only about 20 wolverines are estimated to live in Washington, and the species is a candidate for state protection. No wolverines have been spotted in the Project Area, but wolverines are known to live in low densities across large home ranges, and there have been confirmed sightings of the infamously elusive species elsewhere within the Kettle Range. Although the Forest Service disputes that the Project Area provides suitable denning habitat for wolverines, it concedes that it contains potential foraging habitat and vital travel corridors for the species. Wolverines are under increasing threat as climate change causes their habitat, characterized by deep snow and high altitudes, to become increasingly fragmented.

56.     The eastern side of the Project Area overlaps with two Lynx Analysis Units ("LAUs"): the West Sherman LAU and the Hall Creek LAU. LAUs contain core habitat components required to support the Canada lynx, a federally listed

threatened species. Washington has listed the lynx as a state endangered species

because of its "small and restricted population, and an increase in the number and



*Figure 1 from the Sanpoil Project BE shows habitat potential within two Lynx Analysis Units.*

severity of threats" to the species. Lynx prefer boreal forests that contain subalpine

fir and lodgepole pine forest cover, and require healthy populations of snowshoe

hare. Lynx are a rare sight in Washington, but a camera trap survey performed in

2016 and 2017 captured three photos of lynx in and just outside the Project Area.

57.     A March 2020 article in The Journal of Wildlife Management

documents these camera traps, which caught four pictures of lynx in the whole Kettle

Range area. *See* King et al., *Will Lynx Lose Their Edge? Canada Lynx Occupancy

in Washington,* 84 The Journal of Wildlife Management 705, at 8 (May 2020) ("2020

Lynx Study"). Researchers could not determine if the photographs indicated a small

resident population of lynx or transient individual lynx. *Id.* at 13. However, the 2020 Lynx Study notes that the Kettle Range was once a stronghold for lynx, and still provides the second largest block of potential habitat for lynx in the state. *Id.* at 3.

58.    The 2020 Lynx Study discusses the "precarious status of lynx in Washington today and in the future," and emphasizes that as the climate warms, preserving the species within the state will probably require "maintaining the greatest quantities of lynx habitat at high elevation as possible refugia…where favorable snow conditions may persist for some time." *Id.* at 14. The study's data supports other recent studies indicating it may take 35-40 years for lynx habitat in Washington to regenerate after it is damaged by fire or certain forest treatments. *Id.* at 12; *see also* Holbrook et al., *Spatio-temporal responses of Canada lynx (Lynx canadensis) to silviculture treatments in the Northern Rockies*, 422 U.S. Forest Ecology and Management 114, 114-124 (2018).

## C. Forest Service Approves Several Timber Projects in Same Area

59.    Within the last decade, the Forest Service has approved at least eleven timber harvest projects within the Colville Forest, which have impacted at least 179,331 acres. The Forest Service implemented seven of these projects in areas that

1  are either adjacent or in close proximity to the Sanpoil Project. [4] The Forest Service

2  plans to start two more projects in this same area over the next two years.



*Map of Forest Service projects in the vicinity of the Sanpoil Project. Courtesy of KRCG.*

3        60.    In 2011, the Forest Service approved **the Kettle Face Fuel Reduction**

4  **Project ("Kettle Face Project")** following a FONSI, authorizing 16,203 acres of

5  ongoing  treatments,  including  various  forms  of  logging,  such  as  "commercial

---

[4] Six of these projects are depicted in the KRCG map, above. The West Zone Project is not shown because it was implemented in scattered pockets around the Forest.

thinning" and "precommercial treatments," and prescribed burns, which the Forest Service calls "fuels treatments." The Forest Service evaluated the "cumulative effects area" for lynx for this project as all of the "LAUs on the Kettle Crest, which cover a total of about 199,000 acres." Kettle Face EA, Chapter 3 at 161.

61.    In 2012, the Forest Service approved the 6,555-acre **Walker Fuels Reduction Project ("Walker Project")** following a FONSI, authorizing "commercial thinning," "precommercial treatments," and "fuels treatments."

62.    In 2013, the Forest Service approved the **West Zone Project** subject to a categorical exclusion to NEPA, and as a result, it did not evaluate the project's potential environmental impacts. This project applied "precommercial thinning" to 2,099 acres scattered across different portions of the Colville Forest.

63.    The Forest Service approved the **Deer Jasper Restoration Project ("Deer Jasper Project")** in 2014, again following a FONSI, allowing timber treatments over 25,128 acres, including "commercial thinning," "shelterwood removal," and "underburning."

64.    In 2016, the Forest Service authorized the **Sherman Pass Project**, authorizing timber harvests and burns over 34,043 acres directly adjacent to the Sanpoil Project Area. *See* Environmental Assessment for the Sherman Pass Project ("Sherman EA") at 6. The Sherman Pass Project involves 7,998 acres of "mechanical thinning," 7,366 acres of "mechanical ladder fuels reductions," and 7,322 acres of

"non-mechanical thinning," along with 4,475 acres of "underburning" and 3,984 acres of "mechanical piling and pile burning." *Id*. at 23-25. The project authorized the construction of 20 miles of temporary road, along with repairs and reconstruction of another 90 miles of existing road. *Id.* at 27-30.

65.     The Forest Service acknowledged the Sherman Pass Project would effect threatened, sensitive, and endangered species, and evaluated its cumulative effects along with past and anticipated future projects in nearby areas, including the Sanpoil Project. The Forest Service noted that "at least four wolf packs travel the cumulative effects area," and that the Sherman Pass Project, along with the "Orient, Deer-Jasper, [and] Sanpoil" may reduce habitat suitability for gray wolves by reopening roads and allowing increased access for poachers. *Id*. at 113-14.

66.     The Forest Service indicated the project would include "harvest in high-quality foraging habitat" for Canada lynx, which "could adversely affect" the species. Sherman Pass TES Report at 61. It estimated the project would impact 1,020 acres of lynx denning habitat, including portions of the West Sherman LAU. *Id*. at 60; *see also id*. at 55. The Forest Service recognized it had already "harvested timber in several Lynx Analysis Units within the cumulative effects analysis area," including in the Walker Project immediately to the north. Sherman EA at 116. It predicted that cumulative impacts from its projects could decrease the quality of the

lynx habitat corridor, while an associated increase in road density might reduce foraging habitat for snowshoe hare, primary lynx prey. *Id*.

67.   The Forest Service predicted the Sherman Pass and Sanpoil projects would increase grazing range and "produce changes in livestock management, habituation of livestock on the landscape, changes in natural barriers, and changes to the available forage base." *Id*. at 94. It acknowledged that "implementation of the Walker, Deer Jasper, and Sanpoil projects may reduce access to the Kettle Crest National Recreation Trail." Sherman EA at 91. Taken together, these projects would "result in a cumulative decline in the level of natural and undeveloped environment, outstanding opportunities for solitude, and primitive and unconfined recreation" associated with proposed wilderness areas, including Bald Snow. *Id*. at 90.

68.   The Forest Service indicated the Sherman Pass Project would provide more "open" views into the Forest, and maintain "mosaic stand conditions," by leaving tree clumps, canopy gaps, and complex patches of vegetation. *Id*. at 145. Overall, the project was purportedly designed to create "[l]andscape character changes [that] would be seen as thinned stands of trees and a more open forested canopy character." *Id*. at 146.

