Claire Loebs Davis, WSBA #39812
ANIMAL & EARTH ADVOCATES, PLLC
2226 Eastlake Ave E #101
Seattle, WA 98102
Tel: (206) 601-8476
claire@animalearthlaw.com

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KETTLE RANGE CONSERVATION GROUP, | Case No. 2:21-cv-161 |
| Plaintiff, | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| v. | |
| U.S. FOREST SERVICE, GLENN CASAMASSA, Pacific Northwest Regional Forester, U.S. Forest Service, RODNEY SMOLDON, Forest Supervisor, Colville National Forest, TRAVIS FLETCHER, District Ranger, Republic Ranger District, U.S. Forest Service. | **02/09/2023** **With Oral Argument: 1:30 p.m.** |
| Defendants. | |

1

2

**TABLE OF CONTENTS**

ACRONYMS AND SHORT CITATIONS ................................................................ ii

INTRODUCTION ....................................................................................................1

BACKGROUND ......................................................................................................1

   I.   Factual Background ........................................................................................1

     A.   2019 Forest Plan Drops 21-Inch Rule Protecting Old Growth ...................1

     B.   Service Authorizes Sanpoil Logging Project ...............................................2

     C.   Service Drops Lynx LAUs from Project Following ESA Notices ..............3

     D.   Procedural History .........................................................................................4

ARGUMENT ...........................................................................................................5

   I.   Legal Framework and Standard of Review .........................................................5

   II.   KRCG Has Established Jurisdiction, Venue, Standing, and Ripeness............8

   III.   2019 Plan Violates NFMA, NEPA, and the APA .......................................9

     A.   NFMA Requires Forest Plans to Meet Diversity Mandate .........................9

     B.   FEIS Fails to Support Conclusions about the Selected Plan Alternative ..11

     C.   2019 Plan Fails to Provide Information to Satisfy Diversity Mandate ......15

     D.   Sanpoil ROD and EA Fail to Explain how Change Will Affect Project ...23

   IV.   Sanpoil Project Violates NEPA, NFMA, and the APA .............................24

     A.   Service Failed to Analyze any Meaningful Cumulative Impacts ..............25

     B.   Service Failed to Analyze Impact on Ability to Meet Diversity Mandate 27

     C.   Service Failed to Develop Site Specific Plans ...........................................32

     D.   Service Was Required to Develop EIS for the Sanpoil Project. ................38

CONCLUSION .....................................................................................................40

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1

## ACRONYMS AND SHORT CITATIONS

2

For the Court's convenience, following is a list of the acronyms and short

3

references for documents and statutes referenced in this brief.

4

| 2019 Plan | 2019 Colville National Forest Land Management Plan |
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BE | Biological Evaluation |
| DBH | Diameter at Breast Height |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| IRA | Inventoried Roadless Areas |
| KRCG | Kettle Range Conservation Group |
| LAU | Lynx Analysis Unit |
| LSOF | Late Structure Old Forest |
| MIS | Management Indicator Species |
| MMBF | Million Board Feet of Timber |
| NEPA | National Environmental Policy Act |
| NEWFC | Northeast Washington Forest Coalition |
| NFMA | National Forest Management Act |
| NOI | Notice of Intent to Sue |
| ROD | Record of Decision |
| Service | U.S. Forest Service |

MOTION FOR SUMMARY JUDGMENT - ii

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1

## Table of Authorities

2 **Cases**

3 *All. for the Wild Rockies v. U.S. Forest Serv.*,
    907 F.3d 1105 (9th Cir. 2018) ........................................................ 10

4
*Barnes v. U.S. DOT*,
5     655 F.3d 1124 (9th Cir. 2011) ........................................................ 41

*California v. Block*,
6     690 F.2d 753 (9th Cir. 1982) .......................................................... 23

7 *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) .......................................................... 9

8
*Ctr. for Biological Diversity v. U.S. DOI*,
9     623 F.3d 633 (9th Cir. 2010) .......................................................... 21

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
10    349 F.3d 1157 (9th Cir. 2003) .................................................. 22, 24

11 *Earth Island Inst. v. U.S. Forest Serv.*,
    442 F.3d 1147 (9th Cir. 2006) ........................................................ 33

12
*Ecology Ctr. v. Castaneda*,
13    574 F.3d 652 (9th Cir. 2009) ........................................................ 5, 8

*EIS. Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*,
14    538 F.3d 1172 (9th Cir. 2008) ........................................................ 39

15 *Friends of the Clearwater v. Dombeck*,
    222 F.3d 552 (9th Cir. 2000) .......................................................... 39

16
*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
17    528 U.S. 167 (2000) ...................................................................... 9

18 *Fulbright v. McHugh*,
    67 F. Supp. 3d 81 (D.D.C. 2014) ...................................................... 7

19 *Hapner v. Tidwell*,
    621 F.3d 1239 (9th Cir. 2010) ........................................................ 5, 6

20
*Idaho Sporting Cong. v. Rittenhouse*,
21    305 F.3d 957 (9th Cir. 2002) ................................................ 18, 19, 25

22 *Idaho State Snowmobile Ass'n v. U.S. Forest Serv.*,
    No. 1:19-cv-00195-DCN, 2021 U.S. Dist. LEXIS 25886 (D. Idaho Feb. 10, 2021) ............ 33

23

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.*,
    88 F.3d 754 (9th Cir. 1996) ........................................................... 16

*Israel v. Chabra*,
    537 F.3d 86 (2d Cir. 2008) ........................................................... 16

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
    387 F.3d 989 (9th Cir. 2004) ........................................................ 25

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) .......................................................... 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................... 7

*Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002) ........................................................ 25

*Native Ecosystems Council v. Tidwell*,
    599 F.3d 926 (9th Cir. 2010) ........................................................ 16

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ................................................. 17, 18

*Native Ecosystems Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012) ...................................................... 10

*Neighbors of Cuddy Mt. v. Alexander*,
    303 F.3d 1059 (9th Cir. 2002) ........................................................ 8

*Occidental Eng'g Co. v. Immigration & Naturalization Serv.*,
    753 F.2d 766 (9th Cir. 1985) .......................................................... 7

*River Runners for Wilderness v. Martin*,
    593 F.3d 1064 (9th Cir. 2010) ........................................................ 7

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ....................................................................... 6

*Se. Alaska Conserv. Council v. U.S. Forest Serv.*,
    443 F. Supp. 3d 995 (D. Alaska 2020) ......................................... 33

*Se. Alaska Conserv. Council*,
    443 F. Supp. 3d 995 .................................................... 33, 34, 35, 37

*Seattle Audubon Soc'y v. Moseley*,
    798 F. Supp. 1484 (W.D. Wash. 1992) ........................................ 11

*Sierra Club v. Mainella*,
    459 F. Supp. 2d 76 (D.D.C. 2006) .................................................. 7

MOTION FOR SUMMARY JUDGMENT - iv

1

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .................................................................... 9

2

**Statutes**

5 U.S.C. § 702 ............................................................................... 8

5 U.S.C. § 706 ........................................................................... 40, 7

5 U.S.C. §§ 701-706 ...................................................................... 8

16 U.S.C. § 1604 ................................................................... 15, 5, 9

16 U.S.C. § 1604(g)(3)(B) ("Diversity Mandate") ...................... 10

16 U.S.C. § 1604, (g) .................................................................... 10

16 U.S.C. §§ 1600-1614 ................................................................ 8

28 U.S.C. § 1331 ............................................................................ 8

28 U.S.C. § 1391 ............................................................................ 8

28 U.S.C. §§ 2201-02, 5 ................................................................ 8

42 U.S.C. § 4332 ................................................................. 24, 38, 6

42 U.S.C. §§ 4321 to 4370m-12 .................................................... 8

**Other**

1982 Rule §219.xx ................................................................ *passim*

36 C.F.R. § 219.12 ....................................................................... 10

36 C.F.R. § 219.17 ....................................................................... 10

40 C.F.R. 219.19 ............................................................... 11, 16, 18

40 C.F.R. pts. 1502, 1508 ............................................................ 25

40 C.F.R. § 1502.9 ....................................................................... 21

40 C.F.R. § 1502.14 ..................................................................... 21

40 C.F.R. § 1502.24 ..................................................................... 23

40 C.F.R. § 1508.7 ....................................................................... 25

40 C.F.R. § 1508.27 ................................................................ 39, 40

40 C.F.R. §§ 101.4 -1508.9 ............................................................ 6

40 C.F.R. §§ 1502.9 -1503.4 ........................................................ 22

47 Fed. Reg. 43026 ...................................................................... 10

50 C.F.R. § 1502.21. ..................................................................... 33

50 C.F.R. § 1508.23 ..................................................................... 33

85 Fed. Reg. 43304 ........................................................................ 6

23

**ANIMAL & EARTH ADVOCATES, PLLC**
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

**INTRODUCTION**

By means of the 2019 Colville National Forest Land Management Plan ("2019 Plan") and the Sanpoil Project ("Project"), the U.S. Forest Service ("Service") is trying to turn back the clock more than 50 years—reversing hard-fought protections for old-growth forests and ignoring laws protecting species diversity to create a short-term boost in local timber production. Plaintiff Kettle Range Conservation Group ("KRCG" or "Plaintiff") asks the Court to hold the Service accountable to the requirements imposed by the National Forest Management Act ("NFMA"), the National Environmental Protection Act ("NEPA") and the Administrative Procedure Act ("APA"), by invalidating the Final Record of Decision for the Sanpoil Project ("Sanpoil ROD") and the 2019 Plan ("2019 Plan ROD"), vacating the Sanpoil ROD and relevant portions of the 2019 Plan ROD, and remanding those decisions to the agency for proceedings in compliance with the law.

**BACKGROUND**

**I.    Factual Background**

*A. 2019 Forest Plan Drops 21-Inch Rule Protecting Old Growth*

A survey performed in 1936 estimated that old-growth stands dominated more than 70% of the forests in eastern Washington and Oregon.[1] But in 1994, a scientific

---

[1] Mark Henjum, *et al.,* INTERIM PROTECTION FOR LATE SUCCESSIONAL FORESTS, FISHERIES, AND WATERSHEDS: NATIONAL FORESTS EAST OF THE CASCADE CREST, OREGON AND WASHINGTON 17 (1994) ("Eastside Screens Report") (submitted as Exhibit A to the Declaration of Claire Loebs Davis, ECF. No. 47-1).

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476 FAX: 206.456.5191

panel assembled by Congress (the "Eastside Panel") warned that these forests had already been "transformed," and that if current rates of logging continued, old-growth stands would soon occupy less than 10% of these forests. *Id.* at 19. The panel warned that such a loss would "jeopardize many components of the biological diversity of eastside forests and increase numbers of threatened, endangered, and extinct species." *Id.* at 5. In particular, the panel found that only 1% of the Colville National Forest ("Colville" or "Forest") consisted of old-growth stands protected from logging. *Id.* at 54. In 1995, the Service implemented recommendations from the panel to protect remaining old-growth habitat, adopting procedures to limit proposed timber sales that included a ban on cutting trees over 21-Inches in diameter at breast height ("DBH"). *See* FP 002982-3028 ("21-Inch Rule").[2]

The Service issued the ROD for the 2019 Plan on October 21, 2019, replacing the 1988 plan as amended by the 21-Inch Rule. FP 108254, 113724. The Final Environmental Impact Statement for the 2019 Plan ("FEIS") considered six alternatives. The 2019 Plan ROD selected Alternative P, which abandoned the 21-Inch Rule and promised to open the largest percentage of Forest to logging. FP 108237-40. In place of a bright-line rule protecting old growth, the 2019 Plan ROD substituted a "guideline" containing a variety of circumstances. *Id.*; FP 109776-77.

### B. Service Authorizes Sanpoil Logging Project

The Service published a scoping letter for the Sanpoil Project on December

---

[2] The 21-Inch Rule is often referred to as "Eastside Screens," but that report included other proposed rules to protect old-growth habitat. Eastside Screens Report at 7-12.

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

14, 2016, and released a draft Environmental Assessment on February 6, 2019. AR 03795, 05633. On May 27, 2020, the Service published its final Environmental Assessment ("EA") (AR 06003-77) and draft Decision Notice and Finding of No Significant Impact (AR 06784-95). The EA discusses just two alternatives: the Proposed Action, accepted through the Sanpoil ROD, and a "no action" alternative. AR 06017. On December 11, 2020, the Service issued the ROD and Final FONSI, approving the Project and finding no significant impact that would require completion of an Environmental Impact Statement ("EIS"). AR 06784-85. The Sanpoil ROD authorized timber harvests in 8,410 acres and prescribed burns in another 19,129, requiring the construction of 3.7 miles of temporary roads and improvements to roughly 8 miles of crude "non-system" roads, and opening 10,585 additional acres to grazing. AR 06019, 06054, 06784. The EA estimates the Project will generate 50 million board feet of timber ("MMBF") over 10 years. AR 06038.

### C. Service Drops Lynx LAUs from Project Following ESA Notices

In September 2018, the Service completed a Biological Assessment ("BA") concluding that the Project would not have any adverse impact to any species listed under the Endangered Species Act ("ESA"), including the Canada lynx. AR 05505-39. The BA indicates Project actions would occur in 3,638 acres of the West Sherman and Hall Creek Lynx Analysis Units ("LAUs"), including 2,587 acres of lynx habitat. AR 05525. Yet the BA concludes that these treatments would not have an adverse impact to lynx, based largely on the assumption that any negatively impacted habitat would quickly regenerate. AR 05525-26.

MOTION FOR SUMMARY JUDGMENT - 3

On May 17, 2021, KRCG issued a 60-Day Notice of Intent to Sue ("NOI") under the ESA, claiming the Service had failed to ensure the Project would not jeopardize the Canada lynx. AR 07411. On August 24, 2021, the Service supplemented its analysis of the Project's impacts on lynx, correcting some of the errors mentioned in the first NOI. AR 06918-28. On November 26, 2021, KRCG issued a second NOI, which claimed the supplemental analysis still failed to consider the best available science, and asserted the Service was required to reinitiate ESA consultation because of two recent developments: a fire that burned large parts of the Hall Creek LAU, and an announcement that the Colville Confederated Tribes had begun to reintroduce lynx to the area. AR 0741-42.

On January 24, 2022, the Service wrote a letter to file documenting its decision to remove the West Sherman and Hall Creek LAUs from the Project. AR 07411-13. The letter indicates the Service does not plan to revise the EA due to this change, but does not provide details about how removing the LAUs would impact either (1) the intensity of logging activities in remaining units and/or (2) the overall volume of timber expected to be generated by the Project. AR 07413.

*D. Procedural History*

KRCG filed this action May 12, 2021. ECF No. 1. On August 3, 2021, KRCG filed the First Amended Complaint, adding allegations under the ESA. ECF No. 9.[3] The Service certified two administrative records on September 20, 2021, one related

---

[3] KCRG has now dropped the ESA claims, due to the Service's January 24, 2022, decision to drop the lynx LAU's from the Project.

MOTION FOR SUMMARY JUDGMENT - 4

to the 2019 Plan ("FP") and one to the Sanpoil Project ("AR"). ECF No. 14. On November 16, 2021, the Service lodged a supplemental administrative record ("Supp. AR") (ECF No. 22), and it made further corrections to the AR on September 13, 2022 (ECF No. 43). On March 31, 2022, the parties requested a stay while they attempted to finalize a settlement, which the Court granted and then extended at the parties' request. ECF Nos. 35-38. On July 6, 2022, the Parties informed the Court that settlement negotiations were at an impasse. ECF No. 39. Following a settlement conference, the Court scheduled summary judgment briefing. ECF Nos. 41, 45.

## ARGUMENT

### I.    Legal Framework and Standard of Review

Plaintiff challenges the Service's failure to comply with overlapping requirements under NFMA, NEPA, and the APA.

NFMA imposes both procedural and substantive requirements on the Service's management of national forests. Procedurally, NFMA requires the Service to develop and maintain forest management plans. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (citing 16 U.S.C. § 1604(a)). After a forest plan is adopted, subsequent agency actions must comply with that plan. *Id.*

Substantively, NFMA requires the Service to include certain provisions in its forest plans and subsequent actions, including protecting forest habitat and wildlife diversity. *See* 16 U.S.C. § 1604(g)(3); *Hapner v. Tidwell*, 621 F.3d 1239, 1246 (9th Cir. 2010).

The Service must also comply with NEPA when developing forest plans and

MOTION FOR SUMMARY JUDGMENT - 5

site-specific actions such as logging projects.[4] NEPA has two purposes, to ensure: (1) that agencies will take a "hard look" at environmental impacts by carefully considering detailed information before they take action; and (2) that "relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989). To this end, NEPA requires federal agencies to prepare a detailed EIS for all major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). To determine whether they must prepare an EIS, agencies may first prepare an EA, a concise public document that "provides sufficient evidence and analysis" for determining whether a project will have a significant environmental impact. 40 C.F.R. §§ 101.4(b)(2), 1508.9.

The Court reviews the Service's compliance with NEPA and NFMA under the rubric of the APA. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (subsequent history omitted). Under the APA, a court may set aside agency

---

[4] The Council on Environmental Quality ("CEQ") promulgates regulations implementing NEPA. *Id.* In 2020, CEQ adopted new NEPA regulations. *See* 85 Fed. Reg. 43304-43376. However, the prior regulations were still in place when the 2019 Plan was adopted, and the Service chose to apply those regulations to the Project, which was nearly final when the 2020 regulations became effective. *See*, *e.g.,* AR 06323.10, 06791 (draft and final FONSI, evaluating finding of no significant impact based on pre-2020 regulations). All citations to NEPA regulations in this brief thus refer to the regulations in place before 2020.

MOTION FOR SUMMARY JUDGMENT - 6

1    actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

2    accordance with law." 5 U.S.C. § 706(2)(A). Review under this standard is narrow.

3    *Lands Council*, 537 F.3d at 987. To be upheld, an agency's action "need only be a

4    reasonable, not the best or most reasonable, decision." *River Runners for Wilderness*

5    *v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). However, an agency must "examine

6    the relevant data and articulate a satisfactory explanation for its action including a

7    "rational connection between the facts found and the choice made" *Motor Vehicle*

8    *Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Thus, a

9    decision is arbitrary and capricious if the agency (1) relied on factors Congress did

10   not intend it to consider, (2) "entirely failed to consider an important aspect of the

11   problem," or (3) offered an explanation "that runs counter to the evidence before the

12   agency or is so implausible that it could not be ascribed to a difference in view or

13   the product of agency expertise." *Lands Council*, 537 F.3d at 987.

14        A motion for summary judgment "serves as the mechanism for deciding, as a

15   matter of law, whether the agency action is supported by the administrative record

16   and otherwise consistent with the APA standard of review." *See Sierra Club v.*

17   *Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Rule 56 standard does not apply to

18   motions for summary judgment in agency review cases. *See Fulbright v. McHugh*,

19   67 F. Supp. 3d 81, 89 (D.D.C. 2014). Instead, the court's role "is to determine

20   whether or not as a matter of law the evidence in the administrative record permitted

21   the agency to make the decision it did." *Occidental Eng'g Co. v. Immigration &*

22   *Naturalization Serv., 7*53 F.2d 766, 769 (9th Cir. 1985).

23

MOTION FOR SUMMARY JUDGMENT - 7

1  **II.    KRCG Has Established Jurisdiction, Venue, Standing, and Ripeness**

2        This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-

3  706(APA), 28 U.S.C. § 1331 (federal question), 2201 (declaratory relief), 2412

4  (costs and fees) and 1346 (United States as defendant). This action arises under the

5  APA, 5 U.S.C. §§ 701-706; NEPA, 42 U.S.C. §§ 4321 to 4370m-12; and NFMA, 16

6  U.S.C. §§ 1600-1614; and those statutes' implementing regulations. Venue is proper

7  in this Court under 28 U.S.C. § 1391, because a substantial part of the events or

8  omissions giving rise to the claims occurred within this judicial district. The federal

9  government has waived sovereign immunity pursuant to 5 U.S.C. § 702.

10        An actual, justiciable controversy exists between the parties, and the requested

11  relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06. The

12  2019 Plan ROD and Sanpoil ROD are both final agency actions subject to judicial

13  review under the APA. Some forest plan provisions are not ripe for judicial review

14  until they are implemented through a site-specific action that threatens imminent

15  harm. *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1064 (9th Cir. 2002).

16  However, such actions may be reviewed as part of a challenge to "a specific, final

17  agency action, the lawfulness of which hinges on these practices." *Id.* In this context,

18  courts will review forest plan provisions on logging in conjunction with specific

19  timber projects. *See e.g.*, *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 659 (9th Cir.

20  2009). Plaintiff thus properly challenges the Project in its own right, as well as an

21  implementation of the new logging provisions of the 2019 Plan.

22        An organization may sue on behalf of its members, if those members have

23

MOTION FOR SUMMARY JUDGMENT - 8

standing in their own right and the interests they assert are germane to the organization's purposes. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000). In an environmental case, plaintiffs have standing if they can show a particularized harm to their "recreational" or even "mere esthetic interests." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Plaintiffs have standing to challenge "programmatic" agency decisions such as forest plans when they can show a concrete harm "fairly traceable" to that program. *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1081 (9th Cir. 2015) (cleaned up). Here, KRCG has standing to sue on behalf of its members, because those members assert interests at the heart of KRCG's mission to "defend wilderness, protect biodiversity, and restore ecosystems of the upper Columbia River Basin," and have shown that the 2019 Plan and the Sanpoil Project threaten imminent harms to their esthetic and recreational interests. *See, e.g.*, Declaration of Timothy J. Coleman ¶¶ 3, 9-15, 19- 21; Declaration of Jay Jurgensen ¶¶ 4, 5, 7.

Both in its own name and through its membership in NEWFC, KRCG submitted comments and objections regarding both the 2019 Plan and the Sanpoil ROD. *See, e.g.*, Coleman Decl. ¶¶ 4-7; AR 0556-75, 06366-75, 06376-94, 06510-15, 06678-83, 06685-705. It has thus exhausted all its administrative remedies.

III.    **2019 Plan Violates NFMA, NEPA, and the APA**

A.    *NFMA Requires Forest Plans to Meet Diversity Mandate*

NFMA requires the Service to develop, maintain, and revise plans for each national forest. 16 U.S.C. § 1604(a). Forest plans consist "of broad, long-term plans

MOTION FOR SUMMARY JUDGMENT - 9

and objectives for the entire forest." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1109 (9th Cir. 2018). These plans are designed to "manage forest resources by balancing the consideration of environmental and economic factors." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012); *see* 16 U.S.C. § 1604(e), (g) (forest plans must provide for multiple uses, including recreation, grazing, and timber harvest, as well as the protection of watersheds, riparian areas, wilderness, and fish and wildlife species habitat and diversity).

In particular, the Service must develop regulations to ensure that its forest plans "provide for diversity of plant and animal communities" and designate "steps to be taken to preserve the diversity of tree species." *Id.* § 1604(g)(3)(B) ("Diversity Mandate"). The history, context, and purposes of NFMA make clear that this mandate requires planners to treat wildlife diversity "as a controlling, co-equal factor in forest management and, in particular, as a substantive limitation on timber production." *Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1484, 1489 (W.D. Wash. 1992) (citing Charles Wilkinson & H. Michael Anderson, Land *and Resource Planning in the National Forests, 64* Or. L. Rev. 1, 296 (1985)).

The applicable NFMA regulations[5] define "diversity" as the "distribution and

---

[5] The Service adopted NFMA planning regulations in 1982. 47 Fed. Reg. 43,026-43,052 (Sept. 30, 1982) ("1982 Rule" or "1982 Rule § 219.xx"). The Service revised these rules in 2012, but included transitional provisions allowing it to apply the 1982 Rule to plans initiated before 2012. 36 C.F.R. § 219.17(b)(3). The Service elected to apply the 1982 Rule to the 2019 Plan, which it began to develop in 2003, except that

MOTION FOR SUMMARY JUDGMENT - 10

1    abundance of different plant and animal communities and species within the area

2    covered by a land and resource management plan." 1982 Rule § 219.3. The 1982

3    Rule further requires that "wildlife habitat shall be managed to maintain viable

4    populations of existing native and desired non-native vertebrate species in the

5    planning area." 1982 Rule § 219.19. To meet this requirement, the Service must

6    ensure sufficient habitat is "well distributed" throughout its planning area. *Id*.

7           *B. FEIS Fails to Support Conclusions about the Selected Plan Alternative*

8          The FEIS considered six potential alternatives that encompassed three

9    approaches to logging and the protection of old-growth forests. On one end of the

10    spectrum was Alternative R. Alternative R was meant to address concerns from

11    conservation groups and emphasized a "large-scale reserve approach" to preserving

12    old growth, maintaining the 21-Inch Rule and establishing fixed old-growth reserves

13    that would allow commercial timber harvest on just 12% of the Forest, producing an

14    annual volume of just 14 MMBF. FP 108239-40. Striking middle ground were the

15    No Action Alternative, Alternative B and Alternative O, which would all maintain

16    the 21-Inch Rule, and respectively designate 52%, 37% and 33% of the Forest for

17    commercial logging, for 41-38 MMBF each year. FP 108237, 108239-40. Finally,

18    the Proposed Action (from 2011) and Alternative P (the new recommended action)

19    entertained the most aggressive approach to logging, eliminating the 21-Inch Rule

20    in favor of "active vegetation management in a dynamic landscape approach,"

21    _____

22    it developed the Plan's monitoring requirements under 36 C.F.R. § 219.12 of the

23    2012 rules. FP 113684. The full text of the 1982 Rule is available at FP 109194-225.

MOTION FOR SUMMARY JUDGMENT - 11

1    opening 63% of the Forest to logging, and generating 62 MMBF a year. FP 108238.

2    The 2019 Plan ROD selected Alternative P, which replaced the bright-line

3    protections of the 21-Inch Rule with FW-GDL-VEG-03 Guideline for Large Tree

4    Management, ("Old-Growth Guideline").[6] Under this guideline, projects would be

5    encouraged to "retain and generally emphasize recruitment of individual large

6    trees," which the Plan defines as trees larger than 20 inches DBH.[7] However, the

7    guideline would allow old-growth trees to be removed or destroyed to protect public

8    health or safety, limit infestation or disease, facilitate management of emergency

9    situations, "meet, promote, or maintain desired conditions for structural stages,"

10   "promote special plant habitats," and "reinforce, facilitate, or improve effectiveness

11   of fuel reduction in wildland-urban interfaces." FP 109776-77. While the 2019

12   Forest Plan sets desired conditions for the percentages of different tree species that

13   should be present in old-growth forests with late forest structure, it does not set a

14   minimum amount of old-growth habitat to be preserved.

15   Although Alternative P was clearly the choice most advantageous to the

16   timber industry, the Service engages in sleight of hand reach the surprising

17   conclusion that Alternative P *also* provided more protection for old-growth habitats

18

19   _____

[6] While projects must adhere to the Plan's *standards*, they may deviate from its

20   guidelines by showing they would be "as effective in contributing to the maintenance

21   or attainment of relevant desired conditions and objectives." FP 109905.

22   [7] The Plan generally refers to trees over 20 inches DBH as late structure old forest

23   ("LSOF"), instead of referencing these trees as "old growth." FP 109733.

MOTION FOR SUMMARY JUDGMENT - 12

1    than any of the other alternatives, including the "conservation" alternative expressly

2    designed to preserve old stands of trees. *See* FP 108750. But this claim uses circular

3    reasoning that is based on the "assumption" that the Service's ultimate conclusion is

4    correct. In reality, the Service's adoption of Alternative P in the 2019 Forest Plan

5    and ROD violate both NFMA's substantive requirements and NEPA's procedural

6    requirements, and are arbitrary and capricious under the APA, because the Service

7    fails to: (1) provide any analysis or rationale to support its assertion that Alternative

8    P will provide the most protection for old-growth habitats (2) show that it meets

9    NFMA's Diversity Mandate for management indicatory species; and (3) address the

10    significant contrary body of science that NEWFC and KRCG cite in their objections

11    to the Service's abandonment of the 21-Inch Rule.

12        In 1994, the Eastside Panel concluded that a clear rule was "essential to

13    conserve as many of the mature trees of eastside forests as possible in the short term

14    to sustain these forests in the long term." Eastside Screens Report at 7. It wrote:

15        Mature trees have lived for decades, even centuries; their very existence
     demonstrates that they have the genetic characteristics to survive the
16        full range of environmental variation present in eastern Oregon and
     Washington. They serve as reservoirs of genetic diversity and
17        irreplaceable seed sources for forest regeneration; they replenish the
     depleted supply of large snags and fallen logs, providing nest and den
18        sites for many animals; and they furnish unique historic records. As
     entomologist Boyd Wickman puts it, 'These trees are living examples
19        of our long-term objectives.'

20

21    *Id.* at 7-8. Eastside forests have not achieved these "long-term objectives" in the 18

22    years since the 1994 report, nor has the Service adopted a long-term management

23    plan to protect Eastside forests in place of these interim standardCts. Nevertheless,

MOTION FOR SUMMARY JUDGMENT - 13

1     the 2019 Plan revokes the 21-Inch Rule without any data or other scientific support

2     to support a conclusion that old-growth habitats would be better protected by the

3     loose standards of a "dynamic landscape approach." *See* FP 108238.

4            Indeed, the Service fails to conduct any analysis of the central question: Why

5     is loosening protections for old-growth trees necessary to restore a landscape that

6     used to be primarily comprised of large trees? Instead, the FEIS skates past this

7     fundamental question by assuming it away: "A key assumption of the landscape

8     restoration approach [in Alternative P] is that by strategically locating restoration

9     treatments, landscape fire movement can be altered, and the risk to adjacent late-

10    successional and old forest habitat is reduced." *See* FP 108676. This assumption is

11    repeated in  the Wildlife Report, which asserts there is a "considerable and growing

12    body of science" to support it, before citing to four research papers between 15 and

13    20 years old. FP 103212.

14           The FEIS concedes that the Service can make little more than a guess about

15    the effects of this "strategic" approach: "By strategically locating restoration

16    treatments, landscape-scale fire behavior *may* be altered to be more similar to native

17    disturbance regimes and the risk of loss of LSOF habitat to uncharacteristically

18    severe fires *may* be reduced." *See* FP 108750 (citations omitted, emphasis added);

19    *see also* FP 107840 (Old Growth objection response indicating that eliminating the

20    21-Inch Rule "*may* result in more resilient forest landscapes") (emphasis added).

21           More fundamentally, the Plan documents never explain why the 21-Inch Rule

22    is incompatible with its strategic restoration approach. Indeed, past Service projects

23

MOTION FOR SUMMARY JUDGMENT - 14

have emphasized the strategy of treating late and old structure tree stands to reduce fire risk, increase stand vigor, reduce susceptibility to insects and disease, and move toward historic Forest composition—all *within* the restrictions imposed by the 21-Inch Rule. *See, e.g.*, AR 03010-11 (Sherman Pass Project EA describing restorative treatments under the 21-Inch Rule); AR 01408 (Kettle Face Fuels Project, same).

The 2019 Plan ROD explains that the Service's motivation for eliminating the 21-Inch Rule is to provide "adequate management flexibility to respond to emerging resource issues." FP 113689. In response to objections the Service is even more frank, conceding that the approach will provide "the Forest with more flexible strategies to allow forest managers to better integrate old forest conservation goals with other land management objectives" and allow the Service to avoid "numerous site specific forest plan amendments to permit individual projects to harvest limited numbers of trees $\geq 21$" dbh." FP 107839-40. In other words, the 2019 Plan eliminates the 21-Inch Rule so it will have the flexibility to allow the logging of old-growth trees without a Plan amendment. This admission stands in stark contrast to the claims in the FEIS that Alternative P will provide *more* protection to old-growth habitat. FP 108750. The Service's desire for "flexibility" also conflicts with its substantive NFMA obligations under the Diversity Mandate, and NFMA's procedural requirements, which provide that changes to the direction of a forest plan should be made through the public amendment process. 16 U.S.C. § 1604(f)(4).

*C. 2019 Plan Fails to Provide Information to Satisfy Diversity Mandate*

The 1982 Rule specifies that "diversity shall be considered throughout the

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1    planning process" and "[i]nventories shall include quantitative data making possible

2    the evaluation of diversity in terms of its prior and present condition." 1982 Rule

3    § 219.26. Although NFMA does not require the Service to adhere to any particular

4    methodology to comply with the Diversity Mandate, it must explain why its chosen

5    methodology is reliable. *Lands Council*, 537 F.3d at 994. The Service may use

6    habitat as a proxy to measure species viability, but must "both describe the quantity

7    and quality of habitat that is necessary to sustain the viability of the species in

8    question and explain its methodology for measuring this habitat." *Israel v. Chabra*,

9    537 F.3d 86, 99 (2d Cir. 2008)8; 1982 Rule § 219.19(a)(2)). The Service's analysis

10   will be upheld if it is based on available data and the current state of scientific

11   knowledge. *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754,

12   762 (9th Cir. 1996). A finding that the Service employed a flawed methodology

13   under NFMA will also support a holding that it failed to comply with NEPA.*Native*

14   *Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010).

15       The 1982 Rule requires forest plans to designate "management indicator

16   species" ("MIS") whose "population changes are believed to indicate the effects of

17   management activities," including activities that affect "vegetation type [and] timber

18   age classes[.]" 1982 Rule § 219.19(a)(1). The rule further requires the Service to

19   evaluate planning alternatives in terms of both "amount and quality of habitat and of

20   animal population trends" MIS. 1982 Rule § 219.19 (a)(2)).

21       In place of MIS, the 2019 Plan focuses on the viability of four old-growth

22   "surrogate species:" northern goshawk, pileated woodpecker, American marten, and

23

MOTION FOR SUMMARY JUDGMENT - 16

1    white-headed woodpecker. FP 108678. The 1988 Plan had designated two of these

2    surrogate species, the northern goshawk and the white-headed woodpecker, as MIS

3    for old-growth habitats in the 1988 plan. FP 109794. However, the Service stopped

4    monitoring any of these species directly and started using an inventory of old-growth

5    habitat as a proxy to monitor the viability of the MIS. Such an approach is only

6    sufficient to meet the Diversity Mandate where "both the Forest Service's

7    knowledge of what quality and quantity of habitat is necessary to support the species

8    and the Forest Service's method for measuring the existing amount of that habitat

9    are reasonably reliable and accurate." *Native Ecosystems Council v. U.S. Forest*

10   *Serv.*, 428 F.3d 1233, 1250 (9th Cir. 2005).

11        The FEIS does not provide sufficient data to explain its conclusions about the

12   current status of old growth habitats or the species that depend upon them, much less

13   to substantiate that the selected alternative will meet NFMA's Diversity Mandate.

14   To the contrary, much of the information provided by the Service is contradictory,

15   and the FEIS fails to reconcile those contradictions.

16              1. <u>Service Does Not Evaluate Alternatives for Quality of Habitat</u>

17        The Service has not demonstrated that it has sufficient information about the

18   quantity and quality of old-growth MIS habitat to meet NFMA's requirements. The

19   Service responded to objections that it had not kept an inventory of old-growth

20   habitat by claiming that it used LiDAR structure data to show late-structure data

21   forest wide, claiming this could "be considered a forest-wide old growth survey."

22   FP 107840. But this response does not explain how this data could meet the

23

MOTION FOR SUMMARY JUDGMENT - 17

requirement to describe the effect of its planning alternatives on both the "amount and quality" of old-growth habitat. 1982 Rule § 219.19 (a)(2)). In a formal objection response letter, the Regional Forester instructed the Colville office to explain how its approach meets this planning requirement. FP 107757. In response, the Colville office prepared a memo purporting to  explain how the MIS and other wildlife species were "evaluated in terms of both the amount and quality of habitat and of animal population trends," by referring back to the subjective evaluation of viability outcomes in the Wildlife Report. FP 113620. However, neither the FEIS nor the Wildlife Report discuss the "amount and quality of habitat and population trends" in reaching conclusions about how alternatives affect species viability.

This failure is a violation of NFMA. *Native Ecosystems Council*, 428 F.3d at 1250;*see Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 970 n.5 (9th Cir. 2002) (holding the Service violates NFMA if its proxy method is flawed and there is no direct population monitoring).

### 2.  Conclusions on Old Growth Habitat Contradicted by Record

The FEIS concludes that Alternative P provides better outcomes for old-growth species. *See* FP 108680, Table 183. However, that conclusion is refuted by data within the FEIS itself, as well as elsewhere in the  maze of contradictory, unexplained, and unsupported conclusions in the record.

First, the FEIS's own quantitative modeling shows that Alternative P "produces the *third* most total late forest structure." *See* FP 108332 (emphasis added); *see also* Table 30, FP 108312 (showing the actual acreages of "late structure

MOTION FOR SUMMARY JUDGMENT - 18

1    class"). In fact, the FEIS concludes that "[t]he no action alternative creates the most

2    late structure of any alternative." *See* FP 108317.

3            Second, the record shows that Alternative P does not provide better outcomes

4    for the four surrogate species (northern goshawk, pileated woodpecker, American

5    marten, and white-headed woodpecker) that the FEIS uses to judge the health of

6    "late and old forest structures." FP 108678. One of the "key indicators" for these

7    old-forest species is the "amount, location and spatial configuration of old-forest

8    habitats." *Id.* In its Wildlife Report, the Service projects the amount of habitat that

9    would be available over time for these species under each alternative. *See* FP

10   103356-103358. These graphs reveal that the only species for which Alternative P

11   is the best alternative is the white-headed woodpecker. FP 103357. For the northern

12   goshawk, Alternative P is the *worst* of the six alternatives, while the best are No

13   Action and Alternative R. *Id*. For the American marten, Alternative P is the *third*

14   best alternative, behind No Action and Alternative R. *Id.* And for the pileated

15   woodpecker, the best alternative is No Action, while the others are closely clustered.

16   *Id.* Thus, for all but one species, the Service's own analysis shows that the No Action

17   alternative would provide more habitat than the selected alternative, while

18   Alternative R would provide as much habitat or more.

19           The FEIS does not reference these charts or include any narrative discussing

20   their implications, or explain why the Service nonetheless selected Alternative P.

21   Rather, the FEIS flatly contradicts this analysis when concluding that the No Action

22   alternative would provide a "low" contribution to viability of old growth surrogate

23

MOTION FOR SUMMARY JUDGMENT - 19

1   species, while the preferred alternative would provide a "high" contribution. *See* FP

2   108680, Table 183. In the narrative discussion of alternatives, the FEIS further

3   concludes: "Overall, alternative P would provide greater protection for LSOF (late

4   successional old forest) habitats than no action, the proposed action and alternatives

5   B, O, and R" and "would improve the viability outcomes for surrogate species that

6   are dependent on LSOF habitats." FP 108751. In contrast, the FEIS concludes that

7   the No Action alternative "would not improve the viability outcomes." FP 108687.

8       Fourth, the data on which the FEIS bases these conclusions makes no sense in

9   the context of the other data in the record. The FEIS explains that its conclusions

10  about the superiority of Alternative P for old-growth species are based on qualitative

11  "viability outcomes" for each alternative contained in Appendix B of the Wildlife

12  Report. That Appendix includes a table summarizing the viability outcomes for each

13  alternative in both a short time frame (defined as less than 20 years) and a long time

14  frame (more than 50 years). FP 103354. However, neither the Wildlife Report nor

15  the FEIS explain how the Service arrived at these outcome "scores" for each species

16  and alternative. Nor does either explain why the No Action alternative would have

17  such poor outcomes for old-growth species when the Service acknowledges

18  elsewhere that it would it produce the most old-growth habitat. *See* FP 108687.

19      Fifth, the FEIS fails to quantify or explore risk factors for its surrogate wildlife

20  species, including the risks posed by Alternative P. The FEIS claims that risk factors

21  that influence the viability of surrogate wildlife species "were addressed to varying

22  degrees in each of the alternatives and used to evaluate how well each alternative

23

MOTION FOR SUMMARY JUDGMENT - 20

1    contributes to the viability of surrogate wildlife species." FP 108676. However, it

2    contains no information documenting the role these risk factors played in the

3    viability outcomes. Indeed, in claiming that Alternative P "provides for the retention

4    and restoration of late-successional forest structure" (FP 108750), the FEIS fails to

5    even acknowledge the exceptions to retention specified in Old Growth Guideline,

6    much less to evaluate how often they are likely to occur, and how they would affect

7    the FEIS's conclusions about the impact of this alternative of the surrogate species.

8    In fact, at no point does the FEIS address the dangers of relying upon a flexible

9    guideline in place of the easily quantifiable protective standards of the 21-Inch Rule.

10       The discussion of alternatives in an EIS is "the heart of the environmental

11   impact statement," which "should present the environmental impacts of the proposal

12   and the alternatives in comparative form, thus sharply defining the issues and

13   providing a clear basis for choice among options by the decisionmaker and the

14   public40 C.F.R. § 1502.14. The Service's confusing and contradictory presentation

15   of the impacts of alternatives on old growth and species viability renders the FEIS

16   inadequate under NEPA. *See Ctr. for Biological Diversity v. U.S. DOI*, 623 F.3d

17   633, 648 (9th Cir. 2010) (finding that because of a flawed assumption, an EIS did

18   meet NEPA's requirements to compare the environmental effects of alternatives).

19       3.   Service Violates NEPA by Failing to Respond to Objections

20       Once it determines that an action may have a significant effect on the

21   environment, an agency must develop and publish a draft EIS, and then solicit

22   comments from the public. 40 C.F.R. §§ 1502.9 and 1503. An agency must respond

23   to those public comments in its final EIS, including addressing any scientific

MOTION FOR SUMMARY JUDGMENT - 21

1    evidence cited in those comments that contradict its conclusions. 40 C.F.R. §§

2    1502.9(b), 1503.4; *see Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d

3    1157, 1167-68 (9th Cir. 2003) (holding an agency must respond to evidence and

4    opinions that directly challenge the scientific basis for its EIS).

5         In comments on the Draft EIS for the 2019 Plan, NEWFC noted that the 2019

6    Plan's approach to managing old-growth habitats is ambiguous and would not

7    improve ecological resilience. FP 014803. In response, the Service claims that the

8    "effects analysis described in the FEIS shows that maintaining a 21" diameter limit

9    reduces the ability to attain the desired future condition of having a majority of most

10   vegetation types in late structure." FP 109253. Beyond repeating this conclusion,

11   however, the FEIS provides no such analysis, or any support for this conclusion.

12        NEWFC objected again to the new standards for old-growth harvest in its

13   comments to the FEIS. Noting the high ecological value of old-growth stands,

14   NEWFC challenged the departure from the 21-Inch Rule in favor of more liberalized

15   treatment of old-growth trees, citing to the conclusions of the Eastside Screens Panel

16   and other scientific consensus that old-growth trees need additional protection. AR

17   05570-74. In addition, NEWFC cited subsequent research studies indicating that

18   maintaining old-growth protections would produce better outcomes for old-growth

19   species than the "landscape restoration approach" favored in the EIS. AR 05571-72.

20   For example, NEWFC cited a paper contending that old forest stands on federal

21   lands should be "retained under [a] restoration strategy because of their ecological

22   and social significance, whether they are located inside or outside of current

23

MOTION FOR SUMMARY JUDGMENT - 22

1    reserves." *See* Jerry F. Franklin and K. Norman Johnson, *A Restoration Framework*

2    *for Federal Forests in the Pacific Northwest*, JOURNAL OF FORESTRY, 110:429-39

3    (2012) (Davis Dec. Ex. B) (cited at AR 05571).

4    In response to these objections, the Service asserted that "a broad body of

5    science now supports a more ecologically-based approach." FP 107839. However,

6    it did not identify or cite to any of that "broad body" of science, or identify any other

7    research contradicting the science cited in NEWFC's objection. Notably, the

8    administrative record does not even include many of the studies referenced in the

9    that objection—showing the Service did not even *consider* the crucial science

10   objectors presented to challenge its conclusions. *See* Motion for Leave to Consider

11   Extra-Record Evidence, ECF No. 46. Indeed, the record does not even contain the

12   Eastside Screens Panel report, demonstrating that the Service did not even consider

13   the rationale for the 21-Inch Rule before deciding to discard it. *Id.* This alone shows

14   the Service violated NEPA by failing to maintain the "scientific integrity" of its

15   analysis. 40 C.F.R. § 1502.24. The Service also violated NEPA by failing to respond

16   to extensive evidence presented to contradict its conclusion. *Ctr. for Biological*

17   *Diversity*, 349 F.3d at 1167; *see California v. Block*, 690 F.2d 753, 770-71 (9th Cir.

18   1982) (this "reflects the paramount Congressional desire to internalize opposing

19   viewpoints into the decision-making process to ensure that an agency is cognizant

20   of all the environmental trade-offs that are implicit in a decision").

21   *D. Sanpoil ROD and EA Fail to Explain how Change Will Affect Project*

22   The Sanpoil ROD was issued under the 2019 Plan, and represents the

23

MOTION FOR SUMMARY JUDGMENT - 23

1    confusion created by the 2019 Plan's abandonment of the bright-line 21-Inch Rule
2    in favor of a loose guideline. Although the Sanpoil Silviculture Report restates the
3    Old Growth Guideline (AR 06897), it is not clear how the Project intends to
4    implement it, or whether it will allow old-growth trees to be logged. The report does
5    note that the Sanpoil area contains too many "late open" spruce and subalpine fir
6    and too much "late closed" subalpine fir and lodgepole pine. AR 06873. It also
7    indicates that the Project plans 3,500 acres of treatments in late open and late closed
8    structures (AR 06885), and predicts a decrease of subalpine fir and lodgepole pine
9    in late closed structure as a result of Project treatments (AR 06883, Table 8). In Table
10   7, the Sanpoil EA quantifies how the Project will alter the prevalence of different
11   forest structure types, indicating it would move some forest structures away from
12   the 2019 Plan's desired conditions, including stands of mid-open Douglas-fir and
13   subalpine fir/lodgepole pine and late-open subalpine fir/lodgepole pine. AR 06038.

14        However, as discussed *supra*, the Service's refusal to provide specifics on the
15   implementation of the Project, including meaningful maps or site-specific
16   prescriptions, means that the public has been unable to determine the impact the
17   Project will have on old-growth within the Sanpoil area—illustrating the danger of
18   the 2019 Plan's invitation for the Service to decide the fate of irreplaceable old-
19   growth habitat on a project-by-project basis.

20   **IV.    Sanpoil Project Violates NEPA, NFMA, and the APA**

21        NEPA analyses must thoroughly assess direct, indirect, and cumulative
22   environmental effects of the proposed alternatives. *See* 42 U.S.C. § 4332(2)(C);

23

MOTION FOR SUMMARY JUDGMENT - 24

1    40 C.F.R. §§ 1502, 1508. To take the required "hard look," agencies must consider

2    all past, present, and "reasonably foreseeable" future impacts, even when preparing

3    an EA. *Idaho Sporting Cong.*, 305 F.3d at 973.

4          *A. Service Fails to Analyze any Meaningful Cumulative Impacts*

5       When evaluating the impact of a project on the environment, an agency must

6    consider "the impact on the environment which results from the incremental impact

7    of the action when added to other past, present, and reasonably foreseeable future

8    actions regardless of what agency (Federal or non-Federal) or person undertakes

9    such other actions." 40 C.F.R. § 1508.7. A cumulative impacts analysis "must be

10    more than perfunctory; it must provide a useful analysis of the cumulative impacts

11    of past, present, and future projects." *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387

12    F.3d 989, 993-94 (9th Cir. 2004); *see also Native Ecosystems Council v. Dombeck*,

13    304 F.3d 886, 895 (9th Cir. 2002) (applying cumulative impacts standard to an EA

14    for a timber sale and finding that "without a consideration of individually minor but

15    cumulatively significant effects it would be easy to underestimate the cumulative

16    impacts of the timber sales.") (cleaned up).The Service makes virtually no effort to

17    analyze any of the Project's cumulative impacts, choosing to completely ignore

18    several recent and planned logging projects in nearby areas of the Forest.

19       Within the last decade, the Service has implemented six substantial logging

20    projects in areas either adjacent or in close proximity to the Sanpoil Project, while it

21    plans to start two more projects in this area over the next two years. *See* Attachment

22    A (map of project areas); *see also* Supp. AR 01289 (map showing logging projects

23

MOTION FOR SUMMARY JUDGMENT - 25

planned from 2020-2040 in areas surrounding Sanpoil).

The Service's projects in the recent past have included: the Kettle Face Fuel Reduction Project in 2011, authorizing 16,203 acres of forest treatments. (AR 01633, 01650); the Walker Fuels Reduction Project in 2012 authorizing commercial, pre-commercial, and fuels treatments over 6,555 acres (AR 2024); the Deer Jasper Restoration Project in 2014, allowing timber treatments over 25,128 acres (AR 02370-79, Supp. AR 00333); the Sherman Pass Project in 2016, allowing timber harvests and burns over 34,043 acres directly adjacent to the Sanpoil Area (AR 03519, 03536-38); the Orient Watershed Project in 2018, authorizing 6,600 acres of timber harvests and fuels treatments (AR 0538); and the Trout Lake Insect and Disease Restoration Project in 2019, allowing 2,973 acres of timber treatments (AR 05763). Meanwhile, at the time it approved the Sanpoil ROD, the Service had planned to start the Bulldog Project as early as 2021, implementing treatments in a 44,000-acrea area northeast of Sanpoil, and the Dollar Mountain Project in 2022, encompassing 46,388 acres directly east and adjoining Sanpoil. Supp. AR 01289.

In analyzing the Project's impacts, the EA purports to consider all the "relevant past, present, and reasonably foreseeable future actions," referencing an Appendix that discusses past fires, nearby commercial harvests on private land and minor upcoming Projects. AR 06036, 06064-68, Tables 14 & 15. However, the only Service logging project it mentions is Sherman Pass, which receives only a cursory reference in Appendix A, and is discussed nowhere else in the EA. *Id.* (describing in three sentences some of the treatments the Sherman Pass Project will apply, but

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

not assessing any of its impacts). The Service does not even mention, much less analyze, any cumulative impacts related to the Kettle Face, Walker, Deer Jasper, Trout Lake, Orient Watershed, Bulldog, or Dollar Mountain projects. *Id.*

By contrast, several of these projects cross-referenced one another when discussing cumulative impacts. The Sherman Pass EA acknowledged that the project would combine with other nearby logging projects to impact recreation, mentioning Walker, Deer Jasper, and the planned Sanpoil projects. AR 03604 (cumulative impact would be "decline in the level of natural and undeveloped environment, outstanding opportunities for solitude, and primitive and unconfined recreation"). In fact, the Sherman Pass EA specifically mentioned cumulative impacts on the Kettle Crest National Recreational Trail, which runs across the Sanpoil area. AR 03603.

*B. Service Fails to Analyze Impacts on Ability to Meet Diversity Mandate*

The Service acknowledges that it lacks complete or reliable information about most wildlife populations in the Sanpoil area. AR 06286. Despite this imperfect knowledge, however, the Service recognizes that it "must still ensure that vegetation management activities in the project area do not directly, indirectly, or cumulatively impact the viability of wildlife species across the Forest." AR 06286-87. However, the Project fails to meet this requirement for numerous species.

1.  Gray Wolves

Gray wolves are a Region 6 sensitive species, and a state-listed endangered species. FP 89945, 109922. The Service indicates there are at least two packs of wolves in the Sanpoil area. AR 06308. Human conflict is a primary source of

MOTION FOR SUMMARY JUDGMENT - 27

mortality for wolves. See FP 102261-63 (state recovery plan seeks to minimize sources of mortality and disturbances at den sites); AR 06309 (BE recognizes "primary source of wolf mortality is due to human interactions"); FP 102064 (Service report indicating wolf habitat is impacted by timber harvest and grazing).

Nevertheless, the Service summarily concludes that the Project "may impact" individual wolves" but is not likely to lead to a loss of viability, without performing any meaningful analysis of the impacts of increased activity and intrusions from logging projects. *See* AR 06046. Instead, the EA's full analysis of the Project's impact on wolves is contained in two sentence fragments that relate solely to the impact on big game. *Id.* In discussing the Project's other direct and cumulative impacts on wolf habitat and populations, the Service merely refers repeatedly to its grizzly bear analysis. *Id; see also* AR 06308 (BE). The Service does not explain how the cumulative effects on such disparate species could be the same, including how the "forage" analysis is the same for grizzly bears, which are omnivores, as for wolves, which are carnivores. *See* AR 06044 (discussing berry production and green forage production and palatability for grizzly bear).

As KRCG pointed out in objections to the 2019 Plan "[l]ivestock grazing is the number one contributor to WDFW wolf removal in the State of Washington." FP 106569. Nevertheless, the Service does not analyze the impact on wolves—or any other carnivore—from the 10,585 acres of grazing area that it estimates the Project will add to the Quartz grazing allotment. AR 06054 (concluding summarily that the increase in grazing would lead to better riparian health by causing a broader

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1 distribution of grazing). In response to objections that this analysis was inadequate,

2 the Service merely re-referenced the same inadequate analysis. AR 06704-05.

3      Indeed, the Service does not consider the cumulative impact that Sanpoil

4 would have on wolves when combined with any other project, even though it

5 recognizes that such impacts should be considered on a forest-wide scale, and even

6 though other projects included such a discussion. *See, e.g.* AR 03626-27 (Sherman

7 Pass EA, discussing cumulative impact on wolves from Sanpoil, Walker, and Deer

8 Jasper projects); Supp. AR 00228-45 (lengthy discussion of direct and cumulative

9 impacts on wolves in Deer Jasper EA, considering several other nearby projects);

10                          2. <u>Wolverine</u>

11      Wolverine are a Region 6 sensitive species and a candidate for state and

12 federal protection. FP 089947, AR 06296. No wolverine have been spotted in the

13 Sanpoil Area, but wolverine are known to live in low densities across large home

14 ranges, and there have been confirmed sightings of the infamously elusive species

15 elsewhere within the Kettle Range. AR 05436. Although the Service disputes that

16 Sanpoil provides suitable wolverine denning habitat, it concedes it contains potential

17 foraging habitat and travel corridors. AR 05436-37.

18      The EA concludes the Project is "not likely to jeopardize the existence of

19 wolverines," but this conclusion is based entirely on the unsupported assumption

20 that the Project would "change the structural stage distribution by moving it towards

21 more historic conditions, conditions in which wolverines evolved" AR 06044 (EA).

22 The EA does not recognize the Project would have any negative direct effects for

23

MOTION FOR SUMMARY JUDGMENT - 29

1    wolverine, even though its cumulative effects analysis acknowledges that other

2    vegetation projects would cause "an additional decrease in hiding cover for

3    approximately 5 years, a decrease in seclusion habitat due to an increase in human

4    disturbance." AR 06044. As with wolves, the BE section on wolverine foraging

5    habitat refers simply to the section on grizzly bear. AR 06297. The Service concludes

6    that no Project activities would occur in any mapped travel corridors for wolverine

7    or pine marten, without providing information on the location of those corridors—

8    or furnishing sufficient site-specific Project details to show where Project activities

9    will take place. *Id.; see discussion supra.* As with wolves, the Service does not

10    conduct any analysis of the cumulative impact on wolverines when combined with

11    other nearby Service timber projects—again, in contrast to the discussion in many

12    of the other project EAs. AR 03631-32 (Sherman Pass EA).

13    3.    Sensitive Bat Species

14    The EA's analysis is similarly deficient for all sensitive bat species. The BE

15    notes that the Sanpoil area contains habitat for the little brown bat, a Region 6

16    sensitive species, and the Townsend's big-eared bat, a Region 6 sensitive species

17    and state candidate species, and that both species have been documented in the area.

18    AR 06299, 06309; FP 109922-23. However, the Additional Terrestrial Wildlife

19    Analysis Report concedes that the Service has very little information on where any

20    of these bats live. For example, it indicates it is unable to do a viability assessment

21    for either the Townsend's big-eared bat or the pallid bat due to a "lack of knowledge

22    to adequately map habitat[.]" AR 06259-60, Table 1. This report acknowledges that

23

MOTION FOR SUMMARY JUDGMENT - 30

1    the Project could decrease roosting sites for bats (AR 06264), while the BE notes

2    that the highest conservation priority for the Townsend's bat is to "reduce human

3    disturbance and destruction of roost sites." AR 06310. Nevertheless, the EA

4    concludes that it is "not likely to lead [to] a trend toward federal listing or loss of

5    viability" because Project "activities would either be far enough removed from

6    known bat roost sites to have no effect on species or would be timed to avoid periods

7    that the sites would be occupied." AR 06046. Again, the EA does not explain how

8    it can minimize human disturbance or destruction of roost sites, when the Service

9    has conceded that it does not know where these bats live.

10                  4.  Sensitive Bird and Invertebrate Species

11         The Sanpoil EA acknowledges that the cumulative effects area for the

12    Northern goshawk is the entire Colville Forest and grants that other "USFS

13    vegetation restoration projects" will contribute to effects on the goshawk. AR06045,

14    Table 11. However, the EA then refers only to the projects contained in Appendix

15    A, which excludes significant actions such as the Walker, West Zone, Deer Jasper,

16    Bulldog, and Dollar Mountain projects. *Id.* The EA fails to engage in any meaningful

17    analysis of cumulative effects to the goshawk, other than to say they will be the

18    "same as direct and indirect effects described for this proposed project." *Id.* It

19    describes these effects as "reduction of foraging habitat and a potential increase in

20    availability of food resources for the next 5-10 years," and a "potential abandonment

21    of territories," which could reduce the "breeding population and could affect the

22    species viability." *Id.* Although it does not aggregate these impacts for all the Service

23

MOTION FOR SUMMARY JUDGMENT - 31

1  projects in the area, the Sanpoil EA nevertheless concludes that they "are not likely

2  to lead in a trend towards federal listing or loss of viability." *Id.*

3  As for "[a]ll sensitive invertebrates," the Sanpoil EA acknowledges that "less

4  mobile individuals could be killed," "food plants could be damaged," and that the

5  increase in "grazing has the potential to remove forage and host plants and alter the

6  integrity of meadows and riparian habitats[.]" AR 06046, Table 11. The sensitive

7  invertebrates within the Project Area include the Western bumblebee, a Region 6

8  sensitive species in alarming decline throughout the West. Without looking at the

9  cumulative effects of any other Forest Service project, or analyzing specific effects

10  to the bumblebee, Sanpoil EA collectively reaches the conclusion that the direct and

11  cumulative effects of the project "[m]ay impact individuals but is not likely to lead

12  in a trend toward federal listing or loss of viability" to these invertebrates. *Id.*

13  Such cursory and contradictory analysis is plainly insufficient to meet the

14  NFMA Diversity Mandate, or satisfy the level of analysis required under SEPA and

15  the APA. NEPA and NFMA require an agency to support its claims that it has met

16  NFMA's Diversity Mandate by setting forth the methodologies used and referencing

17  the scientific or other sources relied upon for its conclusions*Earth Island Inst. v. U.S.*

18  *Forest Serv.*, 442 F.3d 1147, 1160 (9th Cir. 2006) (citing 40 C.F.R. § 1502.24)

19  *C. Failure to Develop Site Specific Plans*

20  When an agency proposes a project to be implemented without further, site-

21  specific NEPA review, it must disclose the details of its proposed action at a site-

22  specific level and perform a detailed environmental analysis of the reasonably

23

MOTION FOR SUMMARY JUDGMENT - 32

foreseeable impact of those site-specific actions. *Se. Alaska Conserv. Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 1006 (D. Alaska 2020). In the absence of such specifics, "general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."*Idaho State Snowmobile Ass'n v. U.S. Forest Serv.*, No. 1:19-cv-00195-DCN, 2021 U.S. Dist. LEXIS 25886, at *40 (D. Idaho Feb. 10, 2021).

The Service failed to develop site-specific plans for its silviculture treatments, fuels treatments, and road construction prior to completing the Sanpoil EA, rendering its analysis not meaningful and not in accordance with 50 C.F.R. § 1508.23. To the extent that the Service could not reasonably develop such site-specific plans prior to finalizing the Sanpoil EA, the Service failed to disclose such incomplete or unavailable information, specify why it could not reasonably be obtained, and evaluate its reasonably foreseeable adverse impacts, as required by 50 C.F.R. § 1502.21. To the extent the Service developed site-specific plans prior to completing the EA but failed to disclose them, that would prevent the public from providing meaningful comment on the impact of those plans. This failure is a violation of NEPA, which "requires that environmental analysis be specific enough to ensure informed decision-making" and allow for "meaningful public participation." *Se. Alaska Conserv. Council*, 443 F. Supp. 3d at 1009

The EA describes three activities under the Proposed Action: "silviculture treatments;" "fuels treatments;" and "roads." AR 06018-19. The Proposed Action provides for treatments that include "variable density commercial thinning;"

MOTION FOR SUMMARY JUDGMENT - 33

1   "commercial thinning with openings for insect and disease;" "small pine thinning;"

2   "shelterwood treatments;" and "precommercial thin[s]." AR 06019-20. The EA

3   describes how those treatments would be applied across the Sanpoil area through a

4   single, small-scale map, without road numbers or geolocation data to allow those

5   units and their boundaries to be identified. AR 06024, Fig. 6.

6        In the Sanpoil Silviculture Report, the Service indicates how many acres of

7   each type of logging would occur in each type of forest structure. AR 06884. For

8   example, "late closed" structure, defined as areas containing trees over 20 inches in

9   diameter and canopy cover of over 40%, would be subject to 509 acres of

10  "commercial thin and machine pile burn," 185 acres of "commercial thin with

11  openings," and 526 acres of "precommercial thin[ning]." *Id.* Overall, the Service

12  prescribes 3,200 acres of logging within late closed structure forests, or 18% of the

13  total Project treatments. AR 06885. Nowhere does the EA or any of its supporting

14  documents reveal vital, site-specific details, including how the units on the Project

15  map would look after harvest, what diameter of trees would be logged in each unit,

16  how many trees would be cut down or burned in each location, when different

17  treatments would occur relative to each other, what the spacing would be between

18  the trees that remain, or how these treatments would vary in and across single units.

19  As applied to many areas, the descriptions are broad enough to encompass anything

20  from a selective culling of dead and diseased trees to large clearcuts of healthy

21  forest—including, under the 2019 Plan, potentially cutting old-growth trees.

22       Instead, the Service describes each type of treatment only in vague, general

23

MOTION FOR SUMMARY JUDGMENT - 34

1    terms. For example, "variable density commercial thinning" would target "less

2    vigorous trees" for harvest; "commercial thinning with openings for insect and

3    disease" treatments would leave "small group openings" in areas of "very poor

4    vigor;" and "precommercial thin[ning] would "leave the largest, most vigorous

5    disease-free trees for the residual stand." AR 06019-20 The EA also lists other

6    activities these treatments "*may*" involve: replanting "*may* occur" in the openings

7    created via "commercial thinning with openings for insect and disease;" during

8    "small pine thinning," openings of up to 30% of the stand "*may* occur;" after which

9    planting "*may* occur if needed to attain full stocking levels." *Id.* Similarly, to provide

10    hiding cover for wildlife "[w]ithin ungulate winter range, where the opportunity

11    exists," the Service would "*to the extent feasible*," "retain clumps or patches of

12    shrubs and trees to provide hiding cover." AR 06035 (emphases added).

13        While the EA includes two maps identifying the location of all other proposed

14    road activities, neither map shows the 67 miles of "existing non-system road[s]"

15    identified for restoration. AR 06027-28. The Service acknowledged that when it

16    issued the EA, the condition and status of these roads had still "not been validated

17    by field surveys." AR 06029.

18        The Sanpoil EA indicates the Proposed Action would open 10,585 "capable

19    acres" within the Quartz Allotment for livestock grazing. AR 06054. The Quartz

20    Allotment spans the entire Sanpoil Project Area, and neither the Sanpoil EA nor its

21    supporting documents indicate where these additional grazing acres will be within

22    the Project Area. In addition to being the source of conflicts with native predators,

23

MOTION FOR SUMMARY JUDGMENT - 35

1   which leads to the state-sanctioned killing of wolves, bears, and cougars, the 2019

2   FEIS acknowledges that grazing can dramatically alter native ecological

3   communities, harming both upland and riparian habitat by degrading vegetation,

4   soils, and streams, and potentially decreasing water quality and species viability. FP

5   108535-36. Because the Forest Service does not disclose where additional grazing

6   will occur, it cannot—and does not—evaluate the impact this additional grazing

7   would have on sensitive habitats or the species that depend on them.

8       Overall, the Forest Service is noncommittal about the effects the Project will

9   have on forest structure, indicating the Project might be "neutral" with regard to

10   progress toward desired plan conditions; might "maintain or make progress" toward

11   one or more desired conditions in the long term, but "adversely affect progress

12   toward or maintenance of one or more desired conditions in the short term;" or might

13   make progress toward one or more of the desired conditions in the long term, while

14   also "adversely affect[ing] progress toward other desired conditions in a negligible

15   way over the long term." AR 06895-96. The EA does not show how the Project

16   would impact forest structure on the landscape scale, and is vague about how the

17   Project will affect any particular portion of the Sanpoil area, It indicates the Project

18   will not clear-cut any area larger than 40 acres, but otherwise says only that

19   "openings resulting from the project would be commensurate with patch size and

20   historical conditions for size and distribution reflecting natural disturbance processes

21   and desired conditions described in the Forest Plan." AR 06896.

22       Indeed, the EA suggests the Service cannot determine the environmental

23

MOTION FOR SUMMARY JUDGMENT - 36

consequences of some aspects of the Project, because it has not designed them yet. For example, the EA indicates that treatments "*would be* designed and implemented to reduce stand density, canopy layering, and the preponderance of Douglas-fir and subalpine fir," and that silviculture prescriptions "*would be* designed to move stand-level susceptibility from a "High" or "Moderate" level to a "Moderate" or "Low" level or be designed to maintain a "Low" level of susceptibility." AR 06037. The EA also indicates the Project would enhance the "extent and vigor" of quaking aspen through conifer felling, but that the "extent to which this would occur is estimated to be on the order of 50-500 acres within the footprint of planned activities[.]" *Id.* Furthermore, "the exact extent or location of each meadow and aspen stand affected is uncertain." *Id*. The EA concludes that shaded fuel breaks, ladder fuel reduction, and hand and machine pile burning would "*likely* reduce the quality of the existing semi-primitive non-motorized classes of dispersed recreation and the natural appearing landscapes" along the perimeter of the Roadless Areas. AR 06056.

KRCG and NEWFC asked the Service to provide site-specific information in a letter sent prior to completion of the Project.  The Service responded that:

> Detailed, unit-by-unit silvicultural prescriptions will be finalized after a Decision is issued for the project as a whole and field assessments are completed prior to implementation. The uncertainty of decision details, changing conditions, and additional time sometimes creates a need for ongoing reconnaissance following the decision and prior to finalization of timber sale or service contracts, or activities performed by the Forest Service.

AR 06388. Thereafter, KRCG and NEWFC submitted detailed objections to the EA, marking the first time in its 18-year history that NEWFC has filed an objection to a Service Project. Coleman Dec. ¶ 6.

MOTION FOR SUMMARY JUDGMENT - 37

1 NEWFC objected that the Service did not provide adequate information for

2 the public to collaborate effectively. AR 06372. In particular, NEWFC identified

3 "several inadequacies in the public information that has precluded them from

4 effectively collaborating, such as unreadable maps, no specific prescriptions of

5 proposed commercial harvests, and no description of the application of the landscape

6 prescriptions in the final EA." AR 06372. KRCG echoed these concerns, objecting

7 that the descriptions of the Proposed Action's "silviculture" and "fuels treatments"

8 were vague to the point of prohibiting informed public comment. KRCG noted the

9 Service had provided a small number of sample unit prescriptions three days before

10 it released the EA. KRCG challenged the Service's failure to release prescriptions

11 for the entire Project. KRCG told the Forest Service that "without disclosing what

12 prescriptions will be applied where, there is no way for the Forest Service to assert

13 it reasonably took a hard look at the environmental impacts of the Sanpoil project,

14 nor can the public meaningfully comment on the project." AR 06385.

15 *D. Service Was Required to Develop an EIS for the Sanpoil Project.*

16 The Service ducked conducting a full analysis of the Project through an EIS

17 despite the Project's broad scope, controversial nature, impact to sensitive wildlife

18 species, and alteration of unique geological and recreational areas.

19 NEPA requires federal agencies to prepare an EIS for "major Federal actions

20 significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

21 In considering whether a project has a significant effect on the environment,

22 agencies must consider "[w]hether an action is related to other actions with

23

MOTION FOR SUMMARY JUDGMENT - 38

1    individually insignificant but cumulatively significant impacts." 40 C.F.R. §

2    1508.27(b)(7). Agencies are required to evaluate both the context and intensity of an

3    action to determine the significance of its impact on the environment. *Id.* § 1508.27.

4        Agencies are required to evaluate both the context and intensity of an action

5    to determine the significance of its impact on the environment. 40 C.F.R. § 1508.27.

6    Context refers to the significance of the action with regard to society as a whole, the

7    affected region, the affected interests, and the locality. *Id.* § 1508.27(a). Both short-

8    and long-term effects are relevant to the action's context. *Id.*

9        Courts have found that the presence of any one of these factors, or a

10   combination of multiple factors, may be sufficient to indicate project may have a

11   significant impact to the environment, necessitating *an EIS. Ctr. for Biological*

12   *Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008).

13   NEPA requires an agency to use detailed and quality information so that it will "not

14   act on incomplete information, only to regret its decision after it is too late to

15   correct." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000).

16       In evaluating intensity, an agency must consider ten "significance" factors,

17   several of which indicate the Forest Service should have developed an EIS for the

18   Sanpoil Project, including, but not limited to, the fact that the Project: (1) would

19   have a significant environmental impact, especially when considered along with the

20   impact of other related projects the Service omitted from its analysis; (2) deals with

21   issues of high controversy, such as impacts on wildlife, including several threatened

22   and endangered species; and the most effective means to promote the health of old-

23

MOTION FOR SUMMARY JUDGMENT - 39

growth forests; (3) contains elements of great uncertainty, including unknown impacts on several wildlife species whose status the Service was unable to accurately assess; the uncertainty of the impact of unspecified and/or undeveloped treatments on Forest structure and recreation; and the unknown cumulative impacts on wildlife, recreation, and aquatic habitats; (4) would have an impact on unique geographic areas, because it proposes treatments next to and within Roadless Areas and a recommended wilderness area; (5) would have adverse impacts on state and federal sensitive, threatened, or endangered species and their habitats; and (6) would set a precedent for the Service to approve additional Projects without an adequate disclosure or analysis of their site-specific or cumulative impacts. *See* 40 C.F.R. § 1508.27(b) (listing factors). If for no other reason, the Service should be required to complete an EIS on the Sanpoil Project because its EA failed to provide meaningful site-specific details or analysis, leaving the Projects effects uncertain. "Preparation of an EIS is mandated 'where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent speculation on potential . . . effects." *Barnes v. U.S. DOT*, 655 F.3d 1124, 1140 (9th Cir. 2011).

### CONCLUSION

The Service's decision to approve the 2019 Plan and proceed with the Sanpoil Project is arbitrary and capricious pursuant to the APA. 5 U.S.C. § 706(2), and Plaintiff asks for those decisions to be invalidated, vacated, and remanded.[8]

---

[8] Should the Court grant this motion in whole or part, Plaintiff suggests the parties submit supplementary briefing on the appropriate remedy.

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX:206.456.5191

1   ANIMAL & EARTH ADVOCATES, PLLC

2
            */s/ Claire Loebs Davis*
3           Claire Loebs Davis
            2226 Eastlake Ave E #101
4           Tel: (206) 601-8476
            claire@animalearthlaw.com
5
            *Attorney for Plaintiffs*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

MOTION FOR SUMMARY JUDGMENT - 41



Attachment A:
Select Projects, 2012-2022
*Black borders are Colville*
*National Forest boundaries*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/EMF system, which will send notification of this filing to all counsel of record.


*/s/ Claire Loebs Davis*
Claire Loebs Davis