TODD KIM
Assistant Attorney General
PAUL G. FREEBORNE
TYLER M. ALEXANDER
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Freeborne Tel: (202) 532-5271
Freeborne Fax: (202) 305-0506
Alexander Tel: (202) 305-0238
Alexander Fax: (202) 305-0506
paul.freeborne@usdoj.gov
tyler.alexander@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KETTLE RANGE CONSERVATION GROUP,<br><br>*Plaintiff,*<br><br>v.<br><br>U.S. FOREST SERVICE; GLENN CASAMASSA, Pacific Northwest Regional Forester, U.S. Forest Service; RODNEY SMOLDON, Forest Supervisor, Colville National Forest; TRAVIS FLETCHER, District Ranger, Republic Ranger District, U.S. Forest Service.<br>    *Federal Defendants.* | Case No. 2:21-cv-00161<br><br>**FEDERAL DEFENDANTS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION TO FOR SUMMARY JUDGMENT**<br><br>**February 9, 2023**<br>**With Oral Argument: 1:30 p.m.** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................1

FACTUAL BACKGROUND ...............................................4

    I.    2019 Revisions to the CNF Forest Plan ..............................4

    II.    Sanpoil Project ...................................................8

STATUTORY BACKGROUND.........................................11

    I.    National Environmental Policy Act ..................................11

    II.    National Forest Management Act ....................................13

STANDARD OF REVIEW ...............................................15

ARGUMENT ................................................................16

    I.    Plaintiff's Forest Plan Challenge is Not Ripe for Review .................17

    II.    Plaintiff's Forest Plan Challenge was also Waived ...........................19

    III.    Plaintiff's Forest Plan Challenge also Fails on its Merits.................20

        A.    The Forest Service's Surrogate Species Methodology is Supported by the Best Available Science ................................22

        B.    The Selected Alternative Promotes Diversity by Cultivating More Resilient, Functional Late Structure............26

        C.    The Forest Service Considered and Responded to Public Comment................................................................27

    IV.    The Forest Service Disclosed and Took a "Hard Look" at the Potential Environmental Effects of the Sanpoil Project.....................30

        A.    The Forest Service Disclosed the Project's Treatments ..........30

        B.    The Forest Service Assessed the Cumulative Effects of the Project .....................................................................36

1.    The Forest Service Assessed the Effects on
Recreation ......................................................................38

2.    The Forest Service Also Assessed the Effect on
Endangered    and Sensitive Species ............................39

C.    The Forest Service's FONSI was not Arbitrary or
Capricious ............................................................................43

CONCLUSION ...................................................................................49

ii

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Evans*,
371 F.3d 475 (9th Cir. 2004) ................................................... 53, 59

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
126 F.3d 1158 (9th Cir. 1997) .......................................................14

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983) ........................................................................33

*BARK v. Northrop*,
607 F. App'x 652 (9th Cir. 2015) ............................................ 54, 55

*Barnes v. FAA*,
865 F.3d 1266 (9th Cir. 2017) .......................................................55

*Barnes v. U.S. Dep't of Transp.*,
655 F.3d 1124 (9th Cir. 2011) .................................................. 57, 59

*Bay Neighborhood Council, Inc. v. Karlen*,
444 U.S. 223 (1980) ......................................................................14

*Blue Mountains Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998) ............................................ 13, 52, 55

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) ........................................ 13, 14, 15, 35

*Cascadia Wildlands Project v. U.S. Forest Serv.*,
386 F. Supp. 2d 1149 (D. Or. 2005) ..............................................44

*Cascadia Wildlands v. Bureau of Indian Affairs*,
801 F.3d 1105 (9th Cir. 2015) .................................................. 47, 48

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ......................................................................19

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) .........................................................17

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ................................................................ 23, 24

iii

*Ecology Ctr. v. Castaneda,*
    574 F.3d 652 (9th Cir. 2009) ...................................................16

*Env'tl. Prot. Info. Ctr. V. U.S. Forest Serv.,*
    451 F.3d 1005 (9th Cir. 2006) ...............................................54

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ...............................................................19

*Forest Guardians v. U.S. Forest Serv.,*
    329 F.3d 1089 (9th Cir. 2003) ...........................................16, 30

*Forest Guardians v. U.S. Forest Serv.,*
    641 F.3d 423 (10th Cir. 2011) ...............................................24

*Idaho Sporting Cong., Inc. v. Rittenhouse,*
    305 F.3d 957 (9th Cir. 2002) .................................................15

*In Def. of Animals v. U.S. Dep't of Interior,*
    751 F.3d 1054 (9th Cir. 2014) ...........................................53, 56

*In re Big Thorne Project v. United States Forest Serv.,*
    857 F.3d 968 (9th Cir. 2017) .................................................19

*Inland Empire Pub. Lands Council v. Schultz,*
    807 F. Supp. 649 (E.D. Wash. 1992) ....................................15

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976) .......................................................15, 48, 51

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) .....................................17, 30, 31, 34

*League of Wilderness Defs. v. United Sates. Forest Serv.,*
    549 F.3d 1211 (9th Cir. 2008) ...........................................18, 46

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ...............................................................21

*Marsh v. Oregon Natural Resources,*
    490 U.S. 360,109 S. Ct. 1851 (1989) ....................................53

*N. Alaska Env'tl Ctr. v. Kempthorne,*
    457 F.3d 969 (9th Cir. 2006) .................................................36

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) .................................................54

*Native Ecosystems Council v. Kimbell*,
  No. CV 04-127-M-DWM, 2006 WL 8430971, (D. Mont. Aug. 29, 2006) .........25

*Native Ecosystems Council v. Lannom*,
  No. CV 21-22-M-DWM, 2022 WL 1001493 (D. Mont. April 4, 2022).............25

*Native Ecosystems Council v. Lannom*,
  No. CV 21-22-M-DWM, 2022 WL 2309011 (D. Mont. Apr. 25, 2022).............25

*Native Ecosystems Council v. Marten*,
  No. CV 17-47-M-DLC-JCL, 2018 WL 3630132 (D. Mont. July 31, 2018)........20

*Native Ecosystems Council v. United States Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ........................................................... 57, 58

*Native Ecosystems Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012) ........................................................... 15, 16

*Navickas v. Conroy*,
  575 F. App'x 758 (9th Cir. 2014) ........................................................ 37, 38, 41

*Neighbors of Cuddy Mountain v. Alexander*,
  303 F.3d 1059 (9th Cir. 2002) ........................................................... 21, 22, 44

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2004) ............................................................. 48, 53

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ...........................................................................20

*Plains Res. Council, Inc. v. Surface Transp. Bd.*,
  668 F.3d 1067 (9th Cir. 2011) ...........................................................44

*Portland Audubon Soc. v. Endangered Species Committee*,
  984 F.2d 1534 (9th Cir. 1993) ...........................................................51

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ..................................................................... 11, 12

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ........................................................ 18, 19

*Se. Alaska Conservation Council v. United States Forest Serv.*,
  443 F. Supp. 3d 995 (D. Alaska 2020)............................................. 38, 39

*Seattle Audubon Soc'y v. Moseley*,
  80 F.3d 1401 (9th Cir. 1996).............................................................26

v

*Swanson v. U.S. Forest Serv.*,
  87 F.3d 339 (9th Cir. 1996) ...................................................................14

*The Wild Rockies v. Bradford*,
  856 F.3d 1238 (9th Cir. 2017) ...............................................................16

*The Wild Rockies v. Marten*,
  789 F. App'x 583 (9th Cir. 2020) ..........................................................20

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ...................................................................... 11, 23

*Westlands Water Dist. v. U.S. Dep't of the Interior*,
  376 F.3d 853 (9th Cir. 2004) ......................................................... 12, 13

*Wild Fish Conservancy v. Nat'l Park Serv.*,
  687 F. App'x 554 (9th Cir. 2017) ...........................................................53

*Wild Wilderness v. Allen*,
  871 F.3d 719 (9th Cir. 2017) ..................................................................52

*WildEarth Guardians v. Conner*,
  920 F.3d 1245 (10th Cir. 2019) ............................................... 38, 39, 41

**Statutes**

16 U.S.C. § 529 ............................................................................................25

42 U.S.C. § 4332(2)(C) ...............................................................................12

42 U.S.C. §§ 4321-4331 ..............................................................................11

5 U.S.C. § 706(2)(A) ...................................................................................18

7 U.S.C. § 6912(e) .......................................................................................24

**Regulations**

36 C.F.R. § 218.13 .......................................................................................19

36 C.F.R. § 219.14(f) ...................................................................................25

36 C.F.R. § 220.4(f) .....................................................................................38

36 C.F.R. § 294.13 .........................................................................................7

36 C.F.R. §§ 218.1-218.15 ..........................................................................20

36 C.F.R. Part 218 .......................................................................................19

36 C.F.R. Part 219 .......................................................................................19

40 C.F.R. § 1501.1 ................................................................................................11

40 C.F.R. § 1501.4 ................................................................................................12

40 C.F.R. § 1502.14 ..............................................................................................27

40 C.F.R. § 1502.9 ................................................................................................28

40 C.F.R. § 1508.27(b)(3) .....................................................................................48

40 C.F.R. § 1508.27(b)(4) .....................................................................................46

40 C.F.R. § 1508.27(b)(5) .....................................................................................46

40 C.F.R. § 1508.7 ................................................................................................12

40 C.F.R. § 1508.8(a) ...........................................................................................36

40 C.F.R. § 1508.8(b) ...........................................................................................36

40 C.F.R. § 1508.9(a)(1) .......................................................................................37

40 C.F.R. §§ 1501.3 ..............................................................................................12

40 C.F.R. §§ 1502.16 ............................................................................................36

40 C.F.R. pt. 1502 ................................................................................................12

85 Fed. Reg. 43304 (July 16, 2020) .....................................................................11

# INTRODUCTION

Plaintiff challenges the Forest Service decisions authorizing the 2019 revision of the Colville National Forest's ("CNF's") Forest Plan and the Sanpoil Project of the CNF under the National Forest Management Act ("NFMA") and the National Environmental Policy Act ("NEPA"). Because Plaintiff's claims are not subject to judicial review and fail under the Administrative Procedure Act's ("APA's) deferential standard of review, the Court should enter summary judgment for Federal Defendants and deny Plaintiff's motion.

The Forest Service revised the CNF's 1988 Forest Plan in 2019 to respond to the changed economic, social and ecological conditions that had occurred over the 31-year life of the Plan and the Service's management of the Forest. Plaintiff asserts that the Forest Service acted in an arbitrary and capricious manner in purportedly abandoning an "old growth standard" that existed in the Eastside Screen amendment to the 1988 Plan and imposed a "bright-line rule" prohibiting the harvesting of trees over 21-inches in diameter at breast height ("DBH").

But to even be ripe for review under the APA, Plaintiff's Forest Plan challenge must be presented in connection with a site-specific project that includes the harvesting of trees in excess of 21 inches DBH outside the parameters of the Eastside screens. Because the Sanpoil Project imposes a limit on the harvesting of

trees in excess of 21 inches DBH, the Project fails to provide the requisite site-specific challenge that would permit the Court to exercise APA jurisdiction.

Plaintiff, moreover, failed to raise its concern regarding the harvesting of trees in excess of 21 inches DBH in its objections to the Forest Plan revision or to the Sanpoil Project, as required by Forest Service regulations. The objection is thus waived because Plaintiff failed to timely and properly raise it in the agency's mandatory administrative process.

And even if they were justiciable, Plaintiff's Forest Plan claims would still fail under the APA's deferential standard of review. The record shows that the Forest Service considered six alternatives in detail, and reasonably found that Alternative P resulted in a more resilient forest structure while preserving the viability of wildlife species. The Forest Service's methodology is explained in the record and comports with the best science, satisfying NFMA. Likewise, the Forest Service disclosed the environmental effects of each alternative and responded to dissenting comments raised during the public process. This satisfies NEPA, which does not mandate specific results and does not require the Forest Service to value the total acreage of late forest structure over fire resilient stand composition.

Plaintiff's challenge to the Sanpoil Project Decision Notice and Finding of No Significant Impact ("FONSI", collectively "DN/FONSI") similarly fails. Based on thirteen specialist reports, and after multiple opportunities for public

participation, including directly with Plaintiff, the Forest Service issued an environmental assessment ("EA") to assess the potential environmental effects of the Project. Notwithstanding this record, Plaintiff claims that the Forest Service was required to disclose tree-by-tree prescriptions for the treatments to the public. But NEPA only requires that the agency explain the treatments and where they will be applied. The Forest Service did just that that. Indeed, the EA lists the design elements and standard practices that would guide the prescriptions for implementing the Project.

Plaintiff also contends that the Forest Service failed to assess the cumulative effects of the Project when added to other past, present and reasonably foreseeable projects on the Forest. Plaintiff, however, fails to even acknowledge, much less address the record, including the various specialist reports that fully support the agency's conclusion that the Project will not have a significant cumulative effect.

Finally, Plaintiff argues that the Forest Service's FONSI was arbitrary and capricious, asserting that the Forest Service was required to prepare an Environmental Impact Statement (EIS), rather than an EA, in assessing the potential environmental impact of the Project. The Forest Service's FONSI determination, however, was well supported by the EA and Project record, and well within the agency's discretion to make. Plaintiff's argument to the contrary fails to even address the Project record support for the agency's FONSI.

The Court should accordingly grant this motion, and deny Plaintiff's motion.

## FACTUAL BACKGROUND

### I.    2019 Revisions to the CNF Forest Plan.

Established in 1907, the Colville National Forest contains 1.1 million acres of National Forest System land in northeastern Washington. FP_113753. Before 2019, the Colville was managed under a forest plan approved in 1988. *Id*. The old Forest Plan was amended 41 times, including in 1995 when the Forest implemented the Regional Forester's Forest Plan Amendment #2, Revised Interim Standards for Timber Sales on Eastside Forests (referred to by the Forest Service as the "Eastside Screens"). FP_002978-3028. The Eastside Screens interim wildlife standard prohibited the harvest of all live trees greater than 21 inches DBH. FP_113582. It also required a historical range of variability analysis to compare current stand structure to historical conditions.  *Id*.

As the official name reflects, the Eastside Screens was intended to be an interim rule. And after nearly two decades, its shortcomings were apparent.  *See, e.g.*, FP_108257 ("In addition to the issues related to addressing vegetative system resiliency for late successional and old forests discussed previously, the diameter size emphasis of the Eastside Screens lacks direction for other important habitat

4

structure elements such as snags and downed logs").[1]  Most relevant here, neither

the 1988 Forest Plan nor the Eastside Screens account for the effects of climate

change, which is transforming the National Forest System. FP_108213-14.

In the past, frequent fires through the Colville would keep tree densities low.

FP_113574. But decades of fire suppression have resulted in overstocked stands

with higher fuel loads, leading to higher intensity wildfires. FP_113574;

FP_ 108213. Climate change is a driving factor, resulting in drier conditions and

longer fire seasons. FP_113574; FP_108213; *see also* FP_109738-42 (discussing

impacts of climate change in northeast Washington). As the years passed, the

Forest Service saw a growing need to manage the forest for resiliency to fire—as

well as diversity in stand composition and structure—to foster "ecosystems more

adapted to climate change." FP_108306; *see also id.* (citing studies showing the

need to move toward more historic range of variability to improve forest

resilience).

So in 2019, the Forest Service replaced the 1988 Forest Plan with a new plan

based on the current best available science. FP_113566-628 (Record of Decision

("ROD")). In shaping the plan, the Forest Service considered sixteen alternatives,

advancing six to full consideration. Alternative P—the selected alternative— takes

---

[1] At the time of revision, the 1988 Forest Plan was well beyond the ten-to-fifteen-year plan life provided by NFMA. FP_108212.

a "whole landscape" approach, seeking to reach a "closer approximation of natural disturbance regimes." FP_108644. Under that approach, the Forest Service has more "flexibility in responding to climate change impacts by having management areas that allow a variety of management options to address unforeseen impacts." FP 108306. This flexibility includes the ability to carry out treatments in late structure forest necessary to move stands toward more resilient compositions. *Id.*

But "more flexibility" does not mean "unlimited flexibility." The Forest Plan replaces the Eastside Screens with a new guideline for large tree management.[2] FP_113582; FP 109776-77 (large tree management guideline). The new guideline still protects late structure; "[m]anagement activities should retain and generally emphasize recruitment of individual large trees (larger than 20 inches diameter at breast height) across the landscape." FP_109776. The guideline differs from the Eastside Screens by allowing trees larger than 21 inches DBH to be removed in limited circumstances where trees need to be removed: (1) to protect public health or safety (e.g., "hazard trees"); (2) to allow a response to an emergency (e.g., wildfire response); (3) to promote or retain desired forest conditions; (4) to control or limit a disease or insect infestation; (5) to protect the wildland-urban interface; and (6) to promote special plant habitats. FP_109776-77.

---

[2] The Forest Plan retains the required historical range of variability analysis.

6

The Forest Plan also protects late forest structure through desired conditions, standards, and guidelines. *See, e.g.*, FP_109769-70 (desired condition to move forest structure classes to the historic range of variability, including late structure); FP_109802 (in northern goshawk nest stands, dominant trees should be larger than 15 inches DBH); FP_109797 (requiring horizonal cover to be retained where vegetation types are below the historic range of variability in the Kettle-Wedge Lynx Core Area). For example, all timber harvest in Inventoried Roadless Areas needs to comply with the Roadless Area Rule in effect at the time project-level decisions are made. FP_109777; FP_109944 (map showing roadless areas). Under the current Roadless Area Rule, road construction is highly restricted with limited and specific exceptions. 36 C.F.R. § 294.13. In practice, this means that most roadless areas are inaccessible to any harvest, especially of late structure. Several other management areas also either do not allow harvest or restrict harvest. *See, e.g.*, FP_109872-88 (Wild and Scenic Rivers); FP_109834-41 (Backcountry); FP_109851-65 (Research Natural Areas).

In sum, the Colville National Forest Plan seeks to promote forest structure types that mimic the historic range of variability to improve forest resiliency and combat the effects of climate change. The Forest Plan protects late structure through the large tree management guideline and through management direction that seeks to lessen the risk of loss of late structure to uncharacteristic wildfire.

## II.    Sanpoil Project

Most of the Sanpoil project area is composed of dry Douglas-fir vegetation type, characterized by a mix of mostly ponderosa pine and Douglas-fir trees. FP_104677. Dry Douglas-fir forests historically experienced frequent, low severity fires, but the forest in the Project area has missed several fire intervals due to fire suppression or exclusion efforts. AR_06873. As a result, the historically open stands within the dry Douglas-fir vegetation type in the area, with their mosaic pattern of tree clumps or patches and openings, have now filled in with younger trees and a more uniform stand structure. AR_06888. And this has, in turn, led to increased wildfire risk and decreased spatial heterogeneity across the area. *Id*.

Levels of insect- and pathogen-related mortality have also increased across the Sanpoil area. FP_104681. Much of the risk comes from mountain pine beetle, western pine beetle, Douglas-fir beetle, spruce budworm, and root diseases. FP_104682. Without the Project's treatments, insects and disease would continue to increase. AR_06879. Indeed, in 2012, a forest health hazard warning was issued by the State of Washington, includes the Project area. FP_104682.

The Sanpoil Project will occur in the southern part of the Republic Ranger District that borders the Confederated Tribes of the Colville Reservation ("CCT"). AR_06005. In July 2014, the Chairman of the CCT requested that the Forest Service enter into an agreement with the CCT under the Tribal Forest Protection

1    Act ("TFPA"), which authorizes the Secretary of Agriculture to consider tribally

2    proposed projects on National Forest lands bordering or adjacent to Indian trust

3    land. AR_02491; AR_02684; AR_00794. The CCT requested to work with the

4    Forest Service in developing and implementing treatments in the Sanpoil area to

5    reduce the threat to tribal lands from catastrophic wildfire, promote forest health,

6    and begin restoration processes. AR_02266; AR_02516.

7        Acting pursuant to CCT's request, and the request of Ferry County and

8    other parties, the Forest Service issued a December 14, 2016 scoping notice for the

9    Sanpoil Project. AR_03795. To foster conditions that are less prone to disturbance

10   events from insects, disease and wildfire, the scoping notice proposed vegetation

11   and surface fuel treatments in the Sanpoil area that would include commercial

12   thinning and commercial thinning with openings to address insects and disease;

13   pre-commercial thinning and ladder fuels reduction; landscape natural fuels

14   burning; piling and pile burning; and shaded fuel breaks along key ingress/egress

15   routes and private land boundaries to protect again wildfires. *Id*.

16       Following scoping, the Forest Service prepared detailed specialist reports

17   assessing the potential environmental effects of the Project and a no action

18   alternative, as well as five alternatives that were analyzed but not considered in

19   detail. AR_0617-18. The Forest Service published a February 6, 2019 Draft EA,

20   AR_05611.01-05611.67, and invited public comment. AR_05633. The Forest

Service then prepared a Final EA and Draft Decision Notice Finding of No Significant Impact ("DDN/FONSI"), AR_06003-06077, AR_06323.01-06323.11, and invited objections to the DDN/FONSI from the public. AR_06323.

After considering Plaintiff's and other objections to the DDN/FONSI, and the environmental effects identified in the EA and specialist reports, the Forest Service issued its Final Decision Notice and FONSI ("DN/FONSI"), concluding that the Project will not have significant effects on the quality of the human environment, and thus, an EIS need not be prepared under NEPA. AR_06784-95.

Lastly, on January 24, 2022, the Forest Service amended the Decision Notice by issuing a letter withdrawing those units, and portions of units, of the Project that fall within the Lynx Analysis Units. AR_07411-7413. The Forest Service determined that it was in the best interest of the government and public to drop those units due to the potential loss of habitat caused by the Summit Trail fire in July 2021 and to ensure compliance with the Forest-wide standards for lynx habitat in the Forest Plan. AR_07412.

# STATUTORY BACKGROUND

## I.    National Environmental Policy Act

The purpose of NEPA is to ensure that federal agencies consider the environmental consequences of major federal actions significantly affecting the environment. 42 U.S.C. §§ 4321, 4331; 40 C.F.R. § 1501.1[3]; *see also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). NEPA serves the twin aims of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that the public has access to relevant information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA itself "does not mandate particular results, but simply prescribes the necessary process." *Id.* at 350. Given this focus, a "court must avoid passing judgment on the substance of an agency's decision. Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing *Robertson*, 490 U.S. at 350).

---

[3] Updated CEQ regulations became effective on September 14, 2020. Because projects that were initiated prior to September 14, 2020 could be completed using the previous version of the regulations, which is the case for the Sanpoil Project, the prior version of the regulations is cited. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304 (July 16, 2020).

NEPA requires an agency to prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. An EIS is a detailed statement subject to extensive regulations regarding format, content, and methodology. *See* 40 C.F.R. pt. 1502. An EIS "must consider and assess the environmental consequences of the proposed action and reasonable alternatives to the action." *Westlands Water Dist.*, 376 F.3d at 865 (citing 40 C.F.R. § 1502.14). In addition to direct effects, an EIS also looks at the potential cumulative effects of the proposed action and reasonable alternatives considered by the agency. *See* 40 C.F.R. § 1508.7.

Not every federal action or proposal, however, requires an EIS. An agency may prepare an EA to determine whether the impacts of an action will be significant, and if not, the agency may issue a FONSI and forego preparation of an EIS. *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9, 1508.13. *See also Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

In reviewing the sufficiency of an agency's NEPA analysis, a court should evaluate whether the agency has presented a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted). "[T]he reviewing court

may not 'fly speck' an [an agency's environmental review] and hold it insufficient on the basis of inconsequential, technical deficiencies." *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1183-84 (9th Cir. 1997) (citation omitted); *see also Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996). Further, a court may not force an agency to elevate environmental concerns over other appropriate considerations, *see Stryker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-28 (1980), or "substitute its judgment for that of the agency." *Block*, 690 F.2d at 761.

In particular, "[f]orest management is fairly viewed as the sort of technical field where courts should defer to the findings of specialized administrative agencies." *Inland Empire Pub. Lands Council v. Schultz*, 807 F. Supp. 649, 652 (E.D. Wash. 1992) (citation omitted). "Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Block*, 690 F.2d at 761 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

## II.    National Forest Management Act

"NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). The Forest Service first develops a forest plan containing "broad, long-

term plans and objectives for the entire forest." *Id.* These plans "must provide for multiple uses" of forest resources. *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 961 (9th Cir. 2002) (citing 16 U.S.C. § 1604(e)(1)). The agency then implements the forest plan through site-specific projects. *Weldon*, 697 F.3d at 1056.

"While NFMA requires that the proposed site-specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Id.* (citing *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003)). "In the face of ambiguity, [courts] 'defer to the Forest Service's reasonable interpretation of the Forest Plan's requirements.'" *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1242 (9th Cir. 2017) (quoting *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 661 (9th Cir. 2009)).

This degree of deference is consistent with the intent of NFMA to "provide effective guidance . . . but [to] allow enough flexibility so that the professional foresters can do the job, rather than lawyers and judges." Forest and Rangeland Management: Joint Hearings on S. 2851, S. 2926, S. 3091 Before the Subcomm. on Env't of the Comm. on Agric. and the Subcomm. on the Env't of the Comm. on Interior, 94th Cong., 2d Sess. 262 (1976). "Congress has consistently acknowledged that the Forest Service must balance competing demands in

1   managing [NFS] lands [and], since Congress' early regulation of the national

2   forests, it has never been the case that the national forests were . . . to be 'set aside

3   for non-use.'"  *The Lands Council v. McNair*, 537 F.3d 981, 990 (9th Cir. 2008)

4   (third alteration in original) (internal quote and citation omitted), *abrogated on*

5   *other grounds by Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir.

6   2020).

7                          **<u>STANDARD OF REVIEW</u>**

8          NFMA and NEPA do not supply a separate standard of review. The APA

9   standard of review thus applies for claims under these statutes.  *San Luis & Delta-*

10  *Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA,

11  a court may set aside agency action found to be "arbitrary, capricious, an abuse of

12  discretion, or otherwise not in accordance with law" or "in excess of statutory

13  jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §

14  706(2)(A), (C).

15         An agency action is arbitrary and capricious only where the agency "relied

16  on factors Congress did not intend it to consider, entirely failed to consider an

17  important aspect of the problem, or offered an explanation that runs counter to the

18  evidence before the agency or is so implausible that it could not be ascribed to a

19  difference in view or the product of agency expertise." *League of Wilderness*

20

*Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211,

1215 (9th Cir. 2008) (internal quote and citation omitted).

This standard is a "highly deferential" one—and requires a reviewing court

to consider only "whether the decision was based on a consideration of the relevant

factors and whether there has been a clear error of judgment." *Jewell*, 747 F.3d at

601 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416

(1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

The Forest Service's judgments "often require trade-offs among worthy objectives

. . . Congress left such judgments to a politically responsive agency with relevant

expertise." *In re Big Thorne*, 857 F.3d 968, 976 (9th Cir. 2017). Courts reviewing

agency decisions, moreover, are limited to the administrative record lodged with

the Court. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

## **ARGUMENT**

Plaintiff's motion addresses summary judgment on its Forest Plan challenge

in the Fifth Claim of the Amended Complaint, and the challenges to the Sanpoil

DN/FONSI in the First, Third, and Fourth Claims of the Complaint.[4] Because the

---

[4] Plaintiff's motion makes no argument regarding the Second Claim, which
asserted that the Forest Service failed to consider a reasonable range of alternatives
in the Sanpoil Project's EA. Nor does Plaintiff's motion present any argument
regarding the Sixth Claim, which sought to argue that the Forest Service's approval
of the Project violated the Endangered Species Act ("ESA"). These claims are thus
waived. *See Native Ecosystems Council v. Marten*, No. CV 17-47-M-DLC-JCL,
2018 WL 3630132, at *7 (D. Mont. July 31, 2018) ("The Ninth Circuit has stated

16

Forest Service complied with NFMA, NEPA, and the APA in revising the Forest Plan and in issuing the DN/FONSI for the Sanpoil Project, the Court should grant judgment to Federal Defendants, and deny Plaintiff's motion in its entirety.

### I.    Plaintiff's Forest Plan Challenge is Not Ripe for Review.

Before a forest plan challenge can even be subject to APA review, it must be presented in the context of a challenge to a "site-specific" project that implicates the practices or provisions of the plan challenged. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998). The APA does not permit review of non-discrete "agency action" that is not tied to a party's alleged harm. *See Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). Thus, Plaintiff's Forest Plan challenge is only "'ripe' for judicial review under the APA . . . [when] the scope of the controversy [alleged by a party] . . . and its factual components [are] fleshed out, by some concrete action applying the [controversy] in a fashion that harms or threatens to harm [it]." *Lujan*, 497 U.S. at 891.

Plaintiff's Forest Plan challenge seeks to challenge the 2019 Forest Plan revisions on the ground that the revised plan permits the harvesting of trees in excess of 21-inches DBH, in alleged violation of NEPA and NFMA. *See* Pl.'s Mot.

---

time and time again, that a litigant waives an issue by failing to address it in its opening brief"), aff'd in part and remanded sub nom. *All. for the Wild Rockies v. Marten*, 789 F. App'x 583 (9th Cir. 2020)

for S.J. ("Pl.'s S.J.") at 1-2, 9-24, ECF No. 48. Recognizing that it must bring its Forest Plan challenge in a Project that implicates these provisions and practice, Plaintiff asserts that the Court has APA jurisdiction because the Sanpoil Project "hinges" on the cutting of trees in excess of 21-inches DBH. Pl.'s S.J. at 8 (quoting *Neighbors of Cuddy Mountain*, 303 F.3d at 1067). That assertion is without basis.

The Sanpoil EA explains that the Project targets *smaller* less vigorous trees and those infested by pathogens for commercial thinning. AR_06019. The Final Silviculture Report thus explains that "project activities would *retain* and generally emphasize recruitment of individual large trees (larger than 20 inches diameter at breast height) across the landscape, because silvicultural prescriptions would be implemented to reduce the losses of large trees to disturbances, and would include a *diameter limit of 21 inches DBH*." AR_06897 (emphasis added). "If any trees larger than 20 inches DBH and less than 21 inches DBH are removed [under the Project], it is because they would meet one" of certain limited exceptions, including when it is necessary to protect public health or safety or to control or limit the spread of insect infestation. *Id*. Because the Sanpoil Project thus does not implicate the Forest Plan provisions Plaintiff challenges here, the Court lacks APA jurisdiction to review that challenge. The challenge fails for that reason alone.

1

**II.    Plaintiff's Forest Plan Challenge was also Waived.**

2    Furthermore, nowhere in Plaintiff's objections to the Forest Plan revisions or

3    to the DN/FONSI for the Sanpoil Project did it raise its concern regarding the

4    harvesting of trees in excess of 20 inches DBH or the removal of the Eastside

5    Screen Standard. *See* FP-106561-575; FP_106591-598; AR_06376-94.

6    The objection is thus waived. "Persons challenging an agency's compliance

7    with NEPA must 'structure their participation so that it . . . alerts the agency to the

8    [party's] position and contentions,' in order to allow the agency to give the issue

9    meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764

10    (2004) (first alteration in the original) (quoting *Vt. Yankee Nuclear Power Corp.*,

11    435 U.S. at 553).

12    The Forest Service provides a robust administrative process for public

13    engagement through the NEPA process, consistent with its regulations. 36 C.F.R.

14    Part 218 (establishing Forest Service pre-decisional administrative review

15    process); 36 C.F.R. Part 219 (establishing Forest Service administrative review

16    process for plan amendments and revisions). Statute and Forest Service regulation

17    thus both require administrative exhaustion. *See* 7 U.S.C. § 6912(e) ("[A] person

18    shall exhaust all administrative appeal procedures established by the

19    Secretary…."); 36 C.F.R. § 218.13 (reiterating statutory exhaustion requirement).

20    So that the Forest Service may understand, evaluate, respond, and document its

response to objections in the Administrative Record, Forest Service regulations require that a party file an "objection." 36 C.F.R. §§ 218.1-218.15.

By failing to raise its concerns during the administrative process, Plaintiff "forfeited any objection" that was not raised in the agency's mandatory objection process. *Pub. Citizen*, 541 U.S. at 764*; see also Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 431 (10th Cir. 2011) (recognizing that Plaintiff must exhaust under 7 U.S.C. § 6912(e) before bringing claims in federal district court); *Native Ecosystems Council v. Kimbell*, No. CV 04-127-M-DWM, 2006 WL 8430971, at *10-11, (D. Mont. Aug. 29, 2006) (recognizing that party is barred from pursuing claims not raised in administrative process); *Native Ecosystems Council v. Lannom*, No. CV 21-22-M-DWM, 2022 WL 1001493, at *3-5, (D. Mont. April 4, 2022) (same), *amended*, No. CV 21-22-M-DWM, 2022 WL 2309011 (D. Mont. Apr. 25, 2022). Thus, even if the Court were to find Plaintiff's challenge ripe for review (which it is not), the challenge should be rejected for this additional reason.

### III.    Plaintiff's Forest Plan Challenge also Fails on its Merits.

Even if, however, Plaintiff could overcome these hurdles, its Forest Plan challenge fails on the merits. Through NFMA, Congress entrusted the Forest Service to manage multiple use of resources in a combination that best meets the public interest. *See* 16 U.S.C. § 529 (directing Secretary of Agriculture to administer the National Forest System for multiple uses and sustained yield). The

Forest Service balances the scales through the development, revision, and amendment of forest plans. *Id.* § 1604(e)(1) (requiring forest plans to "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960."). NFMA allows a forest plan to be amended "in any manner whatsoever after final adoption." *Id.* § 1604(f)(4). In doing so, the Forest Service enjoys broad discretion to meet its multiple use mandate. *See Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404-05 (9th Cir. 1996) (upholding regional plan amendment in part because of the "inherent flexibility of the NFMA").

As described above, the Forest Service adopted the 2019 Forest Plan to promote diverse, fire and disease resistant stands and to move forest conditions toward the historic range of variability. Over the past twenty years, uncharacteristic wildfires have been the leading cause of the loss of late forest structure on National Forest System lands in the West. Late forest structure on the Colville is imperiled. FP_108373-74 (describing stand conditions with heavy fuel loads and dense canopies, "increase[ing] potential for fire transmission and spread"); *id.* ("the potential for high-severity fire in late forest structure is particularly concerning because the Forest has considerably less old forest and associated habitat on the landscape than would have historically occurred. This lack of landscape redundancy in late forest structures means that even moderate acreage loss due to

fire events would further exacerbate the imbalance of forest structures."); FP_103327 ("Since the mid-1980s, the size and intensity of large wildfires in the western United States have increased markedly (Westerling et al. 2006), due, in part, to a reduction in fuel moisture driven by increased temperature and lower snowpack."). The selected alternative—Alternative P—calls for strategic treatments that seek to alter landscape-scale fire behavior and reduce the loss of late structure forest. FP_108751

That decision is documented in the Forest Service's record, particularly the Wildlife Report, FP_03197-362; the Final EIS, FP_108184-9721, the Forest Plan, FP_109722-71, and the Record of Decision for the Forest Plan, FP_113566-628. Plaintiff briefs three claims against the Forest Plan: (1) a NFMA challenge to the Forest Service's analysis of habitat for surrogate species, Pl.'s S.J. at 17-18; (2) a NEPA challenge to the Forest Service's conclusion that Alternative P best promotes viability for surrogate species, *id.* at 18-21; and (3) a NEPA challenge to the Forest Service's response to comments submitted during the public participation process, *id.* at 21-23. Even if these claims were considered, each fails.

A.    **The Forest Service's Surrogate Species Methodology is Supported by the Best Available Science.**

Under the 1982 planning rule, the Forest Service needed to designate management indicator species to monitor the potential effects of major forest

management activities.  FP_000220-21 (1982 Planning Rule section 219.19 Fish

and Wildlife Resource). The Forest Service did so here, designating four

management indicator species on the Colville: (1) the MacGillivray's warbler, for

grazing and understory effects; (2) the black-backed woodpecker, for post-fire

salvage harvest; (3) the northern goshawk, for forest vegetation management; and

(4) the white-headed woodpecker, for forest vegetation management. FP_109794.

But over the more than two decades that have passed since adoption of the old rule,

the use of management indicator species has been questioned. *See* FP_108142

(citing studies).

In the 1990s, the management indicator species concept evolved into the

more robust concept of surrogate species. *Id.* (citing Lambeck (1997)). Following

the best available science, the Forest employed "an eight-step process . . . to assess

the ecological conditions capable of sustaining viable populations of terrestrial

wildlife species":

> (1) identification of species of concern, (2) description of source
> habitats, and other important ecological factors, (3) organizing species
> into groups, (4) selection of surrogate species for each group, (5)
> development of surrogate species assessment models, (6) application of
> the surrogate species assessment models to evaluate current and
> historical conditions (7) development of conservation strategies, and
> (8) designing monitoring and adaptive management.

FP_103206 (citing Suring et al. (2011) and Gaines et al. (2017)); *see also* FP_

103342-51 (Wildlife Report references). The Forest Service identified 209 species

of concern, aggregated into 10 families and 28 groups based on habitat

associations. *Id.* From that list, the Forest Service chose 26 surrogate species to

evaluate each alternative's effects on habitat on the Colville.  *Id.*

The Forest Service's method of analysis—detailed in Suring et al. (2011)

and Gaines et al. (2017)—is summarized in the Wildlife Report.  FP_103212-16;

*see also* FP_113600 (ROD discussing method for meeting NFMA's diversity and

viability requirements). The surrogate species assessment process was used to set

the baseline and evaluate each alternative. FP_103212. For each species, "broad-

scale viability assessments were done across the species' range that occurred in

Northeast Washington assessment area." *Id.* To estimate how each alternative

would impact habitat, future trends were modeled at 20, 50, and 100 years for the

American marten, white-headed woodpecker, northern goshawk, pileated

woodpecker, black-backed woodpecker, and Lewis's woodpecker. *Id.*; *see also*

FP_103356. "Other risk factors that influence the viability of surrogate species

were assessed in the short term (<20 years) using the Objectives and the long term

(<50 years) using the Desired Conditions to estimate how alternatives might

contribute to the viability of surrogate wildlife species." *Id.*; FP_108672 (risk

factors); *see also* FP_103354 (chart summarizing viability findings).

Each alternative was evaluated by reference to six key indicators, shown in

Table 6 in the Wildlife Report. FP_103214-15. The conclusions are summarized in

Table 7, FP_103215-16, and detailed in the body of the Wildlife Report. FP_103216-341 (discussing the effects of each alternative). These scientific conclusions receive the highest level of deference. *See The Lands Council*, 537 F.3d at 993 (courts are at their "'most deferential' when the agency is 'making predictions, within its [area of] special expertise, at the frontiers of science." (quoting *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003)) (alterations in original).

As Plaintiff admits, the Forest Service may use habitat as a proxy for the viability of a species. Pl.'s S.J. at 17; 36 C.F.R. § 219.14(f) (2005); *The Lands Council*, 537 F.3d at 998 ("We will defer to its decision to use habitat as a proxy unless the Forest Service makes a 'clear error of judgment' that renders its decision arbitrary and capricious."). Plaintiff dismisses the reasoned analysis in the Wildlife Report as a "subjective evaluation." Pl.'s S.J. at 17-18. But the Forest Service's methodology used the best available science, satisfying NFMA. *See The Lands Council*, 537 F.3d at 994, 996 (upholding analysis supported by studies the Forest Service found reliable); *see also id.* at 998 (Forest Service must describe the quantity and quality of habitat necessary to support viability of species); FP_108670 (showing viability outcomes for surrogate species); FP_103356-58 (showing modeled habitat for surrogate species); FP_109770 (Table 5 showing

forest structure under desired historic range of variability).  Plaintiff's NFMA claim fails and this Court should grant summary judgment for the Forest Service.

**B.    The Selected Alternative Promotes Diversity by Cultivating More Resilient, Functional Late Structure.**

After analyzing the effects of each alternative, the Forest Service concluded that the selected alternative best promotes the viability of the surrogate species. FP_108680 (chart summarizing each alternative's contribution to viability). The Wildlife Report explains why. FP_103326-28. Strategic treatments will move fire conditions back toward historic levels, reducing the risk of losing late structure to uncharacteristic wildfire. FP_103326.  Restoration treatments would result in "multi-layered habitat patches tailored to specific conditions and surrogate species . . . managed within or toward the historic range of variation for each landscape." *Id.*

Plan components would improve late structure habitat, including by retaining snags and prohibiting the cutting of large trees outside of narrow exceptions. *See* FP_103327. Road closures and limits on road density would also protect late structure habitat. *Id.* This dynamic-landscape restoration approach seeks to move the forest toward conditions resilient against the environmental changes brought about by climate change. FP_103327-28; *see also* FP_103327 ("Climate-driven changes in fire regimes would likely be the dominant driver of

changes to forests and LSOF habitats in the western United States over the next century (McKenzie et al. 2004)").

In sum, the Forest Service found that the selected alternative provides the most protection for the surrogate species by providing for resilient landscapes, conserving late structure across the entire forest, and by reducing man-made disturbances. FP_103328. Plaintiff takes a more myopic view, arguing that other alternatives that provide for more total late structure are better.  Pl.'s S.J. at 18-20. But the Forest Service found Alternative P was more beneficial because it results in the "highest percentage of total late forest structure in late open, which is expected to result in increased resilience of late forest habitats." FP_108323.  That conclusion is reasonable and supported by the Forest Service's analysis.

Plaintiff may prefer an approach that prizes the number of large trees over other factors. But the Forest Service is prioritizing moving stands toward more resilient conditions that can withstand climate change-driven wildfire. That decision is supported by the record; it is not arbitrary or capricious. And that is all that NEPA requires. *See* 40 C.F.R. § 1502.14; *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983).

## C.    The Forest Service Considered and Responded to Public Comment.

NEPA requires agencies to "disclose, discuss[,] and respond to all responsible opposing views at appropriate points in Draft and Final documents."

27

40 C.F.R. § 1502.9; *accord The Lands Council*, 537 F.3d at 1001 ("The Forest Service must acknowledge and respond to comments… that raise significant scientific uncertainties and reasonably support that such uncertainties exist."). The Forest Service sought and received comments throughout the NEPA process. FP_017046-194 (scoping comments); FP_109231-454 (responses to comments on the EIS). And the Forest Service's references show that the agency considered sources cited in comment letters. *See, e.g.*, FP_109036 (considering Hessburg, Smith, and Kreiter et al. (1999)); FP_1087567 (same); FP_109036 (considering Hessburg and Agee (2003)); FP_109031 (considering Franklin and Johnson (2012)).

Plaintiff challenges the sufficiency of the Forest Service's responses to comments objecting to the replacement of the Eastside Screen's prohibition on removing trees 21 inches DBH or larger with the large tree guideline.  Pl.'s S.J. at 22-23. This issue was explored in the Final EIS. *See, e.g.*, FP_108491-92 (discussing the need to move forest back toward historic range of variability); FP_ 108319 (listing studies supporting the need to move landscape back toward heterogeneity though silvicultural treatments); FP_099811 (discussing effects of maintaining the Eastside Screens rule); FP_ 099820 (same); FP_099829 (same). NEPA does not require an agency to publish "every comment . . . in the final EIS. Nor must an agency set forth at full length the views with which it disagrees."

*Block*, 690 F.2d at 773.  The Final EIS for the Forest Plan reasonably explains why the Forest Service chose to move away from the inflexible Eastside Screens to a dynamic approach. NEPA requires no more.

Because the Eastside Screens Panel report was not included in the administrative record, Plaintiff argues that the Forest Service "did not even consider the rationale for the 21-inch rule" and "fail[ed] to maintain the 'scientific integrity' of its analysis." Pl.'s S.J. at 23. The Colville National Forest has extensive experience implementing the Eastside Screens, which it has applied to every project for the last 25 years. The rationale for adopting the Eastside Screens is discussed in the interim management direction itself, FP_002978-003028, in the Record of Decision for the Plan FP_ 113582, and in the Final EIS, FP 108257-59. The Final EIS also references several other documents considering the Eastside Screens in depth. FP_109067-68 (citing documents including a 1995 EA for continuation of the Eastside Screens). The Forest Service understood the Eastside Screens, including their limitations.  The decision to move away from their rigid and outdated approach and toward a dynamic landscape approach was well-reasoned and satisfies NEPA. *See N. Alaska Env'tl Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (judicial review under NEPA limited to "whether the agency adequately considered a project's potential impacts and whether the

consideration given amounted to a 'hard look' at the environmental effects." (citation omitted)).

In short, Plaintiff's challenge is not ripe, was waived, and fails in any event under NFMA, NEPA—and the APA. Federal Defendants are accordingly entitled to summary judgment on Plaintiff's Forest Plan challenge in Claim Five.

### IV.   The Forest Service Disclosed and Took a "Hard Look" at the Potential Environmental Effects of the Sanpoil Project.

Plaintiff's challenge to the DN/FONSI authorizing the Sanpoil Project likewise fails. Pl.'s S.J. at 23-40. The Forest Service complied with NEPA in disclosing the Project's treatments, assessing the cumulative effects of the Project, and in issuing the FONSI after taking a "hard look" at the potential environmental effects of the Project. Plaintiff's arguments to the contrary rest on arguments that misapprehend NEPA and ignore the Project record supporting the DN/FONSI.

### A.   The Forest Service Disclosed the Project's Treatments.

NEPA requires that the Forest Service explain which "treatments will be applied in which areas and to what extent" in the project area. *Navickas v. Conroy*, 575 F. App'x 758, 760 (9th Cir. 2014). The EA for the Project discloses that information: The EA both explains and defines the Project's silvicultural and fuels treatments. AR_06019-22. The EA also explains where the treatments will be applied and the extent of those treatments; it also includes unit-by-unit maps

1  showing where treatments will occur. AR_06023-25. In addition, the EA includes

2  maps showing the temporary roads that will be built to permit the silvicultural and

3  fuels treatments—and the planned road closures that are necessary to complete the

4  Project. AR_06027-28. Appendix C of the EA, moreover, cross-references to each

5  of the corresponding unit maps to explain the treatments that will be applied in

6  each of the units in the area. AR_06073-06077 (Appendix C Unit Treatment

7  Table); AR_06024-06025 (maps indicating corresponding units). Finally, the EA

8  spells out the site-specific design elements and standard practices for the

9  treatments that will guide the Forest Service's implementation of the Sanpoil

10 Project. AR_06030-37 (design elements); AR_06069-73 (standard practices).

11      Despite the EA's detailed disclosures, Plaintiff maintains that the Forest

12 Service must go further. Plaintiff contends that NEPA requires that the Forest

13 Service must explain "how the units on the Project map would look after harvest,

14 what diameter trees would be logged in each unit, how many trees would be cut

15 down or burned in each location, when different treatments would occur relative to

16 each other, what the spacing would be between the trees that remain, [and] how

17 many of these treatments would vary in and across single units." Pl.'s S.J. at 34.

18      NEPA does not impose this obligation. The Service has "no obligation

19 [under NEPA] to identify the specific trees that would be removed as part of the

20 Project." *Navickas*, 575 F. App'x at 760. NEPA instead permits an agency to

1    "select treatment units based on changing on-the-ground conditions." *WildEarth*

2    *Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019). Plaintiff's argument

3    to the contrary rests upon *SE Alaska Conserv. Council v. United States Forest*

4    *Service ("SACC")*, 443 F. Supp. 3d 995 (D. Alaska 2020). Pl.'s S.J. at 33. But the

5    district court there ruled the Forest Service erred by not explaining in the Project

6    EIS "when and where the harvest activities or road construction" authorized would

7    occur under the project. *Id*. at 1009. Here, that is not at issue because the EA

8    thoroughly explains "when and where" Project treatments will occur.

9        *SACC*, moreover, involved a challenge to an EIS for a project that used

10   condition-based management ("CBM"). Under CBM, the agency identifies

11   conditions that characterize the types of sites on which certain management

12   activities could occur but does not disclose where treatments will occur.  *SACC*,

13   443 F. Supp. 3d at 1000. The Sanpoil Project does not use CBM; rather, the Project

14   involves the more traditional approach to project development and NEPA used in

15   cases such as *WildEarth Guardians*, 920 F.3d at 1250-51, 1257-58, where the

16   agency identifies when and where treatments and other projects will occur—and

17   then analyses the potential environmental effects of those activities. *SACC* is thus

18   inapposite.

19       Plaintiff also maintains that the Project's treatments are too vaguely

20   described in the EA and Project record. Pl.'s S.J. at 23-24.  Plaintiff contends, for

32

example, that the Silviculture Report fails to explain how the Project will address the cutting of trees in excess of 21-inches DBH and tree openings. *Id*. at 24. To the contrary, the Report clearly explains that the Project would "retain" and "emphasize recruitment of individual large trees (larger than 20 inches diameter at breast height) across the landscape." AR_06897. The Report also explains the Project would limit the cutting in excess of 21 inches DBH absent one of the narrow exceptions. *Id*. The Report also addresses tree openings: Table 7 to the EA explains the openings, referencing the Douglas-fir, Northern Rocky Mountain mixed conifer, Subalpine fir/Lodgepole pine, and Spruce/Supalpine fir and how each would be maintained in relation to each species historic range of variability. AR_06038. The Siliviculture Report, moreover, explains how the Forest's overall structure, including tree openings, would be impacted by the Project. AR_06895-96.

Plaintiff also complains that the EA describes the Project treatments in "vague, general terms." Pl.'s S.J. at 34-35. But Plaintiff's complaint lies not with the EA's definitions, which are very detailed. AR_06019-20. Plaintiff's complaint is instead that the definitions give the Forest Service latitude to craft implementing prescriptions to suit on-the-ground conditions. *See* Pl.'s S.J. at 35 (referencing use of terms such as "may" or to the "extent feasible" in describing the treatments). However, as explained above, NEPA permits the Forest Service to develop

1    prescriptions that suit on-the-ground conditions when it implements a project.

2    *Navickas*, 575 F. App'x at 760; *WildEarth Guardians*, 920 F.3d at 1258.[5]

3        Plaintiff also speculates that the EA's description of the treatments could be

4    read to permit "large clearcuts of healthy forest[.]" Pl.'s S.J. at 34. The Project

5    record, however, states that "[t]here are no activities planned as part of the Sanpoil

6    project that include a . . . clearcut harvest of even-aged stands." AR_06897.

7        Plaintiff likewise complains that the maps showing the temporary roads that

8    will be constructed under the Project do not show the roads that will restored. Pl.'s

9    S.J. at 35. However, that information, too, is prominently displayed in the record.

10    *See* AR_06684 (Sanpoil Project Non-system Road Templates).

11        Lastly, Plaintiff contends that the Forest Service failed to disclose the

12    additional grazing that will occur in the Quartz allotment in the Sanpoil area,

13    (which, Plaintiff asserts will adversely impact sensitive species, such as gray

14    wolves). Pl.'s S.J. at 35-36, *see also id*. at 28-29. The Project, however, will not

15    result in additional grazing in the allotment. By thinning stands and creating

16    openings the forest canopy in the Quartz allotment, the Project would produce

17    better, not more, grazing area in the allotment. AR_05491. The EA thus states that

18

19    [5] The discussion found in the EA at AR_06037, AR_06056 and AR_06010-11 that

20    Plaintiff references is consistent with that practice. Pl.'s S.J. at 37. There the EA
    explains how the on-the-ground treatments would be implemented in accordance
    with Forest Plan and Roadless Area Conservation Rule requirements.

the improved foraging habitat that will result from the Project's treatments would "add 10,585 *capable* acres to the Quartz allotment." AR_06054 (emphasis added).

The Court should, accordingly, reject Plaintiff's arguments and grant Federal Defendants summary judgment on Claim One of the Amended Complaint that rest upon these arguments. To the extent Plaintiff's arguments can be read to also contend that the Forest Service violated NFMA, moreover, as pled in Claim Four of the Amended Complaint, those claims should also be rejected for the same reason.[6]

---

[6] Plaintiff references the Final Silviculture Report's discussion of Forest-Wide Components, including each of the components of the Plan and how the Project complies with the Plan's desired conditions, objectives, and standards. Pl.'s S.J. at 36. Although not argued as such, Plaintiff appears to be making a NFMA argument that the Project fails to adhere to the "Scenic Integrity Objectives" of the Plan. If so, that argument fails. Under the Forest Plan, "a project or activity is consistent with the objectives of the plan in it contributes to or does not prevent the attainment of any applicable objectives." FP_109904-05. In evaluating a project or activity, the Forest Service "should identify any applicable objective(s) to which the project contributes and document that the project does not prevent the attainment of any objectives." *Id*. Appendix D to the Forest Plan sets forth the Scenic Integrity Objectives. FP_109928-109929. Here, the Forest Service considered those objectives. *See* AR_06493, AR_06495 (maps of Sanpoil scenic integrity objectives). And in the Scenic Resources Report, the Forest Service explained both how the Project adheres to the scenic standards and follow guidelines to meet objectives. AR_06651-06669.

35

**B.      The Forest Service Assessed the Cumulative Effects of the Project.**

Plaintiff's challenge to Forest Service's cumulative effects analysis for the Project similarly fails. Pl.'s S.J. at 25-32. NEPA requires that agencies assess the direct and indirect effects as well as the cumulative impact of their actions on the environment. 40 C.F.R. §§ 1502.16, 1508.25(c). Direct effects are those "caused by the action and occur[ing] at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). A "cumulative impact" of an action is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

To establish a NEPA violation based on the agency's cumulative effects analysis, a plaintiff must show that the agency did not provide "a useful analysis" of those effects. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076 (9th Cir. 2011) (internal quote and citations omitted). A useful analysis includes "some quantified or detailed information." *Id.* "Courts accord substantial deference to an agency's determination of the scope of its 'cumulative effects'

1  review." *Cascadia Wildlands Project v. U.S. Forest Serv.*, 386 F. Supp. 2d 1149,

2  1167 (D. Or. 2005) (citing *Neighbors of Cuddy Mountain,* 303 F.3d at 1071).

3      Here, the EA assesses the potential direct, indirect, and cumulative effects of

4  the Project and the no action alternative. AR_06037-06058. In particular, the EA

5  describes the potential effects on a wide range of natural and human resources. *See*

6  AR_06037-38 (potential effects to forest vegetation); AR_06039-40 (potential

7  effects to air quality, fire risk, and forest health); AR_06040-42 (potential effects

8  to aquatics); AR_06042-52 (potential effects to wildlife, including threatened or

9  endangered species); AR_06053-54 (potential effects to soil); AR_06054 (potential

10  effects to range); AR_06054-55 (potential effects to special uses and minerals);

11  AR_06055 (potential effects to cultural and heritage resources); AR_06055-56

12  (potential effects to botany); and AR_06056-57 (potential effects to recreation).

13      However, an EA is by design a "concise public document" that "[b]riefly

14  provide[s] sufficient evidence and analysis for determining whether to prepare an

15  [EIS] or finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). Thus, the full

16  discussion of the potential effects of the Project is in the Forest Service's specialist

17  reports in the Project record. *See* AR_06037 (Forest Service advised public in EA

18  that "[c]omplete reports are incorporated by reference and available on project file"

19  on Forest Service website); *see also* AR_04220-04251 (Vegetation Management

20  Report); AR_04252-04283 (Soils Report); AR_05192-05203 (Invasive Plants

37

1   Report); AR_05217-05232 (Botany Report); AR_05233-05252 (Recreation

2   Report); AR_06206-06222 (Range Report); AR_06866-06904 (Silviculture

3   Report); AR_05317-05346 (Fire, Fuels, and Air Quality Report); AR_05464-

4   05487 (Effects to Management Indicator Species and Landbirds); AR_05608-

5   05611 (Roads Report); AR_06152-06183 (Watershed Fisheries-Hydrology

6   Report); AR_06275-06322 (Biological Evaluation for Terrestrial Wildlife);

7   AR_0653-06274 (Additional Terrestrial Wildlife Analysis Final), and AR_06918-

8   06928 (Sanpoil Vegetative Management Project Lynx Analysis Supplement).

9              **1.**     **The Forest Service Assessed the Effects on Recreation.**

10        Despite the robust analysis of the effects of the Project in the record,

11   Plaintiff asserts that the Forest Service failed to assess the cumulative effects of the

12   Project on recreation. Pl.'s S.J. at 27. But the EA explains the cumulative effects of

13   the Project on recreation, AR_06067-68, as does the recreation report in the record.

14   AR_05250.

15        Indeed, Plaintiff does not challenge the analysis. Plaintiff instead seeks to

16   argue that the EA's discussion of the cumulative impacts of the Project on

17   recreation is deficient because it fails to catalogue other past projects on the Forest.

18   Pl.'s S.J. at 27. The Forest Service's NEPA regulations, however, do not require

19   that an agency "catalogue or exhaustively list and analyze all individual past

20   actions." 36 C.F.R. § 220.4(f). Nor do the regulations "require the consideration of

the individual effects of all past actions to determine the present effects of past actions." *Id; see also League of Wilderness Defenders–Blue Mountains Biodiversity Project v. U.S. Forest Serv.,* 549 F.3d 1211, 1217 (9th Cir.2008) ("[A]gencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effects of all past actions combined."). Further, in examining the cumulative effects of past actions, an agency can "aggregate[e] the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured." *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015). Plaintiff thus misapprehends NEPA's requirements, and the Sanpoil Project properly addressed cumulative effects on recreation.

      **2.**     **The Forest Service Also Assessed the Effect on Endangered and Sensitive Species.**

Plaintiff also seeks to challenge the Forest Service's cumulative effects analysis for wildlife, contending that the Service does not have a complete census for wildlife. Pl.'s S.J. at 27. True, the Service lacks this information because "[a]ccurate estimates of wildlife populations relative to the project area are difficult if not unfeasible to obtain." AR_06286. And this, in turn, "is due to the limitations of detection methods and the level of effort and time that would be required for a complete census." *Id*. But this reality is not a ground to invalidate the Forest Service's cumulative effects analysis, as Plaintiff suggests in its motion.

"[G]eneral statements about possible effects and some risk" may suffice when "more definitive information" is unavailable. *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 868 (9th Cir.2 005); *see also Kleppe*, 427 U.S. at 414 ("[P]ractical considerations of feasibility might well necessitate restricting the scope of comprehensive statements."). And in any event, "[l]acking complete information on species distributions and abundance, when habitat occurs on which a species depends, [the Forest Service] generally consider[s] the habitat as potentially occupied." AR_06286. Given that a complete census was not feasible, the Forest Service thus took a conservative approach to cumulative effects on wildlife, considering habitat to be occupied.

Plaintiff misreads the Forest Service's 2018 cumulative effects report for the gray wolf prepared in connection with the Forest Plan revision, contending that the report indicates that areas "impacted by timber harvest and grazing" will adversely impact gray wolf habitat, contrary to the conclusion the Forest Service reached in the EA. *See* Pl's S.J. at 28 (citing FP_102064). In fact, the 2018 Forest-wide Gray Wolf Report recognized Forest-wide management under the Plan, including the vegetation management here, would "result in a high likelihood of maintaining the

viability of gray wolves on the [CNF]." FP_102605-102066. The plan-level and project-level conclusions are thus in full accord.[7]

Nor are additional grazing areas of concern in the Sanpoil Project. As explained above, the Project would produce better, not more, grazing area in the Quartz allotment. AR_05491; AR_06054. The Forest Service's cumulative effects analysis is thus fully supported by the administrative record.

Plaintiff also challenges the Forest Service's cumulative effects analysis for the wolverine, questioning the agency's conclusion that the Project is "not likely to jeopardize the existence of wolverines." Pl.'s S.J. at 29-30; AR_06044. But that conclusion was fully supported by the Forest Service's Biological Evaluation for the Project, which concluded that [1] the Project would create openings in the forest canopy that could enhance forage production for wolverines; [2] while other on-going projects, including the Sherman Pass Project, *see* AR_05537-38 (Appendix B, Table 11 and 12) could disturb and displace a wolverine from a foraging or resting site, they but will not have a significant impact to the population as a whole; [3] wolverine travel corridors would remain intact; and [4]

---

[7] Plaintiff also questions why the Forest Service references its grizzly bear analysis in its cumulative effects analysis for wolves and wolverines. Pl's S.J. at 28. The agency did so because grizzly bears and wolves both prey on big game. AR_05449; AR_02949. Both prey on, and eat carcasses of, young ungulates. AR_05449; AR_02949.

the Project's impact on wolverine habitat will be temporary and moderate.
AR_05531.

Plaintiff also challenges the Forest Service's cumulative effects analysis for the little brown bat and the Townsend big-eared bat, asserting again that the agency cannot act without a complete census of where bats live and claiming that the Project would remove bat roost sites. Pl.'s S.J. at 31. Again, the Forest Service is not required to complete a detailed census when undertaking a cumulative effects analysis. Contrary to Plaintiff's contention, moreover, the Forest Service knows "where these bats live." Pl.'s S.J. at 31. Townsend's big-eared bat "hibernate and roost in caves of mine adits"; and its nursing colonies are typically located in sites above 50 degrees, such as old abandoned buildings. AR_06260. Little brown bat similarly roost and nurse in structures such as caves, the hollows of trees, mines, abandoned buildings, and bridges. AR_06299. The Forest Service concluded that the proposed activities may impact individual bats but are not likely to result in a trend toward Federal listing or loss of viability. AR_06046. The Service reached that determination because "activities would either be far enough removed from [these] known bat roost sites to have no effect on [the bat] species or would be timed to avoid periods that the sites would be occupied." *Id*. The determination is thus fully explained and supported in the record.

Lastly, Plaintiff asserts that the Forest Service failed to adequately assess the cumulative impact of the Project on sensitive birds and invertebrate species. Pl.'s S.J. at 31-32. Plaintiff asserts that "[t]he EA fails to engage in any meaningful analysis of cumulative effects to the goshawk." *Id*. at 31. But that analysis is in the Forest Service's Biological Evaluation. AR_06305. Plaintiff also asserts that the EA failed to assess the cumulative effects of the Project on invertebrate species such as Western bumblebee. Pl.'s S.J. at 32. But that information, too, is readily found in the Biological Evaluation. AR_06311. The record includes more than the EA. *See Portland Audubon Soc. v. Endangered Species Committee*, 984 F.2d 1534, 1548 (9th Cir. 1993) ("Section 706 of the APA provides that judicial review of agency action shall be based on 'the whole record.' 'The whole record' includes everything that was before the agency pertaining to the merits of its decision.").

Federal Defendants are entitled to summary judgment on Claim One of the Amended Complaint that relies upon Plaintiff's cumulative effects arguments.

### C.   The Forest Service's FONSI was not Arbitrary or Capricious.

Finally, Federal Defendants are also entitled to summary judgment on Claim Three of the Amended Complaint that asserts that the Forest Service's FONSI was arbitrary and capricious. The FONSI is well supported by the Project record and the EA—and well within the Forest Service's discretion under NEPA to make.

43

Under NEPA, "an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Project*, 161 F.3d at 1212. "Whether an action 'significantly' affects the environment requires analyzing both 'context' and 'intensity.'" *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (citing 40 C.F.R. § 1508.27). "Context refers to the setting in which the proposed action takes place[.]" *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27(a)). "Intensity," meanwhile, means 'the severity of the impact'" under NEPA's implementing regulations. *Id.*

"[T]he regulations identify ten factors that agencies should consider in evaluating intensity." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (citing 40 C.F.R. § 1508.27(b)(1)-(10)). Under the APA's standard of review, an agency's finding of no significant impact is subject to deference, *Wild Fish Conservancy v. Nat'l Park Serv.*, 687 F. App'x 554, 557 (citing *Marsh v. Oregon Natural Resources*, 490 U.S. 360, 376-77), and "may be overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004) (quoting *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002)).

44

1      Because the Forest Service's FONSI was fully supported by the EA and

2   record, including specialists reports for the Project, it is subject to deference, and is

3   not arbitrary or capricious. *See Env'tl. Prot. Info. Ctr. V. U.S. Forest Serv.*, 451

4   F.3d 1005, 1015 (finding agency's analysis of environmental impacts with

5   protection and monitoring measures in place constituted "the requisite 'hard look'

6   at the Project's environmental consequences, and it was not arbitrary and

7   capricious for [the agency] to determine that the impacts would not be significant

8   with these mitigation measures in place."); *BARK v. Northrop*, 607 F. App'x 652,

9   655 (9th Cir. 2015) (finding agency "reasonably relied on its own expert reports

10  and technical expertise in concluding that the impact of the project would be

11  insignificant.").

12      Plaintiff's one paragraph attempt to challenge the Service's FONSI fails to

13  carry its burden under the APA's deferential standard of review. Pl.'s S.J. at 39-40.

14  Stripped of its arguments that the Forest Service was required to disclose "site

15  specific" prescriptions and that the agency allegedly failed to assess the cumulative

16  effects of the Project, which, as explained, have no merit, Plaintiff is left to rest on

17  other arguments. Plaintiff argues that the Project presents potential significant

18  environmental impacts warranting an EIS because it will allegedly result in [1]

19  uncertain impacts; [2] impact the Inventoried Roadless Rule area ("IRA"); and [3]

20

45

set a precedent for future projects. *Id*. None of Plaintiff's arguments, however, have any merit.

Regarding uncertainty, agencies must consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). Effects are likely to be highly controversial if there is "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Barnes v. FAA*, 865 F.3d 1266, 1275 (9th Cir. 2017) (quoting *Blue Mountains Biodiversity Project*, 161 F.3d at 1212) (alteration in original) (internal quote omitted). "A substantial dispute exists when evidence . . . casts serious doubt upon the reasonableness of an agency's conclusions." *In Def. of Animals*, 751 F.3d at 1069 (internal quote omitted). Not only does Plaintiff fail to present any "evidence" of uncertainty, Plaintiff fails to even address the specialist reports, EA, and DN/FONSI that found no uncertainty. *See* Pl.'s S.J. at 40 (resting instead on conclusory parenthetical statements of significance, but nothing more).

Agencies must also consider "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). This does not mean, however, that an EIS is required "anytime there is some uncertainty"; 'only if the effects of the project are 'highly' uncertain" is this intensity factor implicated. *In Def. of Animals*, 751 F.3d at 1070

1    (internal quote and citation omitted). And the Service determined that there is

2    nothing about the Project's restorative treatments that are somehow "highly

3    uncertain" or "highly controversial" within the meaning of the intensity factors

4    Plaintiff invokes.

5        Again, Plaintiff fails to point to anything in the record that would carry its

6    burden of showing that the agency's determination was arbitrary and capricious.

7    Plaintiff instead attempts to (again) argue that the Forest Service was required to

8    have provided "site-specific," tree-by-tree prescriptions for the Project. Pl.'s S.J. at

9    40. But *Barnes*, which Plaintiff attempts to cite for the proposition that the Forest

10   was required to do so, did not even address that issue. *See* Pl.'s S.J. at 40 (citing

11   *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011)).

12       Further, the passage in *Barnes* Plaintiff quotes in purported support of its

13   contention that the Forest Service was required to assess tree-by-tree prescriptions,

14   comes from *Native Ecosystems Council*. *See Barnes*, 655 F.3d at 1140 (quoting

15   *Native Ecosystems Council v. U.S. Dep't of Transp.*, 428 F.3d 1233, 1240 (9th Cir.

16   2005). There, the Court made clear the heavy burden Plaintiff shoulders in

17   attempting to show that a Project is highly uncertain or controversial enough to

18   require an EIS. Even the mere "presence of negative effects," the Court

19   recognized, is not enough to make a Project "highly controversial" or "highly

20   uncertain." *Native Ecosystems Council*, 428 F.3d at 1240 (quote and citation

47

omitted). "Not only would such a standard deter candid disclosure of negative

information," contrary to NEPA's purpose, it would mean that the mere "presence

of some negative effects necessarily rises to the level of demonstrating a

significant effect on the environment," which does not "follow[.]" *Id*. *Native*

*Ecosystems Council* thus highlights the shortcomings in Plaintiff's argument.

The Court should also reject Plaintiff's argument that the treatments in the

IRA warrants an EIS. *See* Pl.'s S.J. at 40 (alleging significance because vegetation

treatments would occur "within Roadless Areas."). Plaintiff seeks to invoke the

third intensity factor, which provides for consideration of the "[u]nique

characteristics of the geographic areas such as proximity to historic or cultural

resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or

ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). Again, the Service fully

considered the Project's impact on the IRA in the EA and record. AR_06010-11;

AR_06056-57; AR_05325; AR_5331-33; AR_06023; AR_06228; AR_06231-32;

AR_06233-37. Based upon this thorough review, the Forest Service concluded that

the Project's treatments in the IRA would not require it to prepare an EIS.

Plaintiff's claim thus fails under the APA's deferential standard of review.[8]

---

[8] Plaintiff also asserts that the Project "proposes treatments next to and within" the recommended wilderness area. Pl.'s S.J. at 40. But the Forest is not proposing activity within the recommended wilderness area. AR_05948-49; AR_05899-5901; AR_06340-6360; AR_06806. The Court should reject Plaintiff's suggestion to the contrary.

Finally, Plaintiff's suggestion that the Project sets a precedent for future actions fails as a matter of law under Ninth Circuit precedent. Pl.'s S.J. at 40. In *Barnes*, the Ninth Circuit recognized that "EAs are usually highly specific to the project and the locale, thus create[e] no binding precedent" for future projects. 655 F.3d at 1140; *see also Anderson*, 371 F.3d at 493 (precedential factor is generally insufficient to demonstrate a significant environmental impact).

Federal Defendants are thus also entitled to summary judgment on the Third Claim the Amended Complaint that relies upon these arguments in seeking to require that the agency prepare a time-consuming EIS in assessing the Project.

## **CONCLUSION**

Based on the foregoing, the Service complied with NFMA, NEPA, and the APA in revising the Forest Plan and in issuing the DN/FONSI for the Sanpoil Project. Accordingly, the Court should grant judgment to Federal Defendants.

Dated:  November 10, 2022                Respectfully submitted,

                                         TODD KIM
                                         Assistant Attorney General

1

2                                         */s/ Paul G. Freeborne*
                                          PAUL G. FREEBORNE
3                                         TYLER M. ALEXANDER
                                          Trial Attorneys
4                                         U.S. Department of Justice
                                          Environment and Natural Resources Division
5                                         P.O. Box 7611
                                          Washington, D.C. 20044-7611
6                                         Freeborne Tel: (202) 532-5271
                                          Freeborne Fax: (202) 305-0506
7                                         Alexander Tel: (202) 305-0238
                                          Alexander Fax: (202) 305-0506
8                                         paul.freeborne@usdoj.gov
                                          tyler.alexander@usdoj.gov

9

10

11

12

13

14

15

16

17

18

19

20

50

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 10, 2022, I electronically filed and served the foregoing on all counsel of record *via* the CM/ECF system.

<u>*/s/ Paul G. Freeborne*</u>
Attorney for Federal Defendants

51