Claire Loebs Davis, WSBA #39812
ANIMAL & EARTH ADVOCATES, PLLC
2226 Eastlake Ave E #101
Seattle, WA 98102
Tel: (206) 601-8476
claire@animalearthlaw.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KETTLE RANGE CONSERVATION GROUP, | Case No. 2:21-cv-161 |
| Plaintiff, | |
| v. | **PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY ISO SUMMARY JUDGMENT** |
| U.S. FOREST SERVICE, GLENN CASAMASSA, Pacific Northwest Regional Forester, U.S. Forest Service, RODNEY SMOLDON, Forest Supervisor, Colville National Forest, TRAVIS FLETCHER, District Ranger, Republic Ranger District, U.S. Forest Service. | **02/09/2023 With Oral Argument: 1:30 p.m.** |
| Defendants. | |

1

# TABLE OF CONTENTS

2  ACRONYMS AND SHORT CITATIONS ......................................................................... ii

3  TABLE OF AUTHORITIES ........................................................................................ v

   INTRODUCTION ....................................................................................................... 1

4  ARGUMENT ............................................................................................................. 2

5     I.   Forest Plan Violates NFMA, NEPA, and the APA ....................................... 2

         A.   Plaintiff's Challenge to the 2019 Plan is Properly Presented for Review ................. 2

6           1.   Challenge to 2019 Plan is Ripe for Review ................................. 2

            2.   Administrative Remedies Have Been Exhausted ......................... 5

7        B.   Service Violated NEPA and NFMA in Replacing the 21-Inch Rule with the Old-Growth Guideline in 2019 Plan ..................................... 8

8           1.   Service Does Not Show Need to Replace 21-Inch Rule ............. 11

9           2.   Service Does Not Evaluate Adverse Effects on Viability ......... 15

            3.   Service's Conclusions in Selecting Alternative P are Contradicted by Evidence in the Record .................................................. 19

10          4.   Service Violated NEPA By Failing to Acknowledge and Respond to Substantive Comments and Objections .......................... 23

11   II.   Sanpoil Project Violates NEPA, NFMA, and the APA ............................ 25

12       A.   Service Fails to Analyze Any Meaningful Cumulative Impacts ........................... 25

         B.   Service Fails to Analyze Impact on Diversity Mandate ................................. 28

13          1.   Gray Wolves ................................................................... 28

            2.   Wolverine ...................................................................... 29

14          3.   Sensitive Bat Species ....................................................... 30

15          4.   Sensitive Bird and Invertebrate Species ............................... 31

         C.   Service Fails to Analyze Site-Specific Impact of Project ............................. 32

16       D.   Service Was Required to Develop EIS on Sanpoil Project ........................... 33

   CONCLUSION ........................................................................................................ 35

17

18

19

20

21

22

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

## ACRONYMS AND SHORT CITATIONS

For the Court's convenience, following is a list of the acronyms and short references for documents and statutes referenced in Plaintiff's briefing.[1]

| | |
|---|---|
| **1982 Rule** | NFMA planning regulations adopted by the Service in 1982, which it elected to apply to the 2019 Plan. |
| **2019 Plan** | 2019 Colville National Forest Land Management Plan |
| **21-Inch Rule** | 1995 Service Rule banning the cutting of trees over 21" DBH |
| **Alternative P** | Alternative Implemented by the Service in the 2019 Plan |
| **APA** | Administrative Procedure Act |
| **BA** | Biological Assessment |
| **BE** | Biological Evaluation |
| **Complaint** | First Amended Complaint (ECF No. 9) |
| **DBH** | Diameter at Breast Height |
| **DEIS** | Draft Environmental Impact Statement |
| **Diversity Mandate** | NFMA requirement that forest plans ensure diversity of plant and animal species. 16 U.S.C. § 1604(g)(3)(B) |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **ESA** | Endangered Species Act |
| **DBH** | Diameter at Breast Height |

---

[1] Although some terms have been added to the list, all terms have the same meaning as in Plaintiff's Motion for Summary Judgment.

COMBINED OPPOSITION AND REPLY - ii

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

| | |
|---|---|
| **EA** | Environmental Assessment |
| **Eastside Screens Report** | 1995 report by Eastside Panel on protecting old-growth habitat in Eastern Washington and Oregon |
| **Eastside Panel** | Scientific panel assembled by Congress in 1994 |
| **EIS** | Environmental Impact Statement |
| **ESA** | Endangered Species Act |
| **Supp. Opp.** | Federal Defendants' Opposition to Plaintiff's Motion for Leave to Consider Extra-Record Evidence in Support of Plaintiff's Motion for Summary Judgment ("Defendants' Opposition to Extra-Record Evidence") (ECF No. 53) |
| **DSJ** | Federal Defendants' Motion and Memorandum of Law in Support of Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Opposition") (ECF. No. 54) |
| **FEIS** | Final Environmental Impact Statement |
| **FONSI** | Finding of No Significant Impact |
| **HRV** | Historic Rate of Variability |
| **IRA** | Inventoried Roadless Areas |
| **KRCG** | Kettle Range Conservation Group |
| **LAU** | Lynx Analysis Unit |
| **LSOF** | Late Structure Old Forest |
| **MIS** | Management Indicator Species |
| **MMBF** | Million Board Feet of Timber |
| **NEPA** | National Environmental Policy Act |
| **NEWFC** | Northeast Washington Forest Coalition |

COMBINED OPPOSITION AND REPLY - iii

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

| | | |
|---|---|---|
| 1 | **NEWFC Objection** | Objection filed by NEWFC to 2019 Plan |
| 2 | **NFMA** | National Forest Management Act |
| 3 | **NOI** | Notice of Intent to Sue |
| 4 | **Old-Growth Guideline** | 2019 Plan's Guideline for Large Tree Management (FW-GDL-VEG-03) |
| 6 | **Supp. Mot.** | Plaintiff's Motion for Leave to Consider Extra-Record Evidence in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion to Consider Extra-Record Evidence") (ECF No. 46) |
| 8 | **PSJ** | Plaintiff's Motion for Summary Judgment and Memorandum in Support (Motion for Summary Judgment") (ECF No. 48) |
| 10 | **ROD** | Record of Decision |
| 11 | **Service** | U.S. Forest Service |

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1

# TABLE OF AUTHORITIES

2

3

**Cases**

4

*Bark v. U.S. Forest Serv.*,
    958 F.3d 865 (9th Cir. 2020) ........................................................ 34, 35

5

*Big Thorne Project v. U.S. Forest Serv.*,
    857 F.3d 968 (9th Cir. 2017) ............................................................. 3

6

7

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) ............................................................ 25

8

*Cascadia Wildlands v. BIA*,
    801 F.3d 1105 (9th Cir. 2015) .......................................................... 26

9

*Ctr. for Biological Diversity v. Dombeck*,
    No. CIV 00-1711 PHX RCB, 2001 U.S. Dist. LEXIS 22158 (D. Ariz. June 14, 2001) .......... 4

10

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
    349 F.3d 1157 (9th Cir. 2003) .......................................................... 25

11

*Ctr. for Biological Diversity v. Zinke*,
    900 F.3d 1053 (9th Cir. 2018) ...................................................... 12, 15

12

*Conservation Cong. v. United States Forest Serv.*,
    555 F.2d 1093 (E.D. Cal. 2008) ......................................................... 7

13

14

*DOT v. Pub. Citizen*,
    541 U.S. 752, 124 S. Ct. 2204, 159 L. Ed. 2d 60 (2004) ................................. 7

15

*Earth Island Inst. v. U.S. Forest Serv.*,
    442 F.3d 1147 (9th Cir. 2006) .......................................................... 25

16

17

*Friends of the Wild Swan v. U.S. Forest Serv.*,
    966 F. Supp. 1002 (D. Or. 1997) ........................................................ 9

18

*Heartwood, Inc. v. United States Forest Serv.*,
    230 F.3d 947 (7th Cir. 2000) ........................................................... 3

19

*Idaho Sporting Cong. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002) ........................................................... 8

20

21

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ........................................................... 9

22

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) ............................... 5

COMBINED OPPOSITION AND REPLY - v

*McBride Cotton & Cattle Corp. v. Veneman,*
   290 F.3d 973, 982 (9th Cir. 2002) ..................................................... 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ..................................................... 11

*N. Alaska Env't Ctr. v. Kempthorne,*
   457 F.3d 969 (9th Cir. 2006) ..................................................... 19

*N.M. v. BLM,*
   565 F.3d 683 (10th Cir. 2009) ..................................................... 33

*Neighbors of Cuddy Mt. v. Alexander,*
   303 F.3d 1059 (9th Cir. 2002) ..................................................... 5

*Ohio Forestry Ass'n v. Sierra Club,*
   523 U.S. 726, 118 S. Ct. 1665, 140 L. Ed. 2d 921 (1998) ..................................................... 3

*Pac. Rivers v. U.S. BLM,*
   No. 6:16-cv-01598-JR, 2018 U.S. Dist. LEXIS 222981 (D. Or. Oct. 12, 2018) ................. 7, 8

*Seattle Audubon Soc'y v. Moseley,*
   80 F.3d 1401 (9th Cir. 1996) ..................................................... 9

*Seattle Audubon Soc'y v. Moseley,*
   798 F. Supp. 1473 (W.D. Wash. 1992) ..................................................... 9

*Sierra Club v. Marita,*
   46 F.3d 606 (7th Cir. 1995) ..................................................... 3

*Sierra Forest Legacy v. United States Forest Serv.,*
   652 F. Supp. 2d (N.D. Cal. 2009) ..................................................... 8

*Washington v. Azar,*
   426 F. Supp. 3d 704 (E.D. Wash. 2019) ..................................................... 12

*WildEarth Guardians v. Conner*
   920 F.3d 1245 (10th 2019) ..................................................... 33

**Statutes**

7 U.S.C.S. § 6912 (LexisNexis) ..................................................... 5, 6, 7, 8

16 U.S.C. § 1604 ..................................................... 3, 9

**Other**

1982 Rule § 219.19 ..................................................... 3, 10

40 C.F.R. § 1502.9 ..................................................... 23, 24

40 C.F.R. § 1508.8 ..................................................... 19, 34

Forest Service Handbook, FSH 1909.15 ..................................................... 33

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

**INTRODUCTION**

The preservation of large, old trees is one of the most controversial and consequential issues in modern forest management. Although decades of aggressive logging have reduced old growth stands to just a fraction of their previous range, these old trees still comprise the "critical backbone" of Eastern Washington forests (AR 02895), providing unique ecological value as habitat for numerous species, serving as irreplaceable reservoirs of genetic diversity and forest regeneration, and mitigating climate change by storing a disproportionally large amount of carbon.

With its 2019 Forest Plan, the Service eliminated the 21-Inch Rule, a critical policy that has protected old growth trees in the Colville National Forest for nearly two decades. Defendants asks the public to trust that they will use the broad exceptions to the new Old-Growth Guideline to provide "more flexibility," but not "unlimited flexibility" (DSJ at 6). Rather than conducting the required analysis of the potential impact of this new policy to old-growth trees and the species that depend on them, the Service takes a leap of faith that its approach "may" eventually contribute to more "resilient forests" (FP 107840). And instead of estimating the amount of old growth that will be lost due to the exceptions to the Old-Growth Guideline, the Service defers that evaluation to the project level, where those details are deferred again to be figured out at the "implementation" stage—with commercial logging companies ultimately deciding which trees to fell.

The National Forest Management Act ("NFMA") and National Environmental Policy Act ("NEPA") demand more. NFMA's substantive provisions

COMBINED OPPOSITION AND REPLY - 1

1   require the Service to place a high value on ensuring the diversity of plant and animal

2   species, including old-growth trees and the many species that depend on the habitat

3   that they create. And NEPA demands that agencies take a "hard look" at potential

4   environmental impacts before taking action. Because the Service has failed to meet

5   these requirements of NFMA and NEPA in approving both the 2019 Plan and the

6   Sanpoil Project, Plaintiff asks the Court to grant summary judgment on its behalf on

7   the First, Third, and Fifth Claims of its Amended Complaint.

## ARGUMENT

### I.   Forest Plan Violates NFMA, NEPA, and the APA

10   Plaintiff asks the Court to grant summary judgment on its Fifth Claim, finding

11   that the Service approved the 2019 Plan in violation of NEPA, NFMA, and the APA.

12   *See* Complaint at ¶¶ 190-97.[2]

#### A.   *Plaintiff's Challenge to the 2019 Plan is Properly Presented for Review*

##### 1.   Challenge to 2019 Plan is Ripe for Review

15   The Service contends Plaintiff's challenge to the 2019 Plan is not ripe for

16   review. It asserts that Plaintiff can only challenge the elimination of the 21-Inch Rule

17   "in connection with a site-specific project that includes the harvesting of trees in

18   excess of 21 inches DBH outside the parameters of the Eastside screens," and that

19   the Sanpoil Project does not qualify. DSJ at 1-2; *see also id.* at 17-18. This assertion

---

[2] Plaintiff does not seek summary judgment on its Sixth Claim, for violation of the ESA, which was addressed when the Service withdrew the LAU's from the Sanpoil Project. In addition, it makes no argument related to its Second or Fourth Claims.

COMBINED OPPOSITION AND REPLY - 2

1    is based on a misunderstanding of the law and a misrepresentation of the facts.

2    First, the question of whether the 2019 Plan complied with the planning

3    requirements of NFMA and the procedural requirements of NEPA was ripe as soon

4    as the Service issued the Plan ROD. The Diversity Mandate applies at the plan level,

5    based on an analysis of the whole forest. *See* 16 U.S.C. § 1604(g)(3)(B) (requiring

6    Service to approve rules for the "development and revision" of forest plans that will

7    "provide for diversity of plant and animal communities"); 1982 Rule § 219.19

8    (applicable rule implementing 16 U.S.C. § 1604(g)(3)(B)). Unlike the logging

9    provisions considered in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 118 S.

10   Ct. 1665, 140 L. Ed. 2d 921 (1998), the question of whether the 2019 Plan complies

11   with the Diversity Mandate will not "benefit from further factual development"

12   through site-specific action. *See id.* at 733; *see also Big Thorne Project v. U.S. Forest*

13   *Serv.*, 857 F.3d 968, 975 n.4 (9th Cir. 2017) (effects of specific project "tell us

14   nothing about whether the agency complied with its legal obligations [under 16

15   U.S.C. § 1604(g)(3)(B)] in adopting the Forest Plan many years earlier").

16   For that reason, "[w]aiting until an actual timber sale occurs under the plan

17   will not clarify the presentation of issues; arguments over the plans' sufficiency as a

18   whole or the procedures followed in developing the plans with regard to diversity

19   are as concrete now as they will ever become." *Sierra Club v. Marita*, 46 F.3d 606,

20   613 (7th Cir. 1995); *see also Heartwood*, *Inc. v. United States Forest Serv., 230 F.3d*

21   947, 953 (7th Cir. 2000) (citing this finding with approval after *Ohio Forestry*).

22   Likewise, Plaintiff's challenge to the 2019 Plan under NEPA also became ripe as

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1    soon as the Service finalized the Plan. *See Ctr. for Biological Diversity v. Dombeck*,

2    No. CIV 00-1711 PHX RCB, 2001 U.S. Dist. LEXIS 22158, at *14 (D. Ariz. June

3    14, 2001) (because "NEPA requires a procedure rather than a specific result, such

4    challenges are ripe at the time the alleged failure occurs").

5         Second, even assuming Plaintiff needed to wait to bring its challenge until the

6    2019 Plan's Old-Growth Guideline was implicated in a site-specific project, the

7    Sanpoil Project clearly suffices. Although the Service now assures Plaintiff that the

8    Project will not harvest trees over 21" DBH (DSJ at 1-2), such assurance is

9    inconsistent with the Sanpoil EA, which explicitly incorporates the Plan's Old-

10   Growth Guideline, along with its exceptions. *See, e.g.* AR 06047, 06049, 06050

11   (citations in the EA to the Old-Growth Guideline (FW-GDL-VEG-03)); AR 06893-

12   97 (reiteration of Plan conditions, objectives, and guidelines in the Sanpoil

13   Silviculture Report, although the Report misstates FW-GDL-VEG-03). Although

14   the Service's failure to provide site-specific details or clarify how it will apply the

15   guideline's exceptions makes it impossible to know the extent to which the Sanpoil

16   Project will cut trees that are at least 21" DBH, the Silviculture Report indicates it

17   will involve treatments in 3,590 acres of "late open" and "late closed" structures,

18   accounting for 20% of the total Project. AR 06885; *see discussion* at PSJ at 23-24.

19   The report also indicates treatments would "move some mid and late structures to

20   early structure." AR 06883.

21        As the declarations of Timothy Coleman and Jay Jurgensen make clear, the

22   Sanpoil Project applies the 2019 Plan's new Old-Growth Guideline through a

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

"concrete action" that "harms or threatens to harm" Plaintiff and its members and supporters. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891, 110 S. Ct. 3177, 3190, 111 L. Ed. 2d 695, 718 (1990); Coleman Decl. ¶¶ 17, 19-27 (ECF No. 49), Jurgensen Decl. ¶¶ 6-7 (ECF No. 50). The Sanpoil Project thus provides a sufficient "relationship between the lawfulness of the site-specific action and the practice challenged," and makes the challenge to the 2019 Plan ripe for review. *See Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002) (citation omitted); *id* at 1069 (holding that "compliance with NFMA's forest-wide species viability requirements is relevant to the lawfulness of any individual timber sale").

## 2.  Administrative Remedies Have Been Exhausted

In claiming that KRCG waived its challenge to the 2019 Plan by failing to object during the agency's administrative process, the Service ignores the substantial record to the contrary. *See* DSJ at 2, 19-20. This record makes clear that KRCG fulfilled the exhaustion requirement of 7 U.S.C.S. § 6912(e) (LexisNexis) by participating extensively in the commenting and objection process for the 2019 Plan.

Indeed, Plaintiff raised concerns at every step of the planning process about the potential removal of the 21-Inch Rule and the Plan's failure to meet NFMA's Diversity Mandate. *See, e.g.*, FP 014803 (2011 NEWFC comments on scoping); FP 091157 (2016 NEWFC comments on DEIS); FP 091192-94 (2016 KRCG comments on draft EIS); FP 090238-39 (2016 postcard from KRCG and others asking Service to add "explicit safeguards for large old trees" to Alternative P); FP 106598 (2018 objection by KRCG and others raising Diversity Mandate); FP 106584-85 (similar).

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1    Specifically, KRCG joined other NEWFC board members in filing a 19-page

2    objection on November 6, 2018 ("NEWFC Objection"), which included a lengthy

3    challenge to the 2019 Plan's failure to adequately protect old and large trees, citing

4    the Eastside Screens Report and half a dozen studies supporting the high ecological

5    value of old trees and the need to keep the 21-Inch Rule. AR 05556-75. Similar

6    concerns were raised by multiple other commentors. *See, e.g.*, FP 091126-27 (2016

7    comment from the Lands Council, stressing importance of retaining clear diameter

8    guidelines to preserve large trees); FP 106602 (2018 objection from the Sierra Club,

9    asserting that the exemptions in the Old-Growth Guideline allowing for big trees to

10    be cut "could easily be applied to practically every acre proposed for logging").

11        Defendants' assertion that Plaintiff failed to object to the Old-Growth

12    Guideline during the forest planning process simply ignores the NEWFC Objection.

13    Although the Opposition does not raise this issue, Defendants may intend to argue

14    that the NEWFC Objection is insufficient to show that KRCG exhausted its remedies

15    as to its challenge to the 2019 Plan. If so, this contention is contrary to both the facts

16    and to the law interpreting the exhaustion requirements of 7 U.S.C.S. § 6912(e).[3]

17        As its name indicates, NEWFC is a coalition, and it submits its comments and

18    objections on behalf of the organizations that belong to that coalition. The NEWFC

19    Objection was explicitly filed on behalf of all the members of its board, on which

20    KRCG actively participated at the time. *See, e.g.*, AR 05556 (describing NEWFC as

21

22

---

[3] Since Plaintiff cited the NEWFC Objection in its opening brief (PSJ at 9, 22-23), it would be inappropriate for Defendants to raise this issue for the first time on reply.

COMBINED OPPOSITION AND REPLY - 6

1    a "coalition of diverse stakeholders" and indicating that the objection has the "full

2    support of the NEWFC board"); FP 014824 (2011 comments identifying KRCG as

3    a co-founder of NEWFC and member of the board). KRCG was thus a party to the

4    NEWFC Objection, in addition to filing separate objections to the Plan under its own

5    name that addressed different topics. *See* FP 106561-75 and 106591-98.

6         However, even if the Court does not credit KRCG as a member of the coalition

7    that filed the NEWFC Objection, the exhaustion requirement of 7 U.S.C.S. § 6912(e)

8    would nonetheless be "satisfied by virtue of other organizations who voiced the

9    objections." *See Pac. Rivers v. U.S. BLM*, No. 6:16-cv-01598-JR, 2018 U.S. Dist.

10   LEXIS 222981, at *11 (D. Or. Oct. 12, 2018). The NEPA exhaustion requirements

11   are designed to ensure that would-be plaintiffs will "structure their participation so

12   that it . . . alerts the agency to the [parties'] position and contentions, in order to

13   allow the agency to give the issue meaningful consideration." *See DOT v. Pub.*

14   *Citizen*, 541 U.S. 752, 764-65, 124 S. Ct. 2204, 2213-14, 159 L. Ed. 2d 60, 77 (2004)

15   (internal citations and quotations omitted) (cited at DSJ at 19-20). Plaintiff did so

16   here, by participating in three objections that covered a wide range of concerns with

17   the Plan, including NEWFC's objection to the Plan's treatment of old trees.

18        Defendants concede that concerns over the elimination of the 21-Inch Rule

19   were raised during the objection process and "explored in the Final EIS." DSJ at 28.

20   Regardless of who filed these objections, they satisfied the "rationale underlying the

21   exhaustion requirement," which is to "avoid premature claims and to ensure that the

22   agency possessed of the most expertise in an area be given first shot at resolving a

COMBINED OPPOSITION AND REPLY - 7

claimant's difficulties." *See Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). In such circumstances, district courts in the Ninth Circuit have routinely found the exhaustion requirement to be met, [4] even if the plaintiff did not file an objection raising the same concerns that are at issue in the litigation. "There is no need for a litigant to have personally raised the issue, so long as the issue was raised by another party and the agency had the opportunity to consider the objection." *Conservation Cong. v. United States Forest Serv.*, 555 F. Supp. 2d 1093, 1106 (E.D. Cal. 2008) (citing cases); *see also, e.g., Sierra Forest Legacy v. United States Forest Serv.*, 652 F. Supp. 2d 1065, 1081 (N.D. Cal. 2009); *Pac. Rivers*, 2018 U.S. Dist. LEXIS 222981, at *11 ("The dispositive inquiry does not concern *who* raised a particular objection but rather *whether* that objection was raised, so as to provide the agency with an opportunity to respond.") (emphasis in original).

### B.  Service Violated NEPA and NFMA in Replacing the 21-Inch Rule with the Old-Growth Guideline in the 2019 Plan

It is telling that although Plaintiff alleges that the Plan fails to satisfy NFMA's Diversity Mandate, Defendants barely acknowledge the existence of the mandate in their brief. DSJ at 11-14, 20-21 (discussion of NFMA does not include discussion of Diversity Mandate). Instead, Defendants focus on the Forest's multiple-use

---

[4] In the alternative, the Court could waive the exhaustion requirement because it would have been futile for KRCG to file an objection that echoed the content it had helped develop in the NEWFC Objection. *See McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 982 (9th Cir. 2002) (excusing failure to exhaust under 7 U.S.C.S. § 6912(e) because it would have been futile).

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1    obligations, and they fail to address the diversity requirements of 16 U.S.C. §

2    1604(g)(3)(B). *See* DSJ at vi & generally (brief does not cite to 16 U.S.C. §

3    1604(g)(3)(B)); *id.*at 24 (containing the brief's only mention of "NFMA's diversity

4    and viability requirements" in a parenthetical). Defendants thus assert based on

5    NEPA alone that "a court may not force an agency to elevate environmental concerns

6    over other appropriate considerations." DSJ at 13.

7        But, of course, a Court *may* (and *must*) force the Service to ensure that its

8    forest plans "provide for diversity of plant and animal communities. 16 U.S.C. §

9    1604(g)(3)(B)). Indeed, Defendants' authority acknowledges that "NFMA

10   unquestionably requires the Forest Service to 'provide for diversity of plant and

11   animal communities . . . in order to meet overall multiple-use objectives.'" *Lands*

12   *Council v. McNair*, 537 F.3d 981, 992 (9th Cir. 2008) (quoting 16 U.S.C. §

13   1604(g)(3)(B)); *see also Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404-05

14   (9th Cir. 1996) (cited in DSJ at 21) (applying NFMA's substantive mandate)

15       While Defendants imply that some higher level of deference applies to forest

16   plan decisions, courts have not hesitated to find violations of NEPA and NFMA in

17   the approval of forest plans. *See Seattle Audubon Soc'y v. Moseley*, 798 F. Supp.

18   1473, 1484 (W.D. Wash. 1992) (granting summary judgment on a NEPA claim after

19   finding that an EIS on a forest plan amendment was devoid of information about the

20   impact on old-growth dependent species); *Friends of the Wild Swan v. U.S. Forest*

21   *Serv.*, 966 F. Supp. 1002, 1021 (D. Or. 1997) (finding the Service violated NFMA

22   by failing to adequately address the viability of bull trout in a plan amendment).

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

Although the NFMA and NEPA questions about effects on old growth species largely overlap, the Service's NFMA obligation is distinct because it is a substantive requirement. The Service is thus required to show that its Plan satisfies the Diversity Mandate, and it must support its conclusions with studies that the agency deems reliable and base its methodology on reliable evidence. *Lands Council*, 537 F.3d at 994-99. Here, when the Service selected Alternative P for the revised Forest Plan, it violated NEPA, because its analysis of the impact on old-growth dependent species—as exemplified by the Service's four "surrogate species," the northern goshawk, pileated woodpecker, American marten, and white-headed woodpecker— was flawed. Meanwhile, it violated NFMA because the results of that flawed analysis failed to show the selected alternative would "maintain viable populations" of these species. *See* 1982 Rule § 219.19 (applicable rule implementing Diversity Mandate). The Service also failed to "estimate the effects of changes in vegetation type, timber age classes, community composition, rotation age, and year-long suitability of habitat related to mobility of management indicator species," and to adequately evaluate its planning alternatives in terms of "both amount and quality of habitat and of animal population trends." *See* 1982 Rule § 219.19(a)(1), (2).

Specifically, the 2019 Plan falls short of NFMA's substantive requirements, and violates the procedural requirements of NEPA, because the Service (1) did not adequately substantiate its reasons for abandoning the 21-Inch Rule; (2) failed to analyze the potential adverse effect on old-growth species of allowing exceptions to the guideline meant to protect existing old trees; (3) reached conclusions regarding

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1    the impact of Alternative P that are not supported by any methodology, and are

2    contradicted by the evidence in the record and confounded by the inclusion of myriad

3    factors; and (4) refused to address substantive comments and objections to the Plan.

4    　　　The 2019 Plan should thus be invalidated, vacated, and remanded as arbitrary

5    and capricious under the APA because the Service failed to "examine the relevant

6    data" or articulate a "rational connection between the facts found and the choice

7    made." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

8    29, 43 (1983); *see also Lands Council*, 537 F.3d at 987 (decision is arbitrary and

9    capricious if agency "failed to consider an important aspect of the problem" or came

10    to an "implausible" conclusion that "runs counter to the evidence").

11    　　　　　　　　1. Service Does Not Show Need to Replace 21-Inch Rule

12    　　　The Service instituted the 21-Inch Rule as an amendment to the 1988 Forest

13    Plan after the Eastside Screens Report found that only 1% of the Colville Forest

14    consisted of old growth stands protected from logging, and that losing these

15    remaining old trees would jeopardize the biological diversity of the Forest. PSJ at 2.

16    The report found that existing protections for old-growth trees were inadequate and

17    recommended a bright-line rule to ban the cutting of any tree older than 150 years

18    or at least 20" DBH. Eastside Screens Report at 201. The Service implemented only

19    a fraction of the report's recommendations, including a weakened provision

20    prohibiting the cutting of trees that were at least 21" DBH. FP 002979-3028

21    (decision notice implementing changes in 1995); AR 005573 (NEWFC Objection

22    describing history of 21-Inch Rule). The ban was meant to stay in place until the

COMBINED OPPOSITION AND REPLY - 11

1   Service finished a comprehensive recovery strategy for eastside landscapes. Eastside

2   Screens Report at 199; *see also* AR 05573 (NEWFC Objection). However, although

3   the Service collected volumes of data, it never implemented this strategy. AR 05573.

4       The 2019 Plan's abandonment of the 21-Inch Rule represented a significant

5   agency policy change, which the Supreme Court has held is subject to a heightened

6   standard under the APA. "When an agency changes a policy based on factual

7   findings that contradict those on which the prior policy was based, an agency must

8   provide a 'reasoned explanation . . . for disregarding facts and circumstances that

9   underlay or were engendered by the prior policy.'" *Ctr. for Biological Diversity v.*

10  *Zinke*, 900 F.3d 1053, 1067-68 (9th Cir. 2018) (quoting *FCC v. Fox TV Stations,*

11  *Inc.*, 556 U.S. 502, 515-16, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009)); *see also*

12  *Washington v. Azar*, 426 F. Supp. 3d 704, 709 (E.D. Wash. 2019) (Bastian, J.)

13  (listing requirements for an agency to comply with the APA in changing a policy).

14      But the Service is unable to point to any "reasoned explanation" in the record

15  for eliminating the 21-Inch Rule. Defendants claim the FEIS explains the Service's

16  decision to move away from the "inflexible" rule, but the Opposition fails to cite to

17  any such explanation. *See* DSJ at 29 (claiming twice that the decision was well-

18  reasoned, without any supporting citations). Instead, the Opposition cites to only

19  three pages of the FEIS to support this claim, none of which offer a reasoned

20  explanation. *See* DSJ at 28 (citing FP 108491-92 and FP 108319). The first citation

21  is to the Fisheries section of the FEIS, which does not explicitly address the 21-Inch

22  Rule. FP 108491-92. The second citation asserts the need for "restoring landscape

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

heterogeneity through forest structure," but does not explain why this cannot be done with the 21-Inch Rule in place. FP 108319. The remaining citations to the "Final EIS" are not to the FEIS at all, but to three pages of the Forest Vegetation Report. DSJ at 28 (citing FP 099811, 099820 and 099829). These three pages repeat the same phrase—which is the *only justification* that the Opposition points to in the agency record for abandoning the 21-Inch Rule. *See* FP 099811, 099820 and 099829 ("but without the ability to remove trees ≥21" dbh it can be difficult to reduce canopy cover enough to qualify as late open structure").[5] These 24 words clearly do not meet the burden to provide a "reasoned explanation" for a policy change. *Id.* at 1067-68.

Not only did the Service fail to identify any new facts contradicting the initial rationale for the 21-Inch Rule, but it refused to even consider that original rationale, as articulated in the Eastside Screens Report. On one hand, Defendants contend that the Court should not consider this report because it was not a part of the certified record, which contains "all documents and materials *directly or indirectly* considered by agency decisionmakers." Opposition to Motion for Extra-Record Evidence, ECF No. 53, at 3 (citation omitted; emphasis added). Simultaneously,

---

[5] The Service also claims that "after nearly two decades" the shortcomings of Eastside Screens "were apparent." DSJ at 4 (citing FP 108257). But the cited section of the FEIS only asserts that the former policy "lacks direction for other important habitat structure elements such as snags and downed logs." FP 108257. The Eastside Screens Report emphasized the importance of protecting snags, and the FEIS does not explain why such protections could not have been added to the 21-Inch Rule. *See id.;* Eastside Screens Report at 7, 176, 185-88. 207.

COMBINED OPPOSITION AND REPLY - 13

1     Defendants claim that the essence of the Eastside Screens Report *was* considered

2     (i.e., was considered "indirectly") because the Service has "extensive experience"

3     applying the standards from the report. DSJ at 29. These claims are contradictory.

4          The Service also contends that the full rationale behind the 21-Inch Rule is

5     contained in "several other documents," but fails to cite to any. DSJ at 29 (citing FP

6     002978-3028, 113582, 108257-59, and 109067-68; *see* FP 002978-3028 (1995

7     notice of decision amending the interim guidance for the 21-Inch Rule, including the

8     related EA, which discusses the 1994 interim direction extensively, but says little

9     about the basis for the original 21-Inch Rule) FP 109067-68 (bibliography pages

10    containing a reference to the 1995 notice and EA along with numerous other

11    unrelated and unexplained citations); FP 113582 (final record of decision, which

12    notes that the Plan eliminates the 21-Inch Rule, but does not discuss the original

13    rationale for the rule); FP 108257-59 (FEIS description of the No Action Alternative,

14    which contains none of the rationale for the 21-Inch Rule).

15         The Service's repeated justification for abandoning the 21-Inch Rule is the

16    "need to move toward more historic range of variability to improve forest

17    resilience." DSJ at 5; *see id.* at 2, 4, 6, 7. 26, 27 (similar). But nowhere does the

18    Service explain why this need required the abandonment of the 21-Inch Rule or other

19    elements of the 1995 "Eastside Screens" amendment—which the Service concedes

20    "required a historical range of variability analysis." DSJ at 4. Indeed, the Eastside

21    Screens Report *agrees* with the need to "restore eastside forests and landscapes," but

22    since old-growth trees occupy only a fraction of their historic range, contends that

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1    "these techniques do not justify further logging of existing old growth." Eastside

2    Screens Report at 11; *see also* PSJ at 14-15 (past Service projects have encompassed

3    same goals within constraints of 21-Inch Rule). Although the Service agrees that

4    "[l]ate forest structure on the Colville is imperiled" (DSJ at 21), it provides no

5    explanation as to why the solution is to *weaken* protections for old-growth trees.

6         The Service's insistence on the need for "resiliency" and to restore the

7    "historical range of variability" do not explain its decision to abandon the 21-Inch

8    Rule. The repetition of catch phrases does not suffice to meet the APA's requirement

9    of a "reasoned explanation" for this change in policy, rendering this decision

10   arbitrary and capricious. *See Ctr. for Biological Diversity*, 900 F.3d at 1067-68.

11                  2. <u>Service Does Not Evaluate Adverse Effects on Viability</u>

12        While proclaiming the importance of the "flexibility" imparted by the Old-

13   Growth Guideline, the Service violated both NEPA and NFMA by ignoring the risk

14   that this flexibility poses to species diversity. Just as the Service failed to consider

15   the rationale that prompted the institution of the 21-Inch Rule, it also neglected to

16   evaluate the adverse impact of replacing that clear rule protecting all large, old trees

17   with a guideline containing several exceptions. *See* PSJ at 20-21; FP 109776-77.

18        Defendants assert that the Old-Growth Guideline "still protects late structure,"

19   and declare, without support, that "'more flexibility' does not mean "'unlimited

20   flexibility.'" DSJ at 6 (source of internal quotations unspecified). But although the

21   Service frequently claims that the exceptions to the Old-Growth Guideline will only

22   be used in "limited circumstances" (DSJ at 6), the potential reach of the exceptions

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

is quite broad. For example, one exception allows trees over 21" DBH to be removed to "meet, promote or maintain desired conditions for structural stages." FP 109777. But the relationship of each project to these desired conditions will vary, so although the conditions are meant to apply forest-wide, the degree to which large trees will be cut to meet them will not be determined until the project level. *See* FP 109904-05 (explaining relationship of projects to "desired conditions").

Although the 2019 Plan FEIS does not engage in any explicit analysis of how often the exceptions to the Old-Growth Guidelines will be invoked, it suggests that the Service understands they will have substantial impact. For example, the FEIS estimates that Alternative P will open 63% of the Forest to logging and generate 62 MMBF a year—substantially more than all the alternatives that retain the 21-Inch Rule, which would open between 12% and 52% of the Forest to logging and produce between 14 and 41 MMBF each year. PSJ at 11; FP 108237-40, 108313-14. In other documents, the Service is frank that the new guideline "specifies a number of scenarios where large trees…may be harvested," thus "allowing adequate management flexibility to respond to emerging resource issues." FP 113689; FP 107839-40 (discussing how new guideline will allow the Service to "better integrate old forest conservation goals with other land management objectives.").

However, nowhere does the FEIS elaborate on the extent of this "flexibility." It does not estimate how often it expects the Service or contracted logging companies to employ the exceptions to the guideline, who will decide when the exceptions are applicable, or estimate how many of the Forest's small population of large, old trees

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1    may be cut down as a result. Although the Service provides estimates of how much

2    late-structure forest will exist under each alternative after 100 years, these estimates

3    incorporate optimistic assumptions that the Plan's management approach will result

4    in more resilient forest landscapes and reduce the loss of old-growth habitat to severe

5    fires. FP 103212 (Wildlife Report, indicating that this "key assumption" is built into

6    modeling for the "landscape restoration approach" under Alternative P). However,

7    elsewhere in the record, the Service concedes that it can only speculate that its

8    approach "may" alter landscape-scale fire behavior. *See* FP 103223 (Wildlife

9    Report); 108750 (FEIS); *see also* FP 107840 (objection response, noting that the

10   approach "may result in more resilient landscapes"). And the Service does not

11   estimate the amount of late-structure forest that might be lost in the immediate future

12   through use of the exceptions to the Old-Growth Guideline, during which time the

13   "landscape restoration approach" will result in little to no decrease in the risk of

14   severe fire. FP 108376-77 ("differences in management prescribed are not sufficient

15   to change [the Fire Regime Condition Class] in the 20-year time period").

16        The Service likewise fails to analyze the potential impact of the new guideline

17   on the viability of old-growth dependent species. In ignoring this risk, the Service

18   dismisses warnings from the Eastside Screens Report, as well as numerous more

19   recent studies on which the Service purports to rely. *See, e.g.*, Eastside Screens

20   Report at 201 ("Continued logging in unprotected areas could reduce [late-

21   structure/old growth] to less than 10% of the region's total forest area and jeopardize

22   more species and ecological processes."); Thomas A. Spies, et al., *Climate change*

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

*adaptation strategies for federal forests of the Pacific Northwest, USA*, 25 LANDSCAPE ECOLOGY 1185, 1191 (2010) (managers "must take into account tradeoffs associated with silvicultural practices that reduce risk of high severity fire but eliminate habitat of species that use dense multistoried forests") (cited at FP 108687); Reed F. Noss, et al., *Managing fire-prone forests in the western United States,* 4(9) FRONT. ECOL. ENVIRON 481, 484 (2006) ("Retention of old live trees, large snags and large logs in restoration treatments is critical.") (cited at FP 108687).

The Service cannot simply dismiss these risks to species viability because it "seeks to promote forest structure types that mimic the historic range of variability to improve forest resiliency and combat the effects of climate change." DSJ at 27. These may be the Service's aspirations, but NEPA demands an analysis of the likelihood that these aspirations will be achieved, and at what cost. The Service thus misses the point by contending that Plaintiff's approach "prizes the number of large trees over other factors." DSJ at 27. In some circumstances, it may make sense to sacrifice some existing old-growth trees to reduce larger risks to late-structure forest. But the science also recognizes the value of the individual mature trees that once dominated eastern Washington forests, but are now few and far between. *See* William Gaines, et al., Short-Term Effects of Thinning and Burning Restoration Treatments on Avian Community Composition Density, and Nest Survival in the Eastern Cascades Dry Forests, Washington, 56(1) FOREST SCIENCE 88, 97 (2010) ("[L]arge trees (and snags) in dry forests provide important habitat for foraging and nesting and are a key component in maintaining or restoring the viability of focal

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

avian species.") (cited at FP 108687); Jerry F. Franklin and K. Norman Johnson, *A Restoration Framework for Federal Forests in the Pacific Northwest,* 110(8) JOURNAL OF FORESTRY 429, 433 (2012) ("[The] characteristic features of old trees (often including their larger size) make them structural cornerstones in forests, contributing to ecosystem services, such as wildlife habitat, resistance to fire and drought, and genetic reservoirs, and require centuries to replace.") (cited at FP 108687, 108319, 108323, 108331, 108345).

Plaintiff likewise recognizes the irreplaceable value of old trees. The degree to which they should be protected is a difficult and controversial decision, and before the Service makes it easier to log old-growth trees, the law requires it to engage in reasoned deliberation about the costs and benefits of that change. NEPA's "hard look" obligation "should involve a discussion of adverse impacts that does not improperly minimize negative side effects." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (internal citation omitted); *see* 40 C.F.R. § 1508.8 (requiring agencies to disclose and analyze potential environmental impacts, including "those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be 'beneficial."). Defendants violate NEPA by focusing on the benefits of the new guideline's "flexibility," while failing to assess the adverse effects of that flexibility.

3. Service's Conclusions in Selecting Alternative P are Contradicted by Evidence in the Record

The Service's analysis of the impacts of competing alternatives is fatally flawed because its conclusions (1) are contradicted by the evidence of the record,

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

(2) are based on a subjective evaluation that conflates a number of factors unrelated to the impact of lifting the 21-Inch Rule, (3) assume the realization of the Service's aspirational objectives related to landscape resiliency; and (4) fail to analyze the risks associated with the abandonment of the 21-Inch Rule. *See discussion* in PSJ at 14-15, 18-21. Rather than explaining or resolving any of these gaps and contradictions, the Opposition merely repeats the Service's unfounded conclusions.

First, the Opposition fails to explain the evidence in the record that contradicts the Service's conclusions. In the Wildlife section of the FEIS, and the separate Wildlife Report, the Service establishes the "key indicators" of effects on old growth surrogate species as the "amount, location and spatial configuration of old-forest habitats." FP 108678, 103214. The FEIS concludes that the No Action alternative, which would continue the 21-Inch Rule, provides the most late-structure habitat. FP 108317. Meanwhile, Appendix C to the Wildlife Report models the specific habitat for the four species that the Service uses as surrogates for old-growth habitat. FP 103356-58. It finds that the No Action alternative provides the most or second-most habitat at both the 20-year and 50-year mark for three out of four old-growth surrogate species—the northern goshawk, pileated woodpecker, and American marten. *Id.* Meanwhile, Appendix C shows that Alternative P would provide more habitat than the No Action alternative for only the white-headed woodpecker, while it would be the worst of the six alternatives for the northern goshawk. *Id.*

The Opposition does not explain or resolve this contradiction, but instead introduces a new factor that the Wildlife Report did not consider. Quoting from the

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

Forest Vegetation section of the FEIS, the Opposition asserts that the Service found Alternative P "more beneficial" because it results in the "'highest percentage of total late forest structure in late open, which is expected to result in increased resilience of late forest habitats.'" DSJ at 27 (quoting FP 108323). The conclusion that more late-open structure would be "more beneficial" is a post hoc characterization that is not made in the FEIS—and the conclusion about open late forest structure is not mentioned in the Wildlife section of the FEIS or in the Wildlife Report. FP 108323. The Opposition does not explain why this single indicator should be the overriding factor for analyzing the impact on the diversity of old-growth dependent wildlife. Moreover, this conclusion is also not supported by the record, which shows that *all* the Plan alternatives would lead to conditions within the historical range of variability for late-open structure in the Forest's dominant vegetation type (Douglas-fir dry), suggesting that they would be almost equally "resilient." *See* Table 28 at FP 108309 (comparing modeled forest structure at 100 years for each alternative).

Second, the Service disregards contradictory findings in the Wildlife Report regarding the projected habitat for individual old-growth surrogate species, in favor of a subjective evaluation that concludes that Alternative P would produce a "high" contribution to viability for all old-growth surrogate species combined, while the No Action alternative would make a "low" contribution. FP 108680 (Table 183 of the FEIS). The Service lists a number of factors it considered in reaching these conclusions, but does not reveal the methodology by which it weighed them. *See* FP 108679. In addition, Table 183 reflects consideration of many factors that are

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

unrelated to the 21-Inch Rule, including how each alternative addressed roads, domestic grazing, new recovery plans, critical habitat, and conservation strategies. *Id.* The Service reflects a similar lack of methodology in arriving at the subjective conclusions about the viability of old-growth dependent species that are reflected in Table 14 of Appendix B of the Wildlife Report. *See* 108687. This table assigns a letter grade for how each alternative will contribute to the viability of specific surrogate species in the short term (less than 20 years) and the long term (more than 50 years). FP 103354. Once again, the Service does not explain the methodology for these scores, which also appear to disregard Appendix C's measure of habitat produced for each old-growth species. *Id.;* FP 103356-57.

Third, the conclusions reflected in both Table 14 of the Wildlife Report and Table 183 of the FEIS incorporate the Service's unfounded assumptions about how each alternative would address climate change by restoring landscape resistance and resiliency, even though such impacts are aspirational and uncertain. *See* FP 108679 (factors for Table 183), FP 103326 (factors for Table 14, including the fact that Alternative P "may" alter landscape scale fire behavior).

Fourth, the Service's description of the factors accounted for in Tables 14 and 183 does not include any estimation of the risk to old-growth trees and late-forest habitat from the exceptions to the Old-Growth Guideline FP 108679, 103326. Without even considering the risk to old-growth trees or their dependent species, the Service simply concludes in the Social Resources section of the FEIS that "The desired conditions for late forest structure under the proposed action would

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

ameliorate social concerns related to loss of large-diameter trees." FP 108841. The Service's analysis "improperly minimize[s] negative side effects" by considering the speculative, beneficial aspects of Alternative P (a *possible* contribution to landscape resiliency in the long term), without weighing the likelihood that the exceptions in the Old-Growth Guideline would lead to immediate, adverse effects to old-growth trees and dependent species. *See N. Alaska Env't Ctr.*, 457 F.3d at 975.[6]

### 4. Service Violated NEPA By Failing to Acknowledge and Respond to Substantive Comments and Objections

In addition to its independent duty to weigh the original rationale for the 21-Inch Rule and the potential adverse impacts of its change in policy, NEPA imposes an additional responsibility for the Service to respond to "all responsible opposing views at appropriate points in Draft and Final documents." 40 C.F.R. § 1502.9 (cited in DSJ at 28). The Service clearly failed to meet this responsibility in regard to the comments and objections related to the decision to rescind the 21-Inch Rule.

In its objections, NEWFC raised concerns, supported by scientific research, that the Service failed to evaluate or consider the following issues:

---

[6] The Opposition did not respond to Plaintiff's assertion that it lacked sufficient information about the quantity and quality of old-growth habitat to serve as a proxy for species viability. PSJ at 17-18 (discussing the Regional Forester's instruction to the Service to explain how its approach meets requirement to evaluate alternatives in "terms of both amount and quality of habitat and of animal population trends"). Instead of a meaningful response, the Service produced a memo that merely referenced the inadequate analysis contained in the Wildlife Report. FP 108143-44.

COMBINED OPPOSITION AND REPLY - 23

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

- The rationale for a bright-line rule protecting wide-diameter trees, as articulated in the Eastside Screens Report (AR 05572-73), as well as subsequent scientific studies showing the 21-Inch Rule was still necessary (AR 005570-74).

- That old-growth forests and individual large diameter trees are irreplaceable, provide a "disproportionately high ecological value as wildlife habitat" and are the "ecological backbone of dry and mesic forests." AR 05570-72, 00574.

- The Service had produced "absolutely no scientific support" for its decision to abandon the 21-Inch Rule. AR 05573-74.

- Old-growth trees had already been reduced to dangerously low levels, resulting in severe, ongoing population declines in dependent species. AR05574.

- A failure to preserve the 21-Inch Rule or institute equivalent standards and guidelines to protect old-growth habitat would violate the Service's responsibility under NFMA to maintain species diversity. AR 05574.

Defendants assert that they explored these issues and considered the sources cited in comment letters, but the record proves the contrary. DSJ at 27-28. The Service failed to consider the Eastside Screens Report and is still resisting its inclusion in the record. As discussed above, the Service did not point to any place in the record where it discussed the rationale of that report or other scientific studies emphasizing the need to continue stringent protections for both old-growth trees and late-stage habitat. The Service not only refused to consider that the elimination of the 21-Inch Rule might jeopardize species viability—the FEIS does not even assess the risks to old growth of the decision to abandon that rule.

NEPA regulations require an EIS to discuss "any responsible opposing view [and] indicate the agency's response to the issues raised." *Id.* § 1502.9(c). However, the Service reduced the thoughtful and well-supported comments and objections on

COMBINED OPPOSITION AND REPLY - 24

1    this topic to a couple of meaningless phrases in the Forest Vegetation section—and

2    did not mention them at all in the section on Wildlife viability. *See* FP 109250-51

3    (indicating the Service received comments that indicated "the final plan revision

4    documents should include direction that addresses the need to develop large

5    diameter trees" and asked for "[p]rotection for large trees and any existing old

6    growth"); FP 109280-92 (wildlife comment section, containing no reference to

7    viability concerns). In responding to these comments, the Service merely reiterated

8    the inadequate discussion of the topic contained in the earlier version of the FEIS.

9    *See* FP 109249-57 (entire comment section on Forest Vegetation).

10    Because the submitted "evidence and opinions directly challenge the scientific

11    basis upon which the Final EIS rests and which is central to it," the Service was

12    required to "disclose and respond to such viewpoints" in the FEIS. *See Ctr. for*

13    *Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167-68 (9th Cir. 2003).

14    By failing to seriously consider these comments or articulate a meaningful response,

15    the FEIS fell far short of NEPA's requirement to "respond explicitly and directly to

16    conflicting views." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1172-73

17    (9th Cir. 2006); *see also California v. Block*, 690 F.2d 753, 770-71 (9th Cir. 1982)

18    ("NEPA requires responsible opposing viewpoints to be included in the final EIS.").

19    **II.    Sanpoil Project Violates NEPA, NFMA, and the APA**

20    *A.  Service Fails to Analyze Any Meaningful Cumulative Impacts*

21    Plaintiff asks the Court to grant summary judgment on its First Claim, finding

22    the Service violated NEPA by failing to take a "hard look" at the impacts of the

COMBINED OPPOSITION AND REPLY - 25

1    Sanpoil Project, and on its Third Claim, finding an EIS was required to examine the

2    environmental impacts of the Project. *See* Complaint at ¶¶ 169-176; 181-185.

3        Within the 10 years prior to approval of the Sanpoil Project, the Service

4    approved six other timber projects in areas either adjacent or in close proximity to

5    the Sanpoil Project area, which authorized more than 90,000 acres of treatments, in

6    addition to planning for two more projects in the immediate area over the next two

7    years, which will encompass an additional 90,000 acres. PSJ at 25-26 (detailing

8    projects); Attachment A (map of projects). However, the Service protests that NEPA

9    does not require it to "catalogue" all these projects when assessing the cumulative

10   impact of the Sanpoil Project, but that it may "aggregate" the cumulative effects of

11   those projects into an "environmental baseline." DSJ at 39 (quoting *Cascadia*

12   *Wildlands v. BIA*, 801 F.3d 1105, 1111 (9th Cir. 2015)).

13       But the Service neither "catalogued" nor "aggregated" the cumulative impacts

14   of these past logging projects. Instead, the record demonstrates that it violated NEPA

15   by failing to consider the impacts of those projects in any meaningful way. *See*

16   *Cascadia Wildlands*, 801 F. 3d at 1112 (whether an agency discusses each past

17   project individually or "aggregates" them, the courts' role is to "ensure that the

18   agency takes a 'hard look' at the cumulative environmental consequences of the

19   proposed project and provides a clear explanation of its analysis to enable informed

20   public comment on the project and possible alternatives").

21       Although the Service lists 14 different specialist reports that purportedly add

22   to the EA's consideration of cumulative impacts, it does not cite to a single one that

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1  contains any meaningful analysis of the cumulative impact of the Sanpoil Project

2  and any of these past and future timber projects. DSJ at 37-40. The Opposition's

3  lone claim that the Service considered the impact of any of these projects is a citation

4  to a cursory mention of the Sherman Pass Project in Table 12 of the Biological

5  Assessment (AR5537-38, cited in DSJ at 41)—which is nearly identical to, but

6  slightly less detailed than, Table 15 in the Environmental Assessment (AR 06066-

7  67) (cited at PSJ at 27). Nor does the Service point to any place in the record where

8  it "aggregated" the cumulative impacts of these past projects. *See, e.g.* AR 06064-

9  66 (Table 14 in the EA, summarily aggregating a few small private commercial

10  harvests in the Project area and timber projects by the Confederated Tribes of the

11  Colville Reservation, but failing to do the same for any Service timber projects).

12  Indeed, while the Service contends that Plaintiff "fails to even acknowledge,

13  much less address the record, including the various specialist reports" (DSJ at 3),[7] it

14  fails to cite to *a single* specialist report containing a sufficient cumulative effects

15  analysis. For example, although the Service claims the record contains a "robust

16  analysis" of the cumulative impacts on recreation, neither of its supporting citations

17  reference this supposedly vigorous discussion. *See* DSJ at 38 (citing to AR 06067-

18  68 (Table 15 of the EA), which lists three projects under "Recreation &

19  Transportation" and contains four conclusory sentences on their "predicted or

20

21  _____

   [7] Contrary to this repeated claim, Plaintiff cites frequently to relevant Project

22  documents other than the EA, including the BE (PSJ at 27-31), BA (*id.* at 3), and

   Additional Terrestrial Wildlife Report (*id.* at 30-31).

COMBINED OPPOSITION AND REPLY - 27

1    ongoing effects) and AR 05250 (the Recreation Report, which purports to have

2    considered the actions "provided in the Specialist Support Package in tables 10 and

3    11," a document to which the Service does not cite and which does not appear to be

4    in the record or the public Project materials). This cursory treatment is clearly

5    inadequate under NEPA—especially when contrasted with the EA for the adjacent

6    Sherman Pass project, which indicated it would combine with Sanpoil and two other

7    projects to produce a "decline in the level of natural and undeveloped environment,

8    outstanding opportunities for solitude, and primitive and unconfined recreation."

9    PSJ at 27 (referencing AR 03603).

10                    *B. Service Fails to Analyze Impact on Diversity Mandate*

11           The Opposition similarly fails to identify any analysis in the record showing

12    the Service adequately considered the Project's impact on several wildlife species.

13                              1. <u>Gray Wolves</u>

14           The Service points to no analysis of the Project's impact on gray wolves that

15    Plaintiff failed to consider, or which constitutes a sufficient analysis of cumulative

16    impacts. It misunderstands the point of Plaintiff's citation to the 2018 cumulative

17    effects report on gray wolves. *See* DSJ at 40; PSJ at 28 (mistakenly citing to FP

18    102064 rather than FP 102065). The point of this citation (among others) was not to

19    claim that the Service came to a different *conclusion* in 2018 about whether the plan

20    would adversely affect the gray wolf, but to observe that its 2018 analysis correctly

21    recognized that timber harvest, fuels reduction, and grazing adversely impact wolf

22    habitat. But the Sanpoil EA includes only two sentence fragments about the Project's

COMBINED OPPOSITION AND REPLY - 28

1    impact on wolves—neither of which analyze these factors. *Compare* FP 102065

2    (2018 analysis) to AR 06046 (EA) and AR 06308-09 (BE analysis).

3        The Service similarly misinterprets the significance of the fact that the Sanpoil

4    Project will "add 10,585 capable acres" to the Quartz grazing allotment, thus

5    increasing the "amount of transitory range available for livestock use." AR 05491

6    (Range Report); AR 06054 (EA). The point is not that this change will add more

7    *cattle* to the allotment (although it might prompt the Service to permit such an

8    increase), but that it will allow cattle to access more of the allotment—thus creating

9    "better livestock distribution across the landscape," including "increased upland

10   forage." AR 05491. If cattle are roaming into additional areas of the allotment, the

11   likelihood increases that will overlap with core wolf areas like dens and rendezvous

12   sites and come into conflict with wolves. *See* FP 102261-70 (state recovery plan).

13   As Plaintiff indicated in its comments, this conflict is the "number one contributor"

14   to lethal removal of wolves. NEPA required the Service to consider this factor in its

15   assessment of the impact the Project would have on wolves. Finally, the Service

16   defends its instructions in the wolf and wolverine analysis to "[r]efer to grizzly bear

17   cumulative effects" (AR 06044, AR 06046), with the explanation that both grizzly

18   bears and wolves eat ungulates. DSJ at 41 n. 7. The Service's refusal to recognize

19   the differences between these three species, even when challenged, merely

20   reinforces the gaps in its analysis of how the Sanpoil Project will impact each.

21       2. Wolverine

22       The Opposition's analysis of the Project's impacts on wolverine merely

COMBINED OPPOSITION AND REPLY - 29

1    reiterates the unfounded conclusions in the Sanpoil EA, BA, and BE. DSJ at 41-42.

2    It does not address Plaintiff's principal concerns: (1) although the Service identifies

3    the cumulative effects area for the wolverine to encompass the entire Kettle Range

4    south of the Canadian border, it does not consider the impact of any other Service

5    timber projects implemented or planned for this region, including the eight identified

6    by Plaintiff (AR 05531, referencing AR 05535-36) and (2) it nonsensically instructs

7    the reader to refer to the section on grizzly bears for information on impacts to

8    wolverine foraging and seclusion habitat, again without regard to the differences

9    between the species (AR 05530-31).

10                      3.  Sensitive Bat Species

11        The Service misunderstands Plaintiff's challenge to its analysis of the

12   Project's impacts on sensitive bat species. Plaintiff does not contend that "the agency

13   cannot act without a complete census of where bats live." DSJ at 42. Rather, Plaintiff

14   questions how the Service can ensure that Project activities will be removed from

15   "'known' bat roost sites," when it concedes that it does not have sufficient

16   knowledge about these sites to map bat habitat. PSJ at 30-31 (citing Table 1 at AR

17   06259-60). The fact that little brown bat roosts in areas including "rock crevices,

18   tree cavities, and underneath the loose bark of snags and stumps" (Table 8 at AR

19   6299) and that the Townsend's big-eared bat roosts in "caves, rock crevices, and old

20   growth trees" (id.) is hardly reassuring, since those conditions are likely to be found

21   throughout Project areas designated for logging. The Service's treatment of these

22   sensitive bat species is also far from the "conservative approach" that it claims to

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1    take. DSJ at 40. To the contrary, its conclusion that the Project is not likely to lead

2    to a loss of viability for these species is dependent on the ability of the Service (and

3    its contractors) to avoid bat roosting sites that the Service is unable to locate.

4                    4. Sensitive Bird and Invertebrate Species

5        As to the Project's effects on the goshawk, the Service says only that "that

6    analysis is in the Forest Service's Biological Evaluation." DSJ at 43; *see discussion*

7    at PSJ at 31. But like the EA, the Sanpoil BE does only a cursory analysis of the

8    Project's cumulative impacts on the goshawk, once again based on the woefully

9    incomplete list of projects in Tables 13 and 14. AR 06305; AR 06317-22. Although

10   the Service concedes that the cumulative effects area for the goshawk is the entire

11   Forest (AR 06305) and that commercial logging has the greatest potential to reduce

12   goshawk nesting and foraging habitat (AR 06304), its cumulative effects analysis

13   does not include meaningful consideration of any other Service logging projects.

14   Because the Service has not specified the degree to which the Project will use the

15   exceptions in the Old-Growth Guideline, the Service also cannot estimate the degree

16   to which the Project will impact the goshawk, an old-growth dependent species.

17   Even so, it does estimate that the Project will reduce potential goshawk habitat by

18   nearly 5,000 acres, or 17% of the habitat in the Project area. AR 06304. In the

19   absence of a meaningful analysis of the degree to which other Service timber projects

20   have decreased goshawk habitat Forest-wide, the Service cannot reasonably

21   conclude such a dramatic reduction will not lead to a loss of viability. AR 06305.

22       Similarly, the Service dismisses Plaintiff's challenge to its analysis of impacts

COMBINED OPPOSITION AND REPLY - 31

on sensitive invertebrates, including the Western bumblebee, by responding that this analysis is in the BE. DSJ at 43. But the BE actually contains *less* information about impacts to sensitive invertebrates than the EA. *Compare* AR 06311 (BE) to AR 06046 (EA). Neither looks at the cumulative impacts from any other Forest logging project, and neither contains any specific analysis of impacts to the bumblebee, a sensitive species that is currently in alarming decline. *See discussion* at PSJ in 32.

### C. Service Fails to Analyze Site-Specific Impact of Sanpoil Project

The Sanpoil Project illustrates the degree to which the exceptions to the Old-Growth Guideline could become a blank check to cut down old-growth trees, while the analysis of the impact on species viability is postponed from the plan level to the project level, and then from the project level to the implementation process—most likely never to happen. The Sanpoil EA does not specify the degree to which the Service will allow the removal of trees over 21" DBH to meet desired conditions, because it is crafted to "give the Forest Service latitude to craft implementing prescriptions to suit on-the-ground conditions." DSJ at 33. Neither does the Sanpoil EA indicate where old-growth trees might be cut to "control or limit a disease or insect infestation," an exception that could apply to vast areas, or to "reinforce, facilitate, or improve effectiveness of fuel reduction in wildland-urban interfaces." *See* FP 109776-77 (listing exceptions). Such details are not contained in the vague and speculative descriptions of the planned treatments for different Project areas, nor in the virtually unreadable maps the Service supplied. *See* PSJ at 34-38.

The Service insists that it does not need consider which trees the Project will

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

cut down when analyzing potential impacts, pointing to cases that it asserts give it the freedom to "select treatment units based on changing on-the-ground conditions." DSJ at 32 (citing *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019). But what *WildEarth Guardians* actually says is that "[s]ometimes" the Service must specify site-specific detail at the project planning stage, but that it "depends on the circumstances." *WildEarth Guardians*, 920 F.3d at 1257.

When the locations of specific actions are consequential to the analysis of environmental effects, the locations must be identified. *See N.M. v. BLM*, 565 F.3d 683, 706 (10th Cir. 2009). Large, old trees are rare and irreplaceable, and each one has a potentially significant ecological value. Because it has not released prescriptions that establish where and to what degree loggers will use the exceptions to the Old-Growth Guidelines, the Service has not described the treatments with sufficiently specificity to analyze the environmental impacts. Without this information, the Project's impact to old-growth trees and their dependent species is unknowable. As the Service indicates in its internal guidance on compliance with NEPA: "If the Agency does not know where or when an activity will occur or if it will occur at all then the effects of that action cannot be meaningfully evaluated." *See* U.S. Forest Service, FOREST SERVICE HANDBOOK, FSH 1909.15.01(1).

### D. Service Was Required to Develop EIS on Sanpoil Project

The Service faults Plaintiff for its "one paragraph attempt" to challenge the Sanpoil FONSI. *See* DSJ at 45; *but see* PSJ at 38-40 (4-paragraph challenge to the FONSI). But the argument that the Service should have completed an EIS on the

1    Sanpoil Project need not be lengthy, because the relevant "context and intensity"

2    factors are co-extensive with the other issues addressed in Plaintiff's Motion for

3    Summary Judgment. *See Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869-70 (9th Cir.

4    2020) (listing factors identified in the NEPA regulations which impact whether an

5    EIS is required) (citing40 C.F.R. § 1508.27(b)). In particular, three of these factors

6    demonstrate the existence of "substantial questions" about whether the Sanpoil

7    Project "may cause significant degradation of some human environmental factor."

8    *Bark*, 958 F.3d at 870. An EIS is thus required. *Id.*

9        First, Plaintiff has shown the Project is closely related to other Service logging

10   Projects, which, when combined, are likely to have a cumulatively significant

11   impact, although none has been examined through an EIS. *See Bark*, 958 F.3d at

12   870. These projects include six other timber projects authorized within the 10 years

13   prior to approval of the Sanpoil Project, and two more planned within the following

14   two years. PSJ at 25-26 (detailing projects); Attachment A (map of projects); *see*

15   *also* Supp AR 01292-95 (detailing the Forest's vegetation management schedule

16   between 2021 and 2025). Under NEPA, this significance factor exists if it is

17   "reasonable to anticipate" that multiple projects will have a cumulatively significant

18   environmental impact—preventing agencies from avoiding a finding of significance

19   by breaking a project down into small component parts. *Bark*, 958 F.3d at 870 (citing

20   40 C.F.R. § 1508.27(b)). As in *Bark*, plaintiff has demonstrated there is "nothing in

21   the EA that could constitute 'quantified or detailed information' about the

22   cumulative effects of the project," and as a result, this lack of analysis "creates

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1   substantial questions about whether the action will have a cumulatively significant

2   environmental impact." *See Bark*, 958 F.3d at 873 (internal citation omitted).

3       Second, Plaintiff has shown the Project's impacts are "highly uncertain" and

4   involve "unique or unknown risks." *See Bark*, 958 F.3d at 870. Although the Service

5   claims that Plaintiff's argument about uncertainty rests only on "conclusory

6   parenthetical statements of significance" (DSJ at 46) they are actually implicated

7   throughout the Plaintiff's briefing. These uncertainties include the unevaluated

8   impact connected with the exceptions to the Old-Growth Guideline, the uncertainties

9   created by the Service's refusal to develop prescriptions detailing how the Sanpoil

10  Project will implement those provisions, and the unknown risk associated with the

11  Service's failure to analyze the direct and cumulative impacts of the Project.

12      Finally, Plaintiff has shown that the Project's impacts to the environment are

13  highly controversial. *Bark*, 958 F.3d at 869-70. "A project is 'highly controversial'

14  if there is a 'substantial dispute [about] the size, nature, or effect'" of the action." *Id.*

15  at 971 (internal citation omitted). Plaintiff has raised substantial disputes about the

16  Project's implementation of the new Old-Growth Guideline and its impact on a

17  number of wildlife species, through commentary and studies that implicate the

18  decades-old controversy about the management of old growth trees.

19                              **CONCLUSION**

20      Based on the foregoing, Plaintiff asks the Court to grant summary judgment

21  on the First, Third, and Fifth Claims of its Complaint, and invalidate, vacate, and

22  remand the Service's decisions to approve the 2019 Plan the Sanpoil Project.

ANIMAL & EARTH ADVOCATES, PLLC
2226 EASTLAKE AVE E #101
SEATTLE, WA 98102
206.601.8476  FAX: 206.456.5191

1

ANIMAL & EARTH ADVOCATES, PLLC

2

3     */s/ Claire Loebs Davis*
      Claire Loebs Davis

4     2226 Eastlake Ave E #101
      Tel: (206) 601-8476

5     claire@animalearthlaw.com

6     *Attorney for Plaintiffs*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

COMBINED OPPOSITION AND REPLY - 36

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/EMF system, which will send notification of this filing to all counsel of record.


*/s/ Claire Loebs Davis*
Claire Loebs Davis