TODD KIM
Assistant Attorney General
PAUL G. FREEBORNE
TYLER M. ALEXANDER
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Freeborne Tel: (202) 532-5271
Freeborne Fax: (202) 305-0506
Alexander Tel: (202) 305-0238
Alexander Fax: (202) 305-0506
paul.freeborne@usdoj.gov
tyler.alexander@usdoj.gov

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KETTLE RANGE CONSERVATION GROUP,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. FOREST SERVICE; GLENN CASAMASSA, Pacific Northwest Regional Forester, U.S. Forest Service; RODNEY SMOLDON, Forest Supervisor, Colville National Forest; TRAVIS FLETCHER, District Ranger, Republic Ranger District, U.S. Forest Service.<br>*Federal Defendants*. | Case No. 2:21-cv-00161<br><br>**FEDERAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**February 9, 2023**<br>**With Oral Argument: 1:30 p.m.** |

Federal Defendants' Reply Brief in Support of Summary Judgment

# **TABLE OF CONTENTS**

**INTRODUCTION**.................................................................................................1

**ARGUMENT** ....................................................................................................2

    I.    Plaintiff's Forest Plan Challenge is Not Ripe for Review. ..................2

    II.    Plaintiff's Forest Plan Challenge was also Waived. ............................5

    III.    Plaintiff's Forest Plan Challenge also Fails on its Merits....................6

        A.    The Colville National Forest Plan's Whole Landscape Approach is Based on the Best Available Science. ...................9

        B.    The 2019 Forest Plan Protects Late Structure and Wildlife by Promoting Resilient Landscapes...........................................11

        C.    The Forest Service Responded to Comments. ...........................17

    IV.    Plaintiff's Challenge to the Sanpoil Project also Fails......................18

        A.    The Forest Service Disclosed the Project's Treatments. ..........18

        B.    The Service Assessed the Project's Cumulative Effects. .........19

        C.    The FONSI was not Arbitrary or Capricious............................24

CONCLUSION ..................................................................................................25

1

2

# **TABLE OF AUTHORITIES**

3  Cases

*All. for the Wild Rockies v. Marten*,
4    789 F. App'x 583 (9th Cir. 2020)...............................................................1

5  *Anderson v. Evans*,
    371 F.3d 475 (9th Cir. 2004)...................................................................24

6  *Bark v. U.S. Forest Serv.*,
    958 F.3d 865 (9th Cir. 2020).....................................................................25

7
   *Cascadia Wildlands v. Bureau of Indians Affs.*
8    801 F.3d 1105 (9th Cir. 2015)........................................................ 19, 21

9  *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ...........................................................................15

10 *Ecology Ctr. v. Castaneda*,
    574 F.3d 652 (9th Cir. 2009).....................................................................11

11 *Forest Guardians v. U.S. Forest Serv.*,
    329 F.3d 1089 (9th Cir. 2003)..................................................................14

12
   *Idaho Wool Growers Ass'n v. Vilsack*,
13   816 F.3d 1095 (9th Cir. 2016)..................................................................16

   *In re Big Thorne Project*,
14   857 F.3d 968 (9th Cir. 2017) ..................................................................13

15 *Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008)....................................................................14

16 *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*,
    615 F.3d 1122 (9th Cir. 2010)..................................................................10

17
   *Marsh v. Oregon Natural Res. Council*,
18   490 U.S. 360 (1989) ................................................................................24

19 *Nat. Res. Def. Council v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005)......................................................................8

20 *Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002)....................................................................24

*Native Ecosystems Council v. Lannom,*
   598 F. Supp. 3d 957 (D. Mont. 2022) ...................................................5

*Native Ecosystems Council v. Marten,*
   No. CV 17-47-M-DLC-JCL, 2018 WL 3630132 (D. Mont. July 31, 2018).........1

*Native Ecosystems Council v. Weldon,*
   697 F.3d 1043 (9th Cir. 2012)................................................... 8, 16

*Navickas v. Conroy,*
   575 F. App'x 758 (9th Cir. 2014)...........................................................18

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
   402 F.3d 846 (9th Cir. 2005) ...............................................................23

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
   523 U.S. 726 (1998) ......................................................................2, 3

*Pit River Tribe v. U.S. Forest Serv.,*
   615 F.3d 1069 (9th Cir. 2010).................................................................8

*Sierra Forest Legacy v. Sherman,*
   646 F.3d 1161 (9th Cir. 2011)...............................................................17

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ................................................................................5

*Thomas v. Anchorage Equal Rts. Comm'n,*
   220 F.3d 1134 (9th Cir. 2000) ................................................................4

*Wild Fish Conservancy v. Nat'l Park Serv.,*
   687 F. App'x 554 (9th Cir. 2017)..........................................................24

*Wild v. Connaughton,*
   662 F. App'x 511 (9th Cir. 2016)..........................................................10

*Wilderness Soc'y v. Thomas,*
   188 F.3d 1130 (9th Cir. 1999)......................................................... 2, 3, 4

*Wilderness Soc'y, Inc. v. Rey,*
   622 F.3d 1251 (9th Cir. 2010).................................................................5

Statutes
16 U.S.C. § 529.........................................................................................7

Regulations
36 C.F.R. § 220.4(f) ...............................................................................19

36 C.F.R. §§ 218.1-218.16..........................................................................5

**INTRODUCTION**

The Forest Service is entitled to summary judgment on the First, Third, and Fifth Claims in the Amended Complaint ("FAC") that Plaintiff pursues.[1] Plaintiff's Forest Plan challenge (Claim Five) is not ripe for judicial review and was waived, and so is not properly before the Court. Even if considered, the record shows that the Colville National Forest Plan is based on the best available science, promotes a diversity of species, and fulfills the Forest Service's multiple-use mandate. The Forest Service only approved the Forest Plan after significant public input and after considering a reasonable range of alternatives. In short, the Forest Service's decision to approve the Colville National Forest Plan complied with the law.

The Forest Service is also entitled to summary judgment on Plaintiff's challenges to the Forest Service's authorization of the Sanpoil Project and Finding of No Significant Impact ("FONSI") under National Environmental Policy Act ("NEPA"). The Forest Service took the requisite "hard look" under NEPA in the Environmental Assessment ("EA") and in the Project record. And based upon its

---

[1] Plaintiff's motion makes no argument regarding the Second, Fourth or Sixth Claims. *See* Pl's Opp. & Reply, ECF No. 57, at 2-3 ("Opp.") at 2 n.2. These claims are thus waived. *See Native Ecosystems Council v. Marten*, No. CV 17-47-M-DLC-JCL, 2018 WL 3630132, at *7 (D. Mont. July 31, 2018) ("The Ninth Circuit has stated time and time again, that a litigant waives an issue by failing to address it in its opening brief"), aff'd in part and remanded sub nom. *All. for the Wild Rockies v. Marten*, 789 F. App'x 583 (9th Cir. 2020)

Page 1 - Federal Defendants' Reply Brief in Support of Summary Judgment

thorough review, the Service determined that the Project's potential environmental impact did not warrant the preparation of an Environmental Impact Statement ("EIS"). Plaintiff's arguments to the contrary seek to impose obligations on the Service that NEPA does not require, and ignores the Administrative Record that fully supports the Forest Service's Decision Notice for the Project and FONSI.

## **ARGUMENT**

### I.    **Plaintiff's Forest Plan Challenge is Not Ripe for Review**.

Plaintiff's Forest Plan challenge is not ripe for judicial review because the Sanpoil Project does not authorize the harvesting of trees over 21 inches in diameter at breast height ("DBH") under the Plan provision that Plaintiff alleges violates the National Forest Management Act ("NFMA"). Defs. Mot. & Memo in Support of Summ. J. ("DSJ"), ECF No. 54 at 17-18. Bare alleged procedural harm does not make Plaintiff's Forest Plan challenge ripe for adjudication. Opp. at 2-3.

"[A] generic challenge to a forest plan untethered to any specific or concrete harm [is] not ripe for adjudication, and therefore not justiciable." *Wilderness Soc'y v. Thomas*, 188 F.3d 1130, 1133 (9th Cir. 1999) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)). For a forest plan challenge to be ripe for review, there must be either: [1] "imminent concrete injuries that would be caused by the forest plan, such as 'allowing motorcycles into a bird-watching area' or 'clos[ing] a specific area to off-road vehicles,' *id*. (quoting *Ohio Forestry*, 523 U.S.

at 738-39); or [2] a site-specific injury causally related to an alleged defect in the forest plan." *Id*. at 1133-34. Neither of these circumstances is present here.

The 2019 Forest Plan itself does not directly approve the cutting of trees. Because a forest plan "does not command anyone to do anything or to refrain from doing anything," it "does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut." *Ohio Forestry*, 523 U.S. at 733.

Plaintiff's Forest Plan challenge can thus only proceed, if at all, under the second circumstance outlined in *Ohio Forestry*—with "the focus" of a site-specific project that implicates the Plan provisions to which Plaintiff's object. *Id*. at 736. But the Sanpoil Project does not authorize the harvesting of trees over 21 inches DBH, and thus does not implicate the Forest Plan provisions allowing harvest of trees over 21 inches DBH. AR_06019; AR_06897. Plaintiff's speculation that the Forest Service will harvest trees over 21 inches DBH under one of the limited exceptions does not make its challenge ripe. Opp. at 4. Courts evaluate "tangible" harm, not the "theoretical" harm that Plaintiff posits. *Thomas*, 188 F.3d at 1133.

Plaintiff's claim, moreover, that the EA and the Project's Silviculture Report authorize the cutting of trees over 21 inches DBH is not correct. Opp. at 4. The Forest Service's incorporation of the Forest Plan's guidelines in the EA and Silviculture Report does not somehow suggest that the Forest Service intends to

Page 3 - Federal Defendants' Reply Brief in Support of Summary Judgment

cut trees over 21 inches DBH. *Id*. The Forest Service incorporated the Plan guidelines to show compliance with the Plan, not to suggest that it will exceed the Project's 21 inch DBH cutting limit. *See* AR_06047, 06049, 06050 (EA referencing Plan guidelines); AR_06893-97 (Project's Silviculture Report) (same).

Nor will the treatments in "late open" and "late closed" structures harvest 3,590 acres of trees greater than 21 inches DBH. Opp. at 4. The Project's treatments are spread throughout the 3,590 acre area. And about 60 percent of the treatments in late structures are non-commercial treatments, including underburning and small tree thinning (as with ladder fuel reduction and precommercial thinning) that do not even involve the cutting of trees larger than 10 inches DBH. *See e.g.* AR_06885 (Silviculture Report noting underburning treatments in "late open" and "late closed" structures); AR_06884 (Silviculture Report); AR_06019-22 (EA showing descriptions of vegetation treatments).

Finally, Plaintiff's attempt to invoke standing principles does not make its Forest Plan challenge ripe for review. Opp. at 4-5. As an initial matter, unlike standing, "ripeness is peculiarly a question of timing . . . designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (citation and quotation omitted). And, in any event, Plaintiff's alleged procedural harm, alone, also does not confer standing upon it or

its alleged members. A "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Like ripeness, standing requires "[a] concrete and particular project [that is] connected to the procedural loss" and that causes a site-specific injury. *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010) (citing *Summers*). Thus, standing and ripeness principles are aligned in divesting the Court of subject-matter jurisdiction to hear Plaintiff's challenge to the Forest Plan.

## II.    Plaintiff's Forest Plan Challenge was also Waived.

Even if Plaintiff's Forest Plan challenge were ripe, however, it was waived because Plaintiff failed to raise its concern about the harvesting of trees over 21 inches in either its objections to the 2019 Forest Plan or the Sanpoil Project. DSJ at 19-20; s*ee* FP_106561-575 (Objections to Forest Plan); FP_106591-98 (Objections to Plan); AR_06376-94 (Objections to Project). That Plaintiff participated in the public comment process does not satisfy its obligation to file an objection. Opp. at 5-8. Forest Service regulations require that a party file an "objection" during the pre-decisional objection process, not just submit public comments. 36 C.F.R. §§ 218.1-218.16; *Native Ecosystems Council v. Lannom*, 598 F. Supp. 3d 957, 965 (D. Mont. 2022), *amended*, No. CV-21-22-M-DWW, 2022 WL 2309011 (D. Mont. Apr. 25, 2022) (a party must submit an "'objection,' not just comments").

Nor does Northeast Washington Forest Coalition's ("NEWFC's") objection to the Forest Plan permit Plaintiff to now contest Forest Plan provisions related to the harvest of trees over 21 inches in diameter. Opp. at 5-8. Even if Plaintiff were deemed to be a party to NEWFC's objections, NEWFC advocated for a Forest Plan that would protect trees over 21 inches, *except* when necessary to address public safety or to address insect and disease infestation. FP_106874. Plaintiff cannot now seek to challenge the Forest Plan by claiming that the exceptions in the Forest Plan adopted somehow trigger a violation of law. Plaintiff is bound by those objections.

### III.    Plaintiff's Forest Plan Challenge also Fails on its Merits.

The Court should thus refuse to consider Plaintiff's Forest Plan challenge. But even if Plaintiff's Forest Plan challenge could proceed to the merits, it fails.

The revisions to the Colville National Forest Plan are comprehensive. FP_107062-326 (summarizing changes from 1988 Forest Plan to 2019 Forest Plan). The Forest Service did not move away from the Eastside Screens in a vacuum, but as part of a decision to use a "whole landscape" approach that seeks to move the forest toward more resilient stand composition. *See* FP_113574 (discussing how the 2019 Forest Plan responds to recent science on climate change); FP_108381-82 ("[s]eventy-three percent of the landscape exhibits a departure from natural fire process"); FP_108318 (explaining the risk of tree mortality in late closed stands due to competition, insects, disease, and fire). The

1  Plan is based on the best available science, promotes diversity of species, and

2  manages the Colville National Forest for multiple use and sustained yield.

3  16 U.S.C. § 529; *id.* § 1604(e)(1).

4      Plaintiff argues the new forest plan represents a "significant agency policy

5  change" subject to heightened scrutiny under *FCC v. Fox*. Opp. at 12. But there is

6  no policy change; the Forest Service developed the new forest plan because NFMA

7  requires a new plan that reflects the current science. FP_108212-15; *see also*

8  FP_113573 (explaining the obligation to manage the forest "based on law, science,

9  and input from tribes, local government, State and Federal agencies, and the

10  public."). It is the *science* that has changed. *See, e.g.*, FP_019396-98 ("research on

11  the ecology and history of pine and mixed-conifer forest (Hessburg et al. 1999a,

12  2005; Merschel 2012; Perry et al. 2004) indicates that many shade-tolerant trees

13  more than 51 cm (20 in) in diameter were established after fire exclusion in the

14  early 1900s. Consequently, restoration guided by size alone will not remove all of

15  the individuals of species and ages of trees that are products of the altered

16  disturbance regimes of these forests."); FP_101673-706 (management under the

17  old forest plan and discussion of changes since 1988 plan was adopted).

18      Plaintiff also continues to mention—though never briefs—NFMA's

19  substantive diversity requirement, arguing that "[t]he Service . . . is required to

20  show that its Plan satisfies the Diversity Mandate[.]" Opp. at 10. This turns the

1  presumption of administrative regularity on its head. *Pit River Tribe v. U.S. Forest*

2  *Serv.*, 615 F.3d 1069, 1082 (9th Cir. 2010) ("we presume that agencies will follow

3  the law."). Plaintiff bears the burden, not the Forest Service. And Plaintiff has still

4  never explained how the Plan violates NFMA's diversity requirements. Opp. at 8-

5  9. Plaintiff's bare allegation does not carry its burden.

6      In any event, as documented in the record, the 2019 Forest Plan promotes a

7  diversity of species, moves forest conditions toward the historic range of

8  variability, and provides for multiple use. FP_113572-73. This satisfies NFMA.

9  *See Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 801 (9th Cir. 2005)

10  (NFMA requires balancing "timber harvesting, recreational use, and environmental

11  preservation."). The Forest Service only approved the 2019 Forest Plan after

12  considering the environmental effects of a reasonable range of alternatives, which

13  included substantial public involvement. That satisfies NEPA. *See Native*

14  *Ecosystems Council v. Weldon*, 697 F.3d 1043, 1052 (9th Cir. 2012) (courts uphold

15  agency decisions unless "the record plainly demonstrates that [the agency] made a

16  clear error in judgment in concluding that a project meets the requirements' of

17  NEPA." (citation omitted)). This Court should grant summary judgment on

18  Plaintiff's Forest Plan claim for Federal Defendants.

19

20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

### A.    The Colville National Forest Plan's Whole Landscape Approach is Based on the Best Available Science.

Federal Defendant's opening brief explained how uncharacteristic wildfire—driven by climate change—is the leading threat to late structure on the Colville. *See, e.g.*, FP_103327-28 (discussing impacts of climate change on the Forest); FP_113574 (same); FP_108373-75 (same). Modern science supports a "dynamic-landscape restoration approach . . . to create landscapes more resilient to climate change and to maintain [late structure] habitats." FP_103327. The 2019 Forest Plan implements that approach, providing the Forest Service with flexibility to carry out treatments across the forest. FP_108306.

Plaintiff argues that the Forest Service failed to adequately explain the change from the Eastside Screens' bright-line rule. Opp. at 12-13. The record thoroughly documents the need to move away from the Eastside Screens. *See, e.g.*, FP_019396 (the Eastside Screens was "designed to be replaced by more in-depth landscape evaluations"); FP_019398 ("The diameter limits were intended as a crude and conservative filter to avoid harvesting old trees, pending the development of more precise definitions and tools."); FP_107839-40 (discussing decision to move from the Eastside Screens to a whole landscape approach); FP_108368-91 (same); FP_108319 (citing recent studies supporting moving landscapes toward heterogeneity); FP_099811, FP099820, FP099829 (discussing what forest management would look like if Eastside Screens remained in effect).

Plaintiff may disagree with the decision, but the Forest Service's scientific

conclusions receive the highest level of judicial deference. *Wild v. Connaughton*,

662 F. App'x 511, 515 (9th Cir. 2016) ("given the Forest Service's technical

expertise regarding the effect of climate change on national forests, we must give

these explanations our 'highest' deference." (citing *League of Wilderness Defs.*

*Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir.

2010))).

Plaintiff also continues to rely on Henjum et al. 1994—which Plaintiff calls

the "Eastside Screens Report"—a thirty-year old paper that Plaintiff never

submitted and so falls outside the record. Opp. at 13-15. Henjum et al. 1994 only

discusses lands west of the Columbia River, Henjum et al. 1994 at 54, and was

written before the Forest Service adopted powerful analytic tools, like LiDAR-

derived forest structure classes for every acre of the Colville. *See* FP_108300.

More, the paper only provided "interim recommendations . . . until a long-term

plan for protection and restoration can be formulated." Henjum et al. 1994 at 4.

The 2019 Forest Plan is that long-term plan, based on modern forest science.

Nor does the 2019 Forest Plan "weaken" protections for larger trees. Opp. at

15. The Plan requires projects to move stands toward the historic range of

variability and severely limits cutting large trees. FP_ 109777. The result will be a

forest that provides late structure habitat that is "resilient and compatible with

1    maintaining disturbance processes such as wildland fire, insects, and diseases."

2    FP_109769; *accord* FP_108751 (treatments are needed to reduce the loss of late

3    structure to uncharacteristic wildfire). The Forest Service's decision is based on the

4    best available science, satisfying both NEPA and NFMA. *See Ecology Ctr. v.*

5    *Castaneda*, 574 F.3d 652, 659-60 (9th Cir. 2009) (standard in Forest Plan is not

6    arbitrary and capricious where it is based on the best available science).

7           **B.    The 2019 Forest Plan Protects Late Structure and Wildlife**
               **by Promoting Resilient Landscapes**.

8

9           Federal Defendant's opening brief explained how the Forest Service

10   evaluated how each alternative would impact wildlife. DSJ at 22-26.[2] This process

11   is detailed in Suring et al. (2011) and Gaines et al. (2017) and summarized in the

12   wildlife report. FP_103212-16; *see also* FP_113600 (ROD discussing method for

13   meeting NFMA's diversity and viability requirements). At the end, the Forest

14   Service concluded that the selected alternative promotes a diversity of species by

15   _____

16   [2] In summary, the Forest Service: (1) identified species of concern; (2) described
     those species habitats and important ecological factors; (3) organized those species
17   into groups; (4) selected a surrogate species from each group; (5) developed
     models to assess impacts on surrogate species; (6) applied those models to evaluate
18   current and historical conditions; (7) developed conservation strategies; and (8)
     designed monitoring and adaptive management tools. FP103206; *see also*
19   FP_103212-16 (summarizing species impacts of each alternative). In applying that
     process, the Forest Service identified 209 species of concern, which were
20   aggregated into groups based on habitat associations. *Id.* From those groups, 26
     surrogate species were selected. *Id.* The species are listed in Table 2 at FP_103207.

Page 11 - Federal Defendants' Reply Brief in Support of Summary Judgment

providing for resilient landscapes, conserving late structure across the entire forest, and by reducing man-made disturbances. FP_103328.

Plaintiff argues that the large tree guideline's exceptions could be abused to the detriment of wildlife.[3] Opp. at 15-16. But the Forest Plan requires that projects advance overall forest plan goals and standards. For work in late structure, a proposed project must meet one or more of the four conditions described under the desired conditions header of Appendix A. FP_109904-05. Projects that qualify under one or more of those conditions are then still subject to the limitations in the large tree guideline (among others). *See* FP_113582 (discussing historical range of variability desired condition). The large tree guideline cannot be used as an end run around the desired conditions, which promote late structure.

Taking the Sanpoil project as an example, the Project preserves large ponderosa pine and western larch, only cutting Douglas-fir and other coniferous species with an average tree DBH of 10.8 inches and none over 20 inches DBH[4] unless necessary to ensure safety during operations. AR_06897. This moves the

---

[3] Plaintiff's speculative concerns about how the Forest Plan will be implemented at the project level, Opp. at 16, underscores why this claim is unripe in the absence of project that approves the felling of large trees. *See supra* sec. I.

[4] For trees over 21" DBH, the Sanpoil Project would be the same under the 2019 Forest Plan or the Eastside Screens.  And because the Large Tree Management Guideline applies to trees 20" and over, the Sanpoil Project is actually more protective of large trees than what would have been required under the Eastside Screens.

forest toward resilient stand compositions, as reflected in the desired conditions in

the Forest Plan. FP_109769 (desired conditions). Plaintiff argues that the 2019

Forest Plan "open[s] 63% of the Forest to logging," suggesting the emphasis is on

timber production. Opp. at 16. But as the Sanpoil Project shows, the Forest Service

is prioritizing needed restoration treatments (particularly in the wildland-urban

interface). *See* FP_108378. Of course, the Sanpoil Project also produces timber.

*See* AR_06008 (purpose and need includes supporting jobs in the tri-county area).

This balances the Forest Service's competing responsibilities to manage the Forest

for ecological benefit and for timber production—the essence of multiple use. *See*

*In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017) ("The NFMA gives

the Forest Service flexibility because the Service has many different goals—

conservation, commerce, recreation, and so on." (citation omitted)).

Plaintiff complains that the Forest Service's predictions "incorporate

optimistic assumptions that the Plan's management approach will result in more

resilient forest landscapes and reduce the loss of old-growth habitat." Opp. at 16-

17. Though predictions about the future are inherently uncertain, the best available

science shows that moving stands toward the historic range of variability will

result in more resilient stand composition, benefiting late structure. *See, e.g.*,

FP_108376-77 ("fire severity is generally reduced across the landscape in areas

where any type of treatment (mechanical and/or fire) is implemented"); FP_108687

1    ("Landscape-scale restoration has been identified as an adaptive strategy to create

2    landscapes more resilient to climate change (Spies et al. 2010, Gaines et al. 2012)

3    and to maintain late-successional and old forest habitat structure (Lawler et al.

4    2014)."); FP_102703 ("this alternative provides for the retention and restoration of

5    late-successional forest structure, which is currently lacking in most forested

6    landscapes (Hessburg et al. 1999)."). That is all that is required. *See The Lands*

7    *Council v. McNair*, 537 F.3d 981, 992 (9th Cir. 2008) ("We have approved forest

8    plans when they are 'based on the current state of scientific knowledge.'" (citation

9    omitted)); *see also id.* at 993 (courts are at their "'most deferential' when the

10   agency is 'making predictions, within its [area of] special expertise, at the frontiers

11   of science." (quoting *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099

12   (9th Cir. 2003)) (alterations in original)); *id.* at 1001 ("to require the Forest Service

13   to affirmatively present every uncertainty in its EIS would be an onerous

14   requirement, given that experts in every scientific field routinely disagree").

15       Plaintiff also argues that the Forest Service overlooked potential losses of

16   late structure during the long shift toward resiliency. Opp. at 17-18. Trees do take

17   time to grow and moving the forest toward the historic range of variability is a

18   long-term goal in a long-term planning document. *But see* FP_108377 (some

19   vegetation improvement within the 20-year period). The FEIS did not ignore this,

20

Page 14 - Federal Defendants' Reply Brief in Support of Summary Judgment

but modeled trends at 20, 50, and 100 years for each alternative. FP_103212; FP103354-56.

Plaintiff continues to press its belief that the No Action Alternative best protects late structure habitat. Opp. at 20. While the no action alternative may provide the largest number of total acres of late structure, it would isolate wildlife in islands of habitat of between 75 and 300 acres in size, *see* FP_103326-28, and leave the forest more vulnerable to uncharacteristic wildfire, threatening late structure and resulting in an overall less resilient landscape. *See, e.g.*, FP_113582; FP_108318; FP_108331-32; FP 108373-74; FP_109740. This is why the Forest Service concluded that the selected alternative resulted in better viability outcomes, as discussed at FP_103354. *See also* FP_103212-15 (summarizing the impacts to wildlife under each alternative).

Plaintiff also dismisses the Forest Service's explanation of how more late open stand composition will lessen fire risk as "post hoc." Opp. at 21. First, the explanation is not post hoc, but a contemporaneous explanation in the record. *See* FP_108332; *see also* FP_099825; *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). Second, Plaintiff misses the point of the quoted language: increased resilience. The selected alternative best promotes a resilient forest and moves the forest toward the historic range of variability. *See, e.g.*, FP_108302 (explaining how Douglas-fir stands have departed from historical

conditions and require treatments); FP_108310 (explaining that the selected

alternative results in the historic range of variability sooner than other alternatives

and more late open structure for Douglas fir); FP_108330-31 (same); *compare*

FP_108317 (no action alternative results in more departed Douglas-fir vegetation

type than other alternatives); FP_108318 (all alternatives move stands toward the

historic range of variability but "the no action alternative gets there more slowly

and produces less than the proposed action and alternative P").

Plaintiff disagrees with the Forest Service's analysis, calling it "subjective."

Opp. at 21. But "[t]he Forest Service is owed greater-than-average deference as it

relates to its choice of technical methodologies." *Idaho Wool Growers Ass'n v.

Vilsack*, 816 F.3d 1095, 1108 (9th Cir. 2016). The Forest Service evaluated

impacts on wildlife using a method based on the best available science, complying

with both NEPA and NFMA. In the end, the Forest Service concluded that the

selected alternative best protects wildlife habitat by promoting fire and disease

resiliency. This Court should defer to the reasoned decision of the expert agency.

*See Native Ecosystems Council*, 697 F.3d at 1051 ("A court generally must be 'at

its most deferential' when reviewing scientific judgments and technical analyses

within the agency's expertise under NEPA." (citation omitted)).

1

## C.    The Forest Service Responded to Comments.

2      Plaintiff also repeats its argument that the Forest Service ignored comments,

3 specifically about Henjum et al. 1994 and objections to moving away from the

4 Eastside Screens. Opp. at 24-25. Again, Plaintiff did not submit Henjum et al.

5 1994, and so it falls outside the record.

6      As discussed above and in Federal Defendants' opening brief, the Forest

7 Service's decision to adopt a whole landscape approach was covered extensively in

8 the administrative process. *See also, e.g.*, FP_108190 (listing "Old forest (late

9 successional) management and timber production" as a significant issue in the

10 EIS); FP_108257 (discussing the Eastside Screens amendment); FP_109231-359

11 (summary of substantive comments). The Forest Service heard Plaintiff throughout

12 the process. *See* FP_08933738 (community meeting notes showing response to

13 questions about species viability method and large trees); FP_089341 (showing

14 Plaintiff as an attendee at that community meeting); FP_089879-90 (notes from

15 meeting between Forest Service and Northeast Washington Forestry Coalition).

16 NEPA requires nothing more. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161,

17 1183 (9th Cir. 2011) ("the SEIS dedicates over 120 pages to raising and

18 meaningfully responding to public critiques. That is all NEPA requires."). Claim

19 Five fails on the merits.

20

**IV.    Plaintiff's Challenge to the Sanpoil Project also Fails**.

Lastly, the Forest Service properly disclosed the treatments under the

Sanpoil Project, and assessed the Project's cumulative impacts (First Claim). The

Service also properly exercised its discretion in issuing the FONSI (Third Claim).

**A.    The Forest Service Disclosed the Project's Treatments**.

In full compliance with its NEPA obligations, the Forest Service explained

which "treatments will be applied in which areas and to what extent" in the Project

area. *Navickas v. Conroy*, 575 F. App'x 758, 750 (9th Cir. 2014). DSJ at 30-35.

Ignoring the record, Plaintiff persists in arguing that the Project's EA fails to

contain the requisite "site-specific detail" to assess the potential environmental

harm of the Project. Opp. at 32-33. But the EA both explains and defines the

Project's silvicultural and fuels treatments. AR_06019-22. The EA also explains

where the treatments will be applied and the extent of those treatments, including

unit-by-unit maps of where treatments will occur. AR_06023-25. While Plaintiff

may not be satisfied with anything short of a tree-by-tree prescriptions for the

Project, Opp. at 33, the Forest Service has "no [NEPA] obligation to identify the

specific trees that would be removed as part of the Project." *Navickas*, 575 F.

App'x at 760. The EA provides more than sufficient "site-specific" detail under

NEPA to assess the potential environmental impacts of the Sanpoil Project.

## B.    The Service Assessed the Project's Cumulative Effects.

The Forest Service also assessed the cumulative effects of the Project. DSJ

at 36-43. Plaintiff continues to claim that the Forest Service failed to take the

requisite "hard look" at the cumulative effect of past projects on recreation and

wildlife species because it did not catalogue such projects in the EA or specialists

reports. Opp. at 26. This claim fails.

"An EA is a 'concise public document' that 'briefly provide[s] sufficient

evidence and analysis for determining whether to prepare an EIS or a [FONSI]."

*Cascadia Wildlands v. Bureau of Indians Affs.*, 801 F.3d 1105, 1111 (9th Cir.

2015) (quoting 40 C.F.R. § 1508.9(a)). Agencies also have "discretion in deciding

how to organize and present information" in an EA. *Id*. at 1112 (internal citation

and quotation omitted). Thus, the Service "can take a 'hard look' at cumulative

impacts either by individually discussing a previously approved project, or

incorporating the expected impact of such projects into the environmental baseline

against which the incremental impact of a proposed project is measured." *Id*.

The Forest Service exercised that discretion here, assessing the Project's

cumulative effects by aggregating the impacts of past projects into the

environmental baseline. *See* AR_06061 (EA citing NEPA's implementing

regulations, 36 C.F.R. § 220.4(f)) (July 24, 2008), that do not mandate that an

agency list or analyze all past actions in its cumulative effects analysis). For

1   example, in assessing the Project's cumulative effect on recreation, the Forest

2   Service assessed the "relevant past, present, and reasonably foreseeable actions

3   found in Appendix A of the EA." AR_06235 (referencing AR_06061-68).

4       Although the Forest Service did not specifically identify all past projects

5   again in the Final Recreation Report for the Project, it exercised the discretion

6   NEPA affords it, and aggregated relevant past projects into the environmental

7   baseline in assessing the cumulative effects of the Project. Furthermore, the only

8   two relevant past, present and reasonably foreseeable future actions that

9   overlapped with the Sanpoil Project in "space and time" were "permitted grazing

10  and the construction of segments of the Pacific Northwest National Scenic Trail."

11  AR_06235. Neither of these actions, the Forest Service determined, would result in

12  effects that would further alter the "roadless values and features" under the 2001

13  Roadless Area Conservation Rule. AR_06235 (Final Recreation Report).

14      The Forest Service similarly complied with NEPA's obligations in assessing

15  the cumulative impact of the Project on wildlife species, including gray wolves,

16  wolverine, sensitive bat species, and sensitive bird and invertebrate species. Opp.

17  at 28-32. Contrary to Plaintiff's assertion, the agency fully considered the Forest

18  Plan risk factors for gray wolves for timber harvest, fuels reduction, and grazing.

19  *Id*. at 28-29 (referencing factors at FP_102065-66). Based on this analysis the

20  Forest Service concluded that the Project would not cumulatively impact the

foraging or seclusion habitat for gray wolves. AR_06046 (EA discussing impact); AR_06308-09 (discussing cumulative effect on foraging and seclusion habitat).

Plaintiff also maintains that the Project will change grazing management on the Quartz Mountain allotment in a manner that will result in the lethal removal of wolves. Opp. at 29. But this, too, is incorrect. The Forest Service's livestock management will be unaffected by the Project. The acres available for grazing will not change as a result of the Sanpoil Project. *See* FP_109551 (absent change in permitted livestock use, capability, and suitability analysis for a Project is not a decision to graze livestock on any specific area of land). Furthermore, the existing natural barriers, which act as pasture/allotment boundaries for grazing management, will also remain in place. AR 06218 (Range Report). The Project's design elements also ensure that fencing will be repaired should it be damaged during the Project's implementation. AR_06031 (EA, Project Design Element 8).

Plaintiff also persists in challenging the Forest Service's analysis for wolverine because the Service did not identify, by name, the past projects it considered in concluding that the Project would not cumulatively impact wolverine. Opp. at 29-30. Again, the Forest Service has the discretion to assess the cumulative effect of the Project by aggregating past projects into an environmental baseline; the Service need not identify those projects by name. *Cascadia*

1    *Wildlands*, 801 F.3d at 1112.[5] Further, the Service's wildlife cumulative effects

2    analysis defines the analysis area as the Kettle Range south of the Canadian border.

3    AR_06298 (Biological Evaluation ("BE")). The Forest Service's analysis also lists

4    the projects that it considered in its analysis that overlapped in time and space with

5    the Sanpoil Project. AR_06317-22 (Appendix A to BE). And based upon its

6    analysis of those projects, the Service concluded that the Project will not lead

7    towards federal listing of wolverine or loss of viability. AR_06298 (BE).

8        Plaintiff also maintains that the Forest Service cannot assess the cumulative

9    effect of the Project on sensitive bat species such as the little brown bat and

10    Townsend's big-eared bat without a site-specific map of bat habitat. Opp. at 30.

11    NEPA, however, does not require such definitive information. The little brown bat

12    and Townsend's big-eared bat hibernate and roost in structures such as mine adits.

13    AR_06260, AR_6299; AR_05879 (Special Uses Report). In addition, retention of

14    snags greater than 20 inches, as required by the Forest Plan, will protect little

15

16    [5] Plaintiff also continues to criticize the Forest Service's EA cross-references to the
grizzly bear analysis in its cumulative effects analysis for wolves and wolverines.
Opp. at 30. As explained in Federal Defendants' opening brief (DSJ at 41 n.7),
17    however, the Service did so because big game species such as grizzly bears,
wolves, and wolverine all prey on, and eat carcasses of, young ungulates. *See*
18    AR_2949 (noting that grizzly bears prey on young ungulates); FP_102065 (noting
effect that grazing of prey species has on the gray wolves' viability); AR_05448-
19    49 (noting that gray wolves prey on young ungulates); FP_102065 (noting effect
that grazing of prey species has on the gray wolves' viability); AR_06297 (noting
20    that wolverine share big game foraging habits as gray wolves).

Page 22 - Federal Defendants' Reply Brief in Support of Summary Judgment

brown bat day roost sites. AR_6299. Because there are no known mines to map, the Service determined that "[a] characterization of cumulative effects to [such] species" can reasonably be made at the project area scale" by assessing the assessed Project's impact on such known roost sites. AR_06046 (EA). The Service further determined that the proposed activity would not likely result in a trend toward Federal listing or loss of viability because "activities would either be far enough removed from known bat roost sites to have no effect on the bat species or would be timed to avoid periods that the sites would be occupied." *Id*. The Forest Service also determined that the snags retained under the Project provide day roost sites. AR_6310 (BE), AR_6264 (Wildlife Analysis Report). The Forest Service's analysis fully comports with NEPA. *See Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 868 (9th Cir. 2005) ("general statements about possible effects and some risk" when "more definitive information" is unavailable.).

Finally, Plaintiff asserts that the Forest Service's cumulative effects analysis for goshawk habitat and sensitive invertebrates, such as the Western bumblebee, are too cursory because neither analysis looks at the effect of projects in the area. Opp. at 31-32. In assessing the Project's impact on the goshawk population, however, the Forest Service's BE discusses the rationale for the viability determination. AR_06305 (concluding that reduction of foraging habitat will be offset by potential increase in availability of food resources, and potential

abandonment of nests is not expected because Forest Service follows Forest Plan guidelines), AR_ 06317-22 (tables identifying past actions and ongoing or reasonably foreseeable actions); AR_06064-68 (EA identifying same tables).

In assessing the cumulative effect of the Project on sensitive invertebrates, the Service concluded that the Project creates habitat that will offset the negative impacts of the Project. *See e.g.*, AR_06313 (Project will "open previously closed areas, which may favor host plants that create favorable nectaring conditions" for Western bumble bee and other sensitive butterflies in the Project area).

### C.    The FONSI was not Arbitrary or Capricious.

Finally, the Forest Service's FONSI determination was within its discretion to make. DSJ at 43-49. Under the APA standard of review, an agency's FONSI is subject to deference, *Wild Fish Conservancy v. Nat'l Park Serv.*, 687 F. App'x 554, 557 (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77), and "may be overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004) (quoting *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002)). Plaintiff offers nothing that would render the FONSI arbitrary and capricious under the APA's highly deferential standard of judicial review.

As discussed, the Project record shows that the Service fully analyzed the cumulative effects of the Project. Opp. at 34-35. There is also nothing that would

1    make the Project "uncertain" or "highly controversial" mandating an EIS. *Id*. at 35.

2    To be "uncertain," there must be scientific "evidence [that] raises substantial

3    questions about the Project's environmental impact." *Bark v. U.S. Forest Serv.*,

4    958 F.3d 865, 870 (9th Cir. 2020). Plaintiff presents no such evidence; it instead

5    relies on its argument that the Service's NEPA analysis must come after tree-by-

6    tree prescriptions, will have a cumulative impact wildlife species, and permits the

7    cutting of trees over 21 inches DBH. As discussed, all of these arguments fail.

8            To be "highly controversial," moreover, there must be "a substantial dispute

9    about the size, nature, or effect" of a Project "rather than the existence of

10   opposition to a use." *Bark*, 958 F.3d at 870 (internal citations omitted). Like

11   uncertainty, a "substantial dispute" must be based on "evidence" that "casts serious

12   doubt upon the reasonableness of [the] agency's conclusions." *Id*. (internal

13   quotation and citation omitted). Because "no scientifically backed information

14   [was] presented that disputes the lack of a significant impact to the quality of

15   human environment as disclosed in the Sanpoil Project EA," AR_06792, the Court

16   should also uphold the Project's Decision Notice and the Forest Service's FONSI.

## CONCLUSION

18           For these reasons, the Court should grant summary judgment to Federal

19   Defendants and dismiss this action with prejudice.

20

Page 25 - Federal Defendants' Reply Brief in Support of Summary Judgment

Dated:  January 24, 2023                    Respectfully submitted,

TODD KIM
Assistant Attorney General

*/s/ Paul G. Freeborne*
PAUL G. FREEBORNE
TYLER M. ALEXANDER
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Freeborne Tel: (202) 532-5271
Freeborne Fax: (202) 305-0506
Alexander Tel: (202) 305-0238
Alexander Fax: (202) 305-0506
paul.freeborne@usdoj.gov
tyler.alexander@usdoj.gov

*Counsel for Federal Defendants*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2023, I electronically filed and served the foregoing on all counsel of record *via* the CM/ECF system.

*/s/ Paul G. Freeborne*
*Attorney for Federal Defendants*