69.   Following implementation, however, KRCG and other members of NEWFC complained the Forest Service had provided incomplete and misleading information about how treatments in the Sherman Pass Project would be applied,

1    and allowed "heavy-handed shelterwood logging" and "clearcuts" in sensitive and

2    scenic areas.



*At left, a photograph from a parking area adjacent to the Sherman Pass following project "treatments." At right, untreated forest area roughly 100 yards away. Photos courtesy of KRCG.*

3        70.    In 2018, the Forest Service approved the **Orient Watershed Project**

4    ("Orient Project") following a FONSI. This project allowed timber harvests over

5    9,670 acres of the Colville and prescribed burns over 6,570 acres. The Forest Service

6    described the scope for analyzing cumulative impacts to lynx as consisting of "the

7    LAUs on the Kettle Crest, which cover a total of about 199,000 acres." Orient Project

8    BE at 24. In its cumulative effects analysis, the Forest Service thus considered

9    several large projects planned for that area, including the Sanpoil Project. *Id*. at 24.

10       71.    In 2019, the Forest Service approved the **Trout Lake Insect and**

11   **Disease Restoration Project** ("Trout Lake Project") based on a NEPA categorical

exclusion**,** allowing 2,973 acres of commercial thinning, larger-scale "regeneration" cuts, and fuel reduction treatments. Most of the Trout Lake Project Area was marked for "commercial thinning" with "regeneration," although the Forest Service indicated it would retain clumps of larger trees, and only allow clearcuts in very limited circumstances. In all areas, the Forest Service indicated it would leave large, downed logs, woody debris, and "snags."[5]



*Unit 7 of the Trout Lake before "treatment," showing a mix of Douglas-fir, ponderosa pine, and western larch, including both healthy trees and snags. Photo courtesy of KRCG.*

---

[5] "Snags" are dead or dying trees that are still standing, and left to decompose naturally. Birds, small mammals, and other wildlife, including owls and woodpeckers, use snags for nests, nurseries, storage areas, foraging, roosting, and perching.

COMPLAINT – 31



*Unit 7 of the Trout Lake Project after "treatment," showing a large clearcut with no snags or downed logs. Photo courtesy of KRCG.*

72.     The Forest Service plans to start the **Bulldog Project** as early as the summer of 2021. The Bulldog Project will encompass 44,000 acres to the northeast of the Sanpoil Project, implementing prescribed burns and timber harvests over 15,405 acres. Among other effects, the Bulldog Project will impact the U.S. and Indian LAUs (where lynx footprints were found in 2020), as well as three known territories of the Northern goshawk, the territory of one known wolf pack, and potential habitats for grizzly bear and wolverine. The project's timber harvests are expected to result in increased stream temperature and sedimentation.

73.     Meanwhile, the Forest Service is also planning the **Dollar Mountain Project** for 2022, which will encompass 50,784 acres directly east and adjoining the Sanpoil Project, and which will likely involve commercial timber harvests, thinning, and prescribed burns. This Dollar Mountain Project will overlap with 9,300 acres of the Bald Snow Roadless Area.

**D. 2019 Forest Plan Sets New Guidelines for Forest Conditions**

74.     In 2019, the Forest Service issued the 2019 Plan ROD, adopting a Revised Colville Forest Plan to replace the Colville National Forest Land and Resource Management Plan approved in 1988 ("1988 Forest Plan").

75.     In the 1988 Forest Plan, the Forest Service identifies the pileated woodpecker and American marten as management indicator species to help monitor the health of habitats with large, old-growth trees. *See* Environmental Impact Statement for 1988 Forest Plan at III-35, Table III-4. However, the Forest Service abruptly stopped monitoring these species less than a decade later—the last time either species was mentioned in a Forest Service monitoring report was in 1997.

76.     In 1995, the Forest Service amended the 1988 Forest Plan to include the Revised Interim Standards for Timber Sales on Eastside Forests ("Eastside Screens Standard"), which prohibits the harvest of trees greater than 21 inches in diameter. *See* Final Programmatic Environmental Impact Statement for the 2019 Plan ("2019 Plan FEIS") at 47. The Forest Service generated the Eastside Screens

Standard based on recommendations from a panel of experts assembled from several prominent scientific organizations, following a collaborative study on the necessity of protecting old-growth forests that was requested by Congress.

77.    The 2019 Forest Plan eliminates the Eastside Screens Standard and its prohibition on harvesting trees greater than 21 inches. 2019 Plan ROD at 8. Instead, it outlines multiple instances where the Forest Service would allow removal of trees with diameters over 20 inches, including to protect public health or safety, limit the spread of infestation or disease, facilitate management of emergency situations, "meet, promote, or maintain desired conditions for structural stages," "promote special plant habitats," and when "strategically critical to reinforce, facilitate, or improve effectiveness of fuel reduction in wildland-urban interfaces." 2019 Forest Plan at 42 ("FW-GDL-VEG-03. Large Tree Management").

78.    While it has prescriptions for the percentages of different tree species that should be present in forests with old-growth characteristics, the 2019 Forest Plan does not set a minimum amount of old-growth habitat to be preserved in the Forest.

79.    The documents supporting the 2019 Forest Plan also do not provide a qualitative assessment of the current health of old-growth stands—nor do they indicate how or whether the Forest Service continued to monitor the health of these stands after it stopped tracking the old-growth management indicator species nearly 20 years beforehand. Indeed, the Wildlife Reports supporting the 2019 Plan FEIS

draw only cursory conclusions about the status of the pileated woodpecker and American marten. It gives the woodpecker a "C" for its "Current Viability Outcome" and the marten a "B-C," without further discussion of either species.

80. The 2019 Forest Plan sets up Scenic Integrity Objectives for each management area, and mandates that project-level activities should be designed to meet those objectives. 2019 Forest Plan at 88 ("FW-OBJ-SCE-01"). An area categorized with a "high" Scenic Integrity Objective, for example, should be left in a state that "appears unaltered," so that "management activities are unnoticed and the landscape character *appears* unaltered." *Id*. at 194 (emphasis in original).

81. The 2019 Forest Plan also lists "desired conditions" for different elements of the Forest, and mandates that site-specific projects "describe any short-term, or negligible long-term, adverse effects the project may have on the maintenance or attainment of any desired condition." *Id*. at 170. One of the Plan's "desired conditions" is to move certain types of forest structure towards their "historical range of variability." *Id*. at 34 ("FW-DC-VEG-03"). Another desired condition indicates habitat conditions should be kept "consistent with the historical range of variability…and contribute to the viability of surrogate species and associated species." *Id.* at 59 ("FW-DC-WL-03").

**E. Plaintiff Submitted Comments on Forest Plan Revision**

82.    In comments on the Draft EIS for the 2019 Forest Plan, KRCG noted that the 2019 Forest Plan's approach to managing old-growth areas is ambiguous and would not improve ecological resilience. Relying on multiple scientific studies, KRCG recommended the Forest Service preserve the Eastside Screens Standard. NEWFC submitted a similar comment, criticizing the Forest Service for abandoning the Eastside Screens Standard and the scientific consensus supporting it.

83.    The Forest Service responded that the 2019 Forest Plan contains new guidelines for managing old-growth trees to replace the Eastside Screens Standard, insisting that "maintaining a [21 inch] diameter limit reduces the ability to attain the desired future condition of having a majority of most vegetation types in late structure." 2019 Plan FEIS at 1025.

84.    NEWFC objected again to the new standards for old-growth harvest in its comments to the 2019 Plan FEIS. Noting the high ecological value of old-growth stands, NEWFC challenged the departure from the Eastside Screens Standard in favor of more liberalized treatment of old-growth trees, citing to a scientific consensus that old-growth trees need additional protection. NEWFC also criticized the Forest Service for its monitoring failures, which led to a lack of reliable, baseline information about the health and prevalence of old-growth.

85.     The Forest Service responded that the new standard provides "the Forest with more flexible strategies to allow forest managers to better integrate old forest conservation goals with other land management objectives." 2019 Forest Plan —Old Growth Final Issue Paper at 3-4. The issue paper asserts that "a broad body of science now supports a more ecologically-based approach," but does not specifically identify or cite to any of this science. *Id.* at 3. The Forest Service did not address the objections regarding its failure to monitor and gather baseline data.

**F.  KRCG and NEWFC Comment on Initial Sanpoil Project Plans**

86.     The Forest Service published a scoping letter for the Sanpoil Project on December 14, 2016 and opened a comment period.

87.     NEWFC commented that the Forest Service could not adequately promote forest health and resiliency without taking larger, landscape-level restoration into account, such as the type of planning described in the Vision 2020 program. NEWFC also expressed concern about Forest Service's plans to create shaded fuel breaks, asking for more details about the activity, including proposed treatment areas and their proximity to riparian areas, Roadless Areas, and proposed wilderness. NEWFC also requested that the Forest Service consider restoration to preserve the area's old-growth.

88.     The Forest Service released a draft EA for the Project on February 6, 2019 and opened another comment period.

89.     NEWFC submitted comments on the draft EA, indicating it would not support any activities that would remove areas from potential consideration as recommended wilderness. It also questioned how the Forest Service could have completed an environmental assessment without understanding the status of the 67 miles of "existing non-system road templates" that it planned to restore.

90.     Three NEWFC board members, representing KRCG, Conservation Northwest, and the Lands Council, submitted an addendum raising additional concerns. The NEWFC board members asked the Forest Service to provide site-specific prescriptions, such as more detailed maps with numbered roads and geolocation data, to give the public critical information necessary to understand and make informed judgments about the Project's specific environmental impacts. They noted that the coarse scale of the maps provided, coupled with a lack of specificity about the proposed treatments, "makes it extremely difficult to do field survey[s] and understand what you are proposing to do." NEWFC Comment Addendum at 2.

91.     The NEWFC board members also challenged the Forest Service for failing to evaluate the cumulative effects of the Project along with the adjoining Sherman Pass Project and expressed concern about the Project's potential impact on certain sensitive species, including the Canada lynx, grizzly bear, and wolverine. Because of these potential impacts, the uncertainty over the Project's specifics, and

the potential for significant cumulative impacts, the board members called for the Forest Service to complete an EIS.

92.    The NEWFC board members expressed a deep concern that the Forest Service would allow "heavy-handed shelterwood logging" and "clearcuts," similar to what they had seen with the Sherman Pass Project. *Id*. They indicated that allowing such treatments in the upper Sanpoil watershed would ruin the views from "some of the most valuable scenic trails and high peaks in the Kettle Range" for decades to come and urged the Forest Service to give weight to these social considerations. *Id*. at 3.

93.    Finally, the board member addendum again questioned the use of shaded fuel breaks, noting they are controversial, and that science has not confirmed their efficacy at promoting forest resiliency. In particular, the board members challenged the Project's plan to place fuel breaks near Roadless Areas, which are "one of the most important biologically diverse wildland complexes" in the Forest, asserting that it was "unconscionable to suggest" that these treatments would not "significantly degrade wildlife habitat suitability." *Id*. at 1.

**G. Forest Service Releases Biological Assessment**

94.    The Forest Service prepared a Biological Assessment for the Sanpoil Project ("Sanpoil BA") and sent it to the U.S. Department of Fish and Wildlife ("Fish and Wildlife") in September 2018. The Sanpoil BA acknowledges that the Forest

Service did not have accurate estimates of wildlife within the Project Area, and that they would be "difficult if not unfeasible to obtain." Sanpoil BA at 16. In particular, the Forest Service noted it is "unlikely that all activity centers such as dens or nests have been found." *Id.* Lacking complete information, the Sanpoil BA indicates that the Forest Service assumes the Project Area is potentially occupied by listed species.

95.     The Sanpoil BA concludes that there would be no adverse impact to any federally listed species, including the lynx. It indicates that planned actions would occur in 3,638 acres of the West Sherman and Hall Creek LAUs, including 2,587 acres of lynx habitat. *Id.* at 21. Yet the Sanpoil BA concludes that there would be no adverse impact to lynx, based largely on the assumption that any negatively impacted habitat would quickly regenerate. The impacted acres of primary prey habitat, for example, would return to prime quality "within 15-20 years." *Id.* at 22. Likewise, the Forest Service suggests that any impact to lynx denning habitat would be negated after about "15 years." *Id.* at 21-2. Alternate prey habitat would similarly be negatively impacted for only "up to 20 years." *Id.* at 22. The Sanpoil BA does not provide a scientific basis for these regeneration predictions.

96.     The Sanpoil BA dismisses the recent photographs of lynx near and around the Project Area as just "one recently documented individual," although it does not explain this conclusion. *Id.* at 23. It likewise does not explain its conclusion

COMPLAINT – 40

that although this individual lynx may be "displaced," the Project is not likely to have any significant impacts on the individual. *Id.*

97.     Fish and Wildlife responded to the Sanpoil BA in December 2018 ("Fish and Wildlife Concurrence"), agreeing with the Forest Service's finding that the Project "may affect, but is not likely to adversely affect lynx." *See* FWS Concurrence at 6. The Fish and Wildlife Concurrence largely parrots the conclusions of the Sanpoil BA, including its assumption that the quality of denning habitat would be restored after 15 years, and that the 2016-2017 camera trap survey captured a photograph of only one lynx. *Id.* at 5-6. The Fish and Wildlife Concurrence also concluded that:

> "lack of lynx dens in the project area indicate lynx would remain transient through the project area, rather than residents. Disturbance during project activities may cause any individuals to be displaced from the area but the effects would be insignificant to transient individuals…Therefore the proposed action may affect, but is not likely to adversely affect lynx."

*Id.* at 6.

**H. Forest Service Releases Final EA and Draft FONSI Describing Action**

98.     On May 27, 2020, the Forest Service published the final Environmental Assessment (the "Sanpoil EA") and draft Decision Notice and Finding of No Significant Impact ("Draft Sanpoil FONSI"). The Sanpoil EA identifies three purposes for the Project: (1) to "promote forest health and resiliency"; (2) increase "water quality, watershed function, and aquatic habitat"; and (3) "[s]upport

infrastructure and jobs in the Tri-County area" through timber harvest. Sanpoil EA at 4-5.

99.    The Sanpoil EA indicates the Project is proceeding under the Vision 2020 proposal, developed in conjunction with NEWFC, and subject to CFLRA. *Id.* at 8. The Forest Service indicates the Project will fulfill the "Vision 2020 CFLRA landscape restoration strategy" to "increase ecosystem resistance and resilience to disturbance, restore old-growth structure and function, and reduce wildfire risk and fire management costs[.]" *Id.*

100.    The Sanpoil EA discusses two alternative courses of action: the "Proposed Action," which includes timber harvests, burns, and road work, and a "no-action" alternative. The Sanpoil EA mentions five alternatives the Forest Service eliminated from detailed study, including a Project that involved no temporary road construction. *Id.* at 14. The Forest Service dismissed this alternative, in part, because "there would be a substantial reduction in the amount of wood products and economic benefit in the Tri-county area." *Id*. The Forest Service also dismissed an alternative that would have eliminated treatments in the Roadless Areas, claiming that large landscape burns in these areas would improve wildlife habitat, and that roadside ladder fuel reductions were required to accomplish these large burns. *Id.* at 15.

101.    The Sanpoil EA describes three types of activities under the Proposed

Action: "silviculture treatments;" "fuels treatments;" and "roads." *Id.* at 15-16.

These treatments would be applied in "units"—polygons dividing the Project Area.

### 1. *Sanpoil EA Describes Massive Logging Project*

102.   The Sanpoil EA describes various types of logging under the Proposed

Action, including "variable density commercial thinning;" "commercial thinning

with openings for insect and disease;" "small pine thinning;" "shelterwood

treatments;" and "precommercial thin[s]." *Id.* at 16-17. The Forest Service described

how those treatments would be applied across the Project Area through a single,

small-scale map, without road numbers or geolocation data to allow those units and

their boundaries to be identified. *Id.* at 21.



*Map of proposed silviculture treatments from Figure 6 of the Sanpoil EA.*

COMPLAINT – 43

103.   In a Silviculture Report dated May 26, 2020, the Forest Service indicates how many acres of each type of logging would occur in each type of forest structure. Silviculture Report at 19. For example, "late closed" structure, defined as areas containing trees over 20 inches in diameter and canopy cover of over 40%, would be subject to 509 acres of "commercial thin and machine pile burn," 185 acres of "commercial thin with openings," and 526 acres of "precommercial thin[ning]." *Id.* Overall, the Forest Service prescribes 3,200 acres of logging within late closed structure forests, or 18% of the total Project treatments. *Id.* at 20.

104.   The Forest Service describes each type of treatment in vague, general terms. For example, "variable density commercial thinning" would target "less vigorous trees" for harvest; "commercial thinning with openings for insect and disease" treatments would leave "small group openings" in areas of "very poor vigor;" and "precommercial thin[ning] would "leave the largest, most vigorous disease free trees for the residual stand." Sanpoil EA at 16-17. The EA also lists other activities these treatments "may" involve: replanting "may occur" in the openings created via "commercial thinning with openings for insect and disease;" during "small pine thinning," openings of up to 30% of the stand "may occur;" after which planting "may occur if needed to attain full stocking levels." *Id*. Similarly, to provide hiding cover for wildlife "[w]ithin ungulate winter range, where the

opportunity exists," the Forest Service would "to the extent feasible," "retain clumps or patches of shrubs and trees to provide hiding cover." *Id.* at 32.

105.   Nowhere does the Sanpoil EA or any of its supporting documents include vital, site-specific details, including how the units on the Project map would look after harvest, what diameter of trees would be logged in each unit, how many trees would be cut down or burned in each location, when different treatments would occur relative to each other, what the spacing would be between the trees that remain, or how these treatments would vary in across single units. As applied to many areas, the descriptions are broad enough to encompass anything from a selective culling of dead and diseased trees to large clearcuts of healthy forest.



*Unit 14 of the Sherman Pass Project following "treatment." Photo courtesy of KRCG.*

COMPLAINT – 45

106.   The Sanpoil EA assumes that logging from the Project would generate 50 million board-feet of timber over a 10-year period. Sanpoil EA at 35. That many board feet would fill an estimated 10,000 to 12,000 logging trucks.

*2.   Sanpoil Project Includes Burning Large Sections of Forest*

107.   The Proposed Action includes six potential fuels treatments: "ladder fuel reductions;" "shaded fuel breaks;" "underburning;" "hand piling;" "machine piling;" and "fireline construction." *Id*. at 17-19.

108.   The Sanpoil EA provides some detail about "shaded fuel breaks," indicating they would result in trees thinned "to a spacing of 5-15 feet between the crowns of individual trees," with "larger trees with thicker bark, higher crowns, and/or fuller, vigorous crowns" preferred for retention. *Id.* at 17. The other fuel treatments are described in general, subjective terms. During underburning, "fuels" would be ignited "at a measured pace" during "predetermined burning conditions." *Id*. at 18. Meanwhile, "ladder fuel reductions," may involve "a variety of methods…includ[ing] hand felling with chainsaws, removal of small diameter trees with a feller-buncher or the mulching of understory trees with a boom mounted or vertical shaft mastication head." *Id*. at 17.

109.   Fuels treatments "may be completed during the same entry as a commercial harvest," and proper "fireline construction…may range from a few inches dug with a hand tool to a dozer line many feet wide[.]" *Id*. at 17, 19. The

1  Sanpoil EA provides a map of the Project Area, showing the vast amount of Forest

2  to be treated. *Id.* at 22.



*Map of proposed fuels treatments, from Figure 7 in the Sanpoil EA.*

3      *3. Sanpoil Project Allows Roadwork to Facilitate Logging and Burning*

4      110.  The Proposed Action would decommission 2.6 miles of road, construct

5  or reopen 12 miles of temporary roads, construct 0.25 miles of new permanent road,

6  make improvements necessary to use about 8 miles of crude "non-system" roads,

7  and engage in the "restoration" of 67 miles of "existing non-system road templates."

8  *Id.* at 16, 23, 26-27. If the non-system roads are "reasonably accessible" and have

9  "resource concerns," they would be restored through "full obliteration or hydrologic

10  stabilization," while the rest would be allowed to recover naturally. *Id.* at 27.

COMPLAINT – 47

111.   The Sanpoil EA does not indicate where the raw material for the road work would come from, and it is not mentioned in any of the supporting materials. However, internal emails indicate the Forest Service would use a gravel pit located in the northeastern portion of the Project Area, near the Gibraltar Trailhead, in an area used as a dispersed camp site. The emails acknowledge that the pit has not been included in any recent NEPA reviews and should be in the Sanpoil analysis.

112.   While the Sanpoil EA includes two maps identifying the location of all other proposed road activities, neither map shows the 67 miles of "existing non-system road[s]" identified for restoration. *Id*. at 24-25, 27. The Forest Service acknowledged that that when it issued the EA, the condition and status of these roads had still "not been validated by field surveys." *Id*. at 27.

## I.   Sanpoil EA Describes Project's Effects on Environment and Recreation

113.   In analyzing the Project's effects on wildlife, the environment and recreational interests, the Sanpoil EA purports to consider all the "relevant past, present, and reasonably foreseeable future actions," which it indicates are represented in maps and tables in Appendix A. *Id*. at 34. Appendix A discusses past fires and commercial harvests on nearby private land, as well as minor upcoming projects such as campground restorations and highway maintenance, while making a cursory reference to predicted effects of the neighboring Sherman Pass Project, which authorizes timber harvests and burns on over 34,043 acres. *See id*. at 62 (Table

15) (noting that the Sherman Pass Project "treatments could also result in changes to livestock management, habituation of livestock to the landscape, changes in natural barriers, and changes to the available forage base"). The Sherman Pass Project is not discussed elsewhere in either Appendix A or the rest of the Sanpoil EA or supporting materials. Neither Appendix A nor any other part of the Sanpoil EA or its supporting materials analyzes the effects of many other recent or anticipated Forest Service projects, including Kettle Face, Walker, West Zone, Deer Jasper, Trout Lake, Orient Watershed, Bulldog, and Dollar Mountain.

114.   In Table 7, the Sanpoil EA quantifies how the Project would alter the prevalence of different forest structure types within the Project Area. It indicates the Project would move some forest structures away from the 2019 Forest Plan's desired conditions, including stands of mid-open Douglas-fir and subalpine fir/lodgepole pine as well as late-open subalpine fir/lodgepole pine. *Id.* at 35.

115.   Overall, the Forest Service is noncommittal about the effects the Project will have on forest structure, indicating the Project might be "neutral" with regard to progress toward desired plan conditions; might "maintain or make progress" toward one or more desired conditions in the long term, but "adversely affect progress toward or maintenance of one or more desired conditions in the short term;" or might make progress toward one or more of the desired conditions in the long term, while also "adversely affect[ing] progress toward other desired conditions in a

COMPLAINT – 49

negligible way over the long term." Silviculture Report at 30-31. The Sanpoil EA does not show how the Project would impact forest structure on the landscape scale, or when compared to the historical forest structure that projects such as Vision 2020 were attempting to replicate.

116.    The Forest Service is equally vague about how the Project will affect any particular portion of the Project Area, providing no more detail than included in its small-scale maps. It indicates that the Project will not clear-cut any area larger than 40 acres, but otherwise says only that "openings resulting from the project would be commensurate with patch size and historical conditions for size and distribution reflecting natural disturbance processes and desired conditions described in the Forest Plan." *Id.* at 31.

117.    The Sanpoil EA suggests the Forest Service *cannot* determine the environmental consequences of some aspects of the Project, because it has not designed them yet. For example, the EA indicates that treatments "*would be designed* and implemented to reduce stand density, canopy layering, and the preponderance of Douglas-fir and subalpine fir," and that silviculture prescriptions "*would be designed* to move stand-level susceptibility from a "High" or "Moderate" level to a "Moderate" or "Low" level *or be designed* to maintain a "Low" level of susceptibility." Sanpoil EA at 34 (emphasis added). The Sanpoil EA also indicates the Project would enhance the "extent and vigor" of quaking aspen through conifer

felling, but that the "extent to which this would occur is estimated to be on the order of 50-500 acres within the footprint of planned activities[.]" *Id.* Furthermore, "the exact extent or location of each meadow and aspen stand affected is uncertain." *Id.*

118.   The Sanpoil EA concludes that the implementation of shaded fuel breaks, ladder fuel reduction, and hand and machine pile burning would "likely reduce the quality of the existing semi-primitive non-motorized classes of dispersed recreation and the natural appearing landscapes" along the perimeter of the Roadless Areas. *Id.* at 53. However, it fails to evaluate the impact of logging activities or road work on recreational or scenic areas, including the use of the gravel pit near the Gibraltar trailhead.

119.   The Sanpoil EA also concludes that no other activities would combine to have a cumulative impact on the "number of acres suitable for designation" as Roadless Areas. *Id*. at 54. The EA does not explain the contradiction between this conclusion and the findings of the Sanpoil Recreation Report, in which the Forest Service acknowledges that the "proposed fuel reduction and pile burning activities may reduce the number of [Roadless Area] acres that may be considered as recommended wilderness." Sanpoil Recreation Report at 12.

120.   The Sanpoil EA also fails to consider other projects that would have a cumulative impact on recreation, including any meaningful analysis of the cumulative impact of the Sherman Pass Project, and any analysis at all of any of the

projects excluded from Appendix A, including Kettle Face, Walker, West Zone, Deer Jasper, Trout Lake, Orient Watershed, Bulldog, and Dollar Mountain. *Id.* at 54. By contrast, the Sherman Pass EA disclosed that the impact of the "Walker, Deer Jasper, and Sanpoil projects would result in a cumulative decline in the level of natural and undeveloped environment, outstanding opportunities for solitude, and primitive and unconfined recreation," and that they may reduce access to the Kettle Crest National Recreational Trail. Sherman Pass EA at 90-91.

121.   Evaluating the impact to aquatic habitats, the Forest Service concludes that since treatments along rivers and streams "are designed to primarily remove smaller trees and leave the largest trees the changes in canopy cover are expected to be small and transient in nature." Sanpoil EA at 39. The accuracy of this statement cannot be evaluated, however, because the Forest Service does not provide specific treatment prescriptions to indicate how many trees would be removed from riparian areas and which types of trees would remain near aquatic habitats.

122.   The Forest Service also claims that direct and cumulative effects to "sediment delivery, stream temperature, large woody debris recruitment and effective stream length and passage of both organisms and stream material are minor, minimal, transient in nature, and short-term." Sanpoil EA at 38. The Sanpoil EA does not discuss other Forest Service projects impacting the same watersheds, including, for example, the O'Brien Creek watershed. *Id.* at 37-38. In the Sanpoil

COMPLAINT – 52

Hydrology Report published on May 22, 2020, the Forest Service acknowledges that "two other Forest Service projects" are in progress within the effects area of the O'Brien Creek watershed. Hydrology Report at 23. However, the Forest Service does not identify these projects, or analyze their cumulative effects. The Sherman Pass EA, however, acknowledges that both it and the Walker Project may impact the O'Brien Creek watershed by altering water yield and peak flows in relevant rivers. Sherman Pass EA at 83.

123.   In analyzing impacts to soils, the Forest Service makes specific numerical determinations regarding detrimental soil conditions. While harvest involving "grapple piling treatments" would approach 18% detrimental soil conditions, the Forest Service claims that "[m]ost units of mechanical treatment would remain under 15% detrimental soil condition[.]" Sanpoil EA at 50. However, the Forest Service does not provide details on what kind of equipment will be used in any particular area, or how "mechanical treatments" will vary across different overlapping timber harvest types to maintain soil conditions under that specified percentage.

124.   The Sanpoil EA indicates the Proposed Action would open 10,585 "capable acres" within the Quartz Allotment for livestock grazing. *Id*. at 51. The Quartz Allotment spans the entire Sanpoil Project Area, and neither the Sanpoil EA nor its supporting documents indicate where these additional grazing acres will be

within the Project Area. In addition to being the source of conflicts with native predators, which leads to the state-sanctioned killing of wolves, bears, and cougars, the 2019 Plan FEIS acknowledges that grazing can dramatically alter native ecological communities, harming both upland and riparian habitat by degrading vegetation, soils, and streams. 2019 Plan FEIS at 240, 496.

125.    In the Sanpoil Biological Evaluation ("Sanpoil BE"), the Forest Service admits that "approximately 77 acres of stands that currently provide potential [lynx] denning habitat would be treated with fuels treatments." Sanpoil BE at 18. The Forest Service also acknowledges that "[h]abitat quality for tree squirrels," which serve as important prey for many species, including lynx and goshawk, "could be reduced for up to 20 years[.]" *Id*. at 18. However, the Sanpoil EA concludes that the Proposed Action "[m]ay affect" but is "not likely to adversely affect" Canada lynx, because there are "no known lynx den sites" in the Colville Forest, and "[s]tands with potential den sites would be protected by avoidance." Sanpoil EA at 41 (Table 10). However, the Sanpoil EA does not provide specific unit prescriptions within the lynx LAUs that would allow for the accuracy of this statement to be evaluated.

126.    As for cumulative impacts to lynx, the Sanpoil EA indicates that the cumulative effects should be evaluated within the West Sherman and Hall Creek LAUs, and that the "effects from this project would be cumulative to those resulting from the White Mountain fire which occurred in 1988." *Id*. Although the North Star

Fire is listed in Appendix A, the Sanpoil EA does not indicate that this fire will have any cumulative impact to lynx, even though it well over 200,000 acres just adjacent to the Project in 2015. More significantly, it does not even mention any other Forest Service Projects, even though the Sherman Pass and Walker Projects also contain portions of the West Sherman LAU—and the Sherman Pass TES Report acknowledged that the Sherman Pass Project would include "harvest in high-quality foraging habitat" for lynx and would affect "1,020 acres of lynx denning habitat." Sherman Pass TES Report at 56, 60-61.

127.   The Sanpoil EA concludes that the Project's direct effect on grizzly bears "would be an increase in disturbance and a small reduction of core habitat during…implementation." Sanpoil EA at 41 (Table 10). It indicates hiding cover "would be degraded in the short term," although it "would be maintained along open roads when possible." *Id.* As for cumulative impacts, the Sanpoil EA acknowledges that "[t]he proposed project would create a decrease in hiding cover for approximately 5 years, a decrease in seclusion habitat due to an increase in human disturbance, and a potential increase in forage habitat." *Id*. It notes that those effects "would be cumulative to those resulting from other similar vegetation management projects that are active or proposed," but it does not name any of those projects, much less discuss their effects. *Id*.

128.   As for gray wolves, the Sanpoil EA concludes that the Proposed Action "[m]ay impact individuals but is not likely to…trend towards federal listing or loss of viability." *Id*. at 43 (Table 11). The Sanpoil EA does not discuss any cumulative impacts on gray wolves, but instead directs the public to "[r]efer to grizzly bear cumulative effects to forage and seclusion for analysis as effects are the same." *Id*. It does not explain how the cumulative effects on such disparate species could be the same, including how the "forage" analysis was the same for grizzly bears, which are omnivores, as for wolves, which are carnivores. *See id*. at 41 (discussing berry production and green forage production and palatability for grizzly bear).

129.   The Sanpoil EA indicates that the area for a cumulative effects analysis on wolverine is the "Kettle Range south of the Canadian border because wolverines have such large home ranges and occur at such low densities." *Id*. at 41. It acknowledges that the cumulative impacts of other "USFS vegetation restoration projects throughout the cumulative effects area" would result in "additional decrease in hiding cover for approximately 5 years, a decrease in seclusion habitat due to an increase in human disturbance, and a potential increase in forage habitat." *Id*. The analysis does not name any of the other Forest Service projects, much less discuss their impact, although it does summarily conclude that "[i]in consideration of these cumulative impacts," the Forest Service is still meeting Forest Plan standards and guidelines for wolverine habitat. *Id*.

130.   The Sanpoil EA acknowledges that the cumulative effects area for the Northern goshawk is the entire Colville Forest, and grants that other "USFS vegetation restoration projects" will contribute to these effects. *Id.* at 42 (Table 11). However, it then refers only to the projects contained in Appendix A, which excludes significant actions such as the Walker, West Zone, Deer Jasper, Bulldog, and Dollar Mountain projects. *Id.* The Sanpoil EA also fails to engage in any meaningful analysis of cumulative effects to the goshawk, other than to say they will be the "same as direct and indirect effects described for this proposed project." *Id.* It describes these effects as "reduction of foraging habitat and a potential increase in availability of food resources for the next 5-10 years," and a "potential abandonment of territories," which could reduce the "breeding population and could affect the species viability." *Id.* Although it does not aggregate these impacts for all the Forest Service projects in the area, the Sanpoil EA nevertheless concludes that they "may impact individuals but [are] not likely to lead in a trend towards federal listing or loss of viability." *Id.*

131.   The Sanpoil EA engages in a similar analysis for the cumulative effects to the great gray owl, acknowledging that the effects on the species should be analyzed on a forest-wide scale, but limiting its analysis to only those projects listed in Appendix A. Meanwhile, it defines the cumulative effects area for the white-headed and Lewis woodpecker as the lower-elevation lands west of the Columbia

River, but fails to consider the cumulative impact of the other projects that took place west of the Columbia River, including Kettle Face, Walker, Deer Jasper, Sherman Pass, West Zone, Bulldog, and Dollar Mountain. *Id.* at 42-43.

132.   As for all sensitive bat species, the Sanpoil EA claims that project activities would be located away from bat roost sites or timed to avoid periods when they are occupied, although it acknowledges that activities near "unknown locations could cause loss of individuals." *Id.* at 43. In a supporting report published on May 22, 2020, however, the Forest Service concedes it has very little information on where some of these bats live. For example, it indicates it is unable to do a viability assessment for either the Townsend's big-eared bat or the pallid bat due to a "lack of knowledge to adequately map habitat[.]" Sanpoil Vegetation Management Project: Additional Terrestrial Wildlife Analysis Report ("Wildlife Report") at 8 (Table 1). The Sanpoil BE also notes that the highest conservation priority for the Townsend's bat is to "reduce human disturbance and destruction of roost sites." Sanpoil BE at 36. The Sanpoil EA does not explain how it can minimize human disturbance or destruction of roost sites, when it has conceded that it does not know where these bats live.

133.   As for "[a]ll sensitive invertebrates," the Sanpoil EA acknowledges that "less mobile individuals could be killed," "food plants could be damaged," and that "[t]he Proposed Action in addition to grazing would have an added negative

cumulative effect," because "grazing has the potential to remove forage and host plants and alter the integrity of meadows and riparian habitats[.]" Sanpoil EA at 43 (Table 11). Although not mentioned in the Sanpoil EA, sensitive invertebrates within the Project Area include the Western bumblebee, a Region 6 sensitive species in alarming decline throughout the West. Without looking at the cumulative effect of any other Forest Service project, or analyzing specific effects to the bumblebee, or any other species in particular, the Sanpoil EA collectively reaches the conclusion that the direct and cumulative effects of the project "[m]ay impact individuals but is not likely to lead in a trend toward federal listing or loss of viability." *Id.*

134.   The Sanpoil EA does not individually analyze effects on the pileated woodpecker or the American marten, despite the former's status as a candidate for the state endangered species list, and the fact that both species are used by the 1988 Forest Plan as a Management Indicator Species for the health of old-growth forests. However, the Wildlife Report predicts that the Project "may affect individuals" of both species but is "not likely to lead to loss of species viability." Wildlife Report at 11 (Table 2). It concludes that current late-closed habitat for these species is below desired conditions set by the 2019 Forest Plan, but it does not address the admission in the Sanpoil EA that the Project would move this category of habitat farther away from those conditions. The Wildlife Report also indicates there will be no risk to

1  old-growth trees because of guidelines directing the retention of trees over 20 inches

2  in diameter, but does not address the impact of the many exceptions to that guideline.

3  **J. Plaintiff's Objections to the Sanpoil EA and Forest Service Responses**

4  135.   KRCG and NEWFC submitted detailed objections to the Sanpoil EA.

5  It marked the first time in its 18-year history that NEWFC has filed an objection to

6  a Forest Service Project.

7  136.   KRCG objected that the descriptions of the Proposed Action's

8  "silviculture" and "fuels treatments" were still vague to the point of prohibiting

9  informed public comment. KRCG noted the Forest Service had provided a small

10  number of sample unit prescriptions three days before it released the Sanpoil EA.

11  KRCG challenged the Forest Service's failure to release draft prescriptions for the

12  entire Project.

13  137.   For example, the Forest Service released a draft prescription for Unit

14  47, slated to receive shelterwood treatments, which detailed that the unit contains

15  550 trees per acre, with a basal area average of 260 square feet per acre. Harvesters

16  would have to leave "all trees over twenty-one inches diameter at breast height" and

17  "enough of [the] healthiest trees" to provide for 10 to 20 remaining trees per acre.

18  The Forest Service released planned shelterwood treatments for Unit 103, where the

19  basal area average is 200 square feet per acre, and harvesters would be directed to

"leave all trees" at and over twenty-one inches diameter at breast height and harvest all smaller trees.

138.    Both KRCG and NEWFC objected that the Forest Service refused to provide specific prescriptions for proposed commercial harvests. They objected that the maps provided were unreadable and unhelpful, such as the small-scale map of commercial logging projects, which failed to include marked roadways or geolocation data. KRCG told the Forest Service that "without disclosing what prescriptions will be applied where, there is no way for the Forest Service to assert it reasonably took a hard look at the environmental impacts of the Sanpoil project, nor can the public meaningfully comment on the project." KRCG Objection at 10.

139.    Both KRCG and NEWFC objected that the Forest Service did not evaluate the condition of the 67 miles of "existing non-system template roads" slated for restoration, and therefore could not evaluate what the potential environmental impacts of "restoration" of those roads would be.

140.    KRCG and NEWFC also objected that the Forest Service failed to indicate where grazing would increase across the Sanpoil Project Area, and therefore did not adequately analyze the potential impacts to sensitive species.

141.    KRCG also objected that the Sanpoil EA and its supporting reports failed to adequately account for the potential direct and cumulative impacts to lynx, wolves, wolverine, grizzly bear, and other wildlife.

142.   KRCG continued its insistence that the Forest Service should prepare a full EIS. because of the significant potential direct, indirect, and cumulative impacts to the environment, especially considering the combined impact with the adjacent Sherman Pass Project, and the upcoming Dollar Mountain project.

143.   KRCG objected that the Forest Service only analyzed one alternative for purportedly improving forest health—and that alternative was actually focused on maximizing timber revenue. KRCG indicated "it is simplistic and lacking investigation for the EA to limit action alternatives to one, timber-centric alternative." KRCG Objection at 14. KRCG objected that the Forest Service had chosen not to analyze any alternative that included making improvements to the section of the Pacific Northwest National Scenic Trail that crosses the Project Area.

144.   NEWFC and KRCG both objected to the Forest Service's refusal to design the Project around the type of broader, landscape-level analysis described in the Vision 2020 proposal, and envisioned by CFLRA, to achieve a "collaborative, science-based ecosystem restoration of priority forest landscapes." NEWFC Objection at 4. The Forest Service thus failed to consider an alternative designed to restore the Forest to its natural, historical structure, as the best way to create a healthy, resilient Forest. Both groups supplied extensive scientific articles to support the assertion that this approach is the best way to promote forest health and diversity, and NEWFC offered its help in continuing to pursue this model through the Vision

2020 project. KRCG noted that the Draft EA included an explanation about a landscape assessment and how it was applied to the Project, but that this assessment was not updated in the final Sanpoil EA.

145.   KRCG and NEWFC renewed their requests for the Forest Service to eliminate shaded fuel break treatments along the Roadless Areas and along Hall Creek Road, near the Bald Snow recommended wilderness. Both groups challenged the Forest Service's failure to seriously consider an alternative that would have eliminated treatments in these areas, and challenged the Forest Service's conclusion that these treatments would not affect the eligibility of recommended wilderness and Roadless Areas.

146.   Both KRCG and NEWFC also objected that the Sanpoil Project fails to comply with scenic objectives and guidelines outlined in the 2019 Forest Plan, and that as a result, it would decrease the quality of recreational areas, including valuable scenic trails such as the Pacific Northwest National Scenic Trail and the Kettle Crest National Recreational Trail. KRCG noted that one draft unit prescription the Forest Service provided would drastically change the scenic quality of an area and would be "visually unacceptable." KRCG Objection at 11. KRCG also objected that the Forest Service failed to analyze the cumulative effect of the Project on recreation, when combined with the effects of other, nearby projects.

147.   In September 2020, the Forest Service issued individual responses to each objecting organization, as well as a group response ("Objection Response").

148.   The Forest Service indicated it could not provide more site-specific prescriptions because "final prescriptions were not available because they are not final until a decision is signed." Cumulative Objection Response at 6.

149.   As to its failure to specify the 67 miles of road for restoration, the Forest Service indicated that it believed "one short segment of non-system road" may enter the recommended wilderness area, but that there would be no significant impact to the area. *Id.* at 9. Although the additional roads had not yet been surveyed or identified, the Forest Service nevertheless assured objectors that the additional surveys would not "reveal significant environmental effects or…change the project proposal." *Id.* at 12.

150.   On December 11, 2020, the Forest Service published the Final Sanpoil EA, and the Decision Notice and Finding of No Significant Impact for the Sanpoil Project ("Sanpoil Decision Notice and FONSI"), approving the Proposed Action as described in the Sanpoil EA.

## VI.   CLAIMS

### A. <u>First Claim</u> –The Forest Service Failed to Meet NEPA's Requirements in Analyzing and Disclosing the Impact of the Sanpoil Project

151.   Plaintiff realleges and incorporates by reference the preceding paragraphs.

152.    NEPA requires that agencies take a "hard look" at the consequences of prospective actions by "carefully consider[ing] detailed information concerning significant environmental impacts." *Robertson*, 490 U.S. at 349.

153.    When an agency proposes a project that would be implemented without further, site-specific NEPA review, it must disclose the details of its proposed action at a site-specific level and perform a detailed environmental analysis of the reasonably foreseeable impact of those site-specific actions. *Alaska Conservation Council*, 443 F. Supp. 3d at 1006.

154.    When evaluating the impact of a project on the environment, an agency must consider that action in conjunction with all other past, present, and reasonably foreseeable future actions. *Idaho Sporting Congress*, 305 F.3d at 973. Cumulative impacts must be discussed in enough detail to provide a thorough analysis of how the projects will cumulatively affect the environment; a simple catalog of other projects in the area is not sufficient. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006).

155.    The Forest Service failed to perform the required analysis of site-specific plans for its silviculture treatments, fuels treatments, and road construction; failed to fully develop those site-specific plans prior to performing its environmental analysis; and failed to provide the public with site-specific information to enable the public to provide meaningful comment on the analysis.

156.   The Forest Service failed to perform sufficient direct analysis of the Project's impact on several state and federal endangered, threatened, or sensitive wildlife species, including, but not limited to, the gray wolf, wolverine, grizzly bear and Canada lynx.

157.   The Forest Service failed to perform adequate cumulative analysis of the Project's impact on the environment, including, but not limited to, its impact on riparian areas, recreation, and several wildlife species, because it failed to take into account several other large projects that the Forest Service has conducted in nearby areas over the past 10 years, as well as reasonably foreseeable projects that the Forest Service has planned for the next few years.

158.   The Forest Service's decision to proceed with the Sanpoil Project is therefore arbitrary and capricious, pursuant to the APA. 5 U.S.C. § 706(2).

**B. <u>Second Claim</u> - The Forest Service Failed to Consider a Reasonable Range of Alternatives**

159.   Plaintiff realleges and incorporates by reference the preceding paragraphs.

160.   NEPA requires an agency to develop and assess appropriate alternatives in any proposal involving unresolved conflicts concerning the uses of available resources. 42 U.S.C. § 4332(E); 40 C.F.R. §§ 1507.2(d), 1508.9(b). The Ninth Circuit has found that agencies have improperly dismissed alternatives from

detailed analysis when a project's purpose and need are written too narrowly. *EPIC v. USFS*, 234 Fed. Appx. 440, 443 (9th Cir. 2007).

161.   Courts have found that the presence of any one of these factors, or a combination of multiple, may be sufficient to indicate that the project may have a significant impact to the environment, necessitating the preparation of an EIS. *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008).

162.   In evaluating the Sanpoil Project, the Forest Service failed to analyze a range of meaningful alternatives, by looking only at a "no action" alternative and the proposed action. For example, the Forest Service improperly precluded serious consideration of alternatives that would avoid the construction of additional roads, or that would avoid construction of fuel breaks in or near Roadless Areas or recommended wilderness. The Forest Service also failed to properly consider an alternative planned at a landscape-scale, to restore Forest ecology to its traditional structure, and did not consider recommended alternatives that would have enhanced recreational resources.

163.   The Forest Service's decision to proceed with the Sanpoil Project is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**C. <u>Third Claim</u> - The Forest Service Should Have Prepared an EIS to Evaluate Significant Environmental Impacts of the Sanpoil Project**

164.  Plaintiff realleges and incorporates by reference the preceding paragraphs.

165.  NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In considering whether a project has a significant effect on the environment, agencies must consider "[w]hether an action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). Agencies are required to evaluate both the context and intensity of an action to determine the significance of its impact on the environment. *Id.* § 1508.27.

166.  Courts have found that the presence of any one of these factors, or a combination of multiple, may be sufficient to indicate that the project may have a significant impact to the environment, necessitating the preparation of an EIS. *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008).

167.  Several factors indicate the Forest Service should have developed an EIS for the Sanpoil Project, including, but not limited to, the fact that the Project: (1) would have a significant environmental impact, especially when considered along with the impact of other related projects the Forest Service omitted from its analysis; (2) deals with issues of high controversy, including impacts on wildlife,

recreation, and old-growth forests, the efficacy of shaded fuel breaks, and the Forest Service's failure to consider a landscape-based approach to Forest resiliency; (3) contains elements of great uncertainty, including unknown impacts on several wildlife species whose status the Forest Service was unable to accurately assess; the uncertainty of the impact of unspecified and/or undeveloped treatments on Forest structure and recreation; and the unknown cumulative impacts on wildlife, recreation, and aquatic habitats; (4) would have an impact on unique geographic areas, because it proposes treatments next to and within Roadless Areas and a recommended wilderness area; (5) would have adverse impacts on multiple state and federal sensitive, threatened, or endangered species and their habitats; and (6) would set a precedent for the Forest Service to approve additional planned Projects within the same area without an adequate disclosure or analysis of their site-specific or cumulative impacts.

168.    The Forest Service's failure to prepare an EIS for the Sanpoil Project was therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

**D. Fourth Claim – The Sanpoil Project Does Not Adhere to the 2019 Colville Forest Plan, in Violation of NFMA**

169.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

COMPLAINT – 69

170.   NFMA requires that individual Forest Service projects be consistent with their corresponding Land Management Plans. 16 U.S.C. § 1604(i).

171.   The Sanpoil Project is not consistent with the 2019 Forest Plan, because it fails to adhere to the Plan's Scenic Integrity Objectives, moves several Forest structures and species habitats away from the desired conditions specified in the Plan, and fails to meet the Plan's guidelines by diminishing the scenic quality of the Forest and the wilderness characteristics of the Roadless Areas.

172.   The Forest Service's final decision to proceed with the Sanpoil Project thus violates NFMA, and should be set aside pursuant to the APA, 5 U.S.C. § 706, as it is not in accordance with law.

**E. Fifth Claim – The 2019 Colville Forest Plan, which Enables the Sanpoil Project, Violates NFMA, NEPA, and the APA**

173.   Plaintiff realleges and incorporates by reference the preceding paragraphs.

174.   NFMA requires that the Forest Service provide "for diversity of plant and animal communities" and "preserve the diversity of tree species." 16 U.S.C. 1604(g)(3)(B). Implementing this requirement, the 1982 Rules require that "wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 1982 Rules § 219.19. To effectuate this goal, the 1982 Rules also require that the Forest Service identify and

1 monitor management indicator species and evaluate planning alternatives with an

2 eye towards the viability of those species. *Id.*

3     175.   The 1988 Forest Plan identifies pileated woodpeckers and American

4 marten as management indicator species for old-growth forests. The Forest Service

5 stopped monitoring these species in 1997, and the 2019 Forest Plan did not replace

6 these species with a different method of monitoring the health of old-growth forests.

7     176.   However, the 2019 Forest Plan eliminates the Eastside Screens

8 Standard to allow wide exceptions to its prohibition on logging large, old trees. The

9 Sanpoil Project allows for 3,590 acres of timber harvest in areas containing old-

10 growth trees, including at least 600 acres of commercial harvest.

11     177.   The 2019 Forest Plan thus does not meet NFMA's mandate to ensure

12 that old-growth habitat, and the numerous ecosystem services it supports, is "well

13 distributed," and thus ensure diversity within the Forest.

14     178.   In adopting the new standard for logging old-growth trees, the Forest

15 Service also violated NEPA and the APA by failing to respond to substantial public

16 comments, including by failing to ensure that the 2019 Plan FEIS adequately

17 responded to opposing scientific views.

18     179.   These sections of the 2019 Forest Plan, Plan FEIS, and Plan ROD are

19 therefore arbitrary, capricious, an abuse of discretion, and otherwise not in

20 accordance with law, and should be set aside pursuant to the APA, 5 U.S.C. § 706(2).

# VII.   REQUEST FOR RELIEF

The Plaintiff therefore respectfully requests that this Court grant the following relief:

A.   Declare that the Sanpoil Decision Notice and FONSI and the Sanpoil EA are invalid pursuant to the APA, 5 U.S.C. § 706(2), because they are arbitrary, capricious, an abuse of discretion, and unsupported by substantial evidence in the record, and because they violate NEPA and/or NFMA, and are therefore not in accordance with law;

B.   Vacate the Sanpoil Decision Notice and FONSI and the Sanpoil EA;

C.   Remand the Sanpoil Decision Notice and FONSI and the Sanpoil EA to the Forest Service with instructions to prepare an Environmental Impact Statement in accordance with the agency's obligations under NEPA and the APA;

D.   Enjoin the Forest Service from allowing timber harvest, prescribed burns, or roadwork within the Sanpoil Project Area until such time as the Forest Service has performed the requisite environmental analysis;

E.   Hold that the 2019 Forest Plan, Plan FEIS, and Plan ROD are unlawful under NEPA, NFMA, and the APA;

F.   Vacate the portions of the 2019 Forest Plan, Plan FEIS, and Plan ROD that are related to the new standards for logging of old-growth trees, and remand

to the Forest Service for new consideration in compliance with NEPA, NFMA, and the APA;

G.      Retain jurisdiction over this case until the Forest Service complies with the requirements of NEPA, NFMA, and the APA;

H.      Award Plaintiff their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

I.      Grant such further relief as the Court deems just and proper.


Respectfully submitted this 12th day of May 2021.


                              ANIMAL & EARTH ADVOCATES, PLLC


                      By  _____

                              *Claire Loebs Davis*
                              *Counsel for Plaintiff*

COMPLAINT – 